| -Fill in this information to identify the case: | |
|---|---|
| Debtor name | **IDC Enterprises, Inc.** |
| United States Bankruptcy Court for the: | DISTRICT OF IDAHO |
| Case number (if known) | 20-20081-TLM |

☐ Check if this is an amended filing

Official Form 425A

# Plan of Reorganization for Small Business Under Chapter 11        02/20

**IDC Enterprises, Inc.** 's Plan of Reorganization, Dated   May 26, 2020

**Background for Cases Filed Under Subchapter V**

 **A. Description and History of the Debtor's Business**

 The Debtor is an Idaho corporation, established in 2007.   The primary business of the Debtor is logging, which it has done for over 13 years.   The Debtor's principal is Jason Lunders.   Mr. Lunders lives in the Grangeville, Idaho, area, and the business is located there, on property owned by Mr. Lunders' grandmother.   The shop, equipment yard and outbuildings are all owned by Mrs. Lunders.   A list of Debtor's equipment is attached.

 Several years ago, Debtor contracted with an accounting firm in the area to handle not only its tax preparation but also its Quickbooks program.   Debtor believed they had done so.   He had a person in Grangeville who was supposed to handle the data entry to keep the Quickbooks entries up to date.   For reasons which are not known, this apparently was never finished properly, or at all.   Debtor has since learned that the books and records are in very poor shape, have not been updated for well over a year, and were substantially in error.   Debtor retained an accountant in Lewiston, Idaho, to prepare the tax returns which were required, but that firm only did tax returns and did not do 'forensic accounting' needed to properly prepare the necessary corrections.   Debtor has retained the services of a bookkeeper/accountant in Boise who has had bankruptcy experience in cases such as this where the books need to be 'rebuilt,' and she has undertaken that task.   Debtor believes that the budget and information which accompany this Plan are basically correct.

 The Debtor's business is seasonal.   Traditionally, its best months are September-November, inclusive.   The business shuts down its logging operation, usually, March till June.   Debtor does winter logging in December-February.   The roads in the logging country are usually close to impassable in March-May, so there is not as much logging ongoing.

 In 2018, Debtor was considering doing a substantial downsize of the business.   The Debtor was having problems with logging in its normal area. It started operating in another region, which had jobs to do, but the timber was not as readily marketable as the timber in the former area.   The sawmill in the new region was not keeping up with IDC's output of logs, which was interfering with IDC's commitments to other customers.

 **Viking Lumber and Bank of the Pacific**

 A friend of Mr. Lunders was working in Alaska cutting logs for Viking Lumber.   He referred IDC to Viking Lumber, an Alaska sawmill operation because Viking could not get a contractor who could pick up the logs being cut, get them to the roadways and load them on trucks for transport for processing.   Viking then called Mr. Lunders, requested IDC to meet with Viking and explore taking over the logging jobs for them.   Viking had several jobs ongoing of various sizes; one of them would have produced 12 million board feet per year for the next ten years.   IDC had sufficient equipment to do these size jobs but not sufficient funding.   IDC requested Viking to provide a credit line to move the needed equipment to Seattle (Viking would pay for moving the items from Seattle to Alaska), to complete the ongoing Idaho jobs, and to start work in Alaska.   Viking referred the matter to Viking's bank, which was Bank of the Pacific from Aberdeen, WA.

 IDC scheduled its equipment to be moved to Seattle by November to be loaded onto a charter barge.   Viking wanted IDC to start earlier, and said they had some equipment they could use to get started.   Mr. Lunders learned that the Viking equipment was in poor shape and not nearly sufficient for the jobs to do; too much time was being spent on repairs to the worn-out Viking equipment.   Viking insisted on greater production, but was advised that Debtor could not meet that level with current equipment.   Mr. Lunders found a Linkbelt 290 Loader and requested Viking to finance it and put it on the weekly barge from Seattle.   Viking, through Kirk Dahlstrom, called BOP; in fact, almost all of the BOP

financing deals were orchestrated by Kirk Dahlstrom in similar fashion.   Mr. Lunders told Dahlstrom that he could buy the loader with the credit line but wanted it fixed so that the equipment would be on a stand-alone loan to reimburse the line of credit.   BOP said that to buy this equipment, it would require another item of equipment pledged for this loan; Mr. Lunders agreed to do so.   Hence, the Linkbelt 290 and the Linkbelt 3400 were added as collateral to BOP.   At any rate, although the BOP loans were put in place, the loader ended up going with the rest of the IDC equipment on the charter barge.

IDC began work, and the first load of logs was shipped to Viking on October 5, 2018.   Debtor and Viking had a written contract for this work.   Debtor maintained a journal of all loads loaded and hauled to the mill.   IDC would load all of the trucks that Viking would send; Viking, to the contrary, started complaining that IDC was not producing sufficient number of loads.   Mr. Lunders reviewed all the records and determined that there were simply not enough trucks (Debtor was not performing the trucking; this was Viking's obligation).   This was an ongoing dispute for the duration of the Viking contract.   For the majority of the project, IDC would produce 10-12five loads per day, but Viking would send at the most two trucks per day.

IDC has never been paid for all of the logging that it did, nor was it allowed to complete its contract for the first year.   Debtors' prior counsel in Alaska computed the damages suffered by IDC due to the breaches of Viking Lumber at $673,725.   Debtor is filing an adversary proceeding against Viking to recoup those damages.

IDC is no longer working for Viking.   There are other mills in Alaska who are negotiating with IDC to work there in the future.   Viking has sent correspondence to Debtor to the effect that it considered Debtor's equipment 'abandoned,' which allegation, of course, is disputed.   Debtor will retrieve its equipment and return it to Idaho as soon as any jobs in Alaska which it may obtain are completed. Debtor has a quote to ship the equipment home via barge from Thorne Bay to Seattle, starting between July 5 and 15, for $52,000.00.   Debtor believes this is worth the cost due to the ability to use these items and the increased value of them in this region over the value in Alaska.

The claim of Bank of the Pacific (BOP) is disputed more as to the extent of its collateralization than as to the amount, although the amount due will be reviewed during this case.   The big controversy comes from BOP's claims that its security interest extends to **all** of Debtor's equipment, as the UCC-1 Financing Statement filed contained that description of the collateral.   However, Debtor disputes the validity of that document or that alleged agreement.   BOP only negotiated for a lien on **four items of equipment** which are more than sufficient in value to secure the loans.   Debtor has correspondence with BOP verifying that position, although BOP contests this assertion.   When the loan was ready to have documents signed and be funded, BOP sent a security agreement listing "all equipment."   Mr. Lunders crossed through that description, and reemphasized that the agreement was only for the items in question.   Debtor will either file an objection to claim or an adversary proceeding against BOP to get this matter before the Court and resolve it.   So far, however, BOP is taking a hard-line position on this point. The items which Debtor alleges were agreed upon for the loans are shown as such in the Liquidation Analysis attached.

**Future Business Plans.**   The logging industry in Debtor's area has been severely affected by the COVID-19 pandemic.   There are several logging companies in the Grangeville, Idaho, area, and none of them are currently working.   There is a shortage of lumber for construction, however; Debtor believes that the log market will necessarily improve due to the demand for lumber in various forms.

Debtor has a chipper, which reduces logs to chips, usable in the paper and chipboard industries.   It has not been an operational part of the business for the last two years, but the demand for chips is increasing and Debtor is contemplating resurrecting that area of the business.   Debtor has been able to obtain Forest Service contracts for fire-damaged timber.   Most mainstream chipping companies do not like that type of timber because the char ruins the chips for several paper products.   However, Debtor does have outlets for those type of chips, and will likely start the chipping operation this year.

Debtor currently has a logging job in Cascade, Idaho.   It has several orders for 'hop poles,' which it processes out of lodgepole pine for hop farmers.   There are currently four loads scheduled for delivery to customers in Yakima.   There are poles due to be delivered to a customer in Parma.   The market is relatively steady for that work.   The Cascade job has some "saw logs" (those suitable for cutting into lumber); the rest of the job is primarily the type of wood for hop poles.

Debtor also plans on retrieving its equipment from the Viking jobs and shipping it home or using it on other Alaska mill jobs.   As stated, there are job possibilities being negotiated.   IDC has also been approached about sawing cedar for fencing material; this is an item in current demand.   There is a sufficient availability of both red and yellow cedar for this area of the business.   For all of these reasons, Debtor has found it extremely difficult to predict a reliable 12-month operating budget; however, Debtor does have sufficient assets to sell if needed to pay the claims of the creditors in this case.

Debtor is continually bidding on various logging jobs.   In 2020, the season is far behind normal due to the virus shutdowns.   Debtor has noticed a change in the business environment.   Two years ago, IDC had 17 employees in various phases of logging.   Mr. Lunders is finding it harder to get good employees, because it cannot keep them employed year around as was possible in 2018 and before.   Formerly, the sawmills would put IDC or other loggers

onto jobs to keep the employees working.   IDC could, and did, have a better employee group than currently.   Since 2018, it seems that the logging jobs all go out for bid.   It is far harder to plan for the future than previously.   IDC has considered selling out some equipment and concentrating more on hauling or other aspects that would not take as much time, capital, or responsibility.   The Plan as proposed allows this flexibility.

**B.     Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to the Plan as Exhibit A.

**C.     Ability to make future plan payments and operate without further reorganization**

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business.   Debtor will continue to operate its business and proceed with logging jobs as they come in.   Debtor will also file the suit against Viking as described infra.   If these activities do not generate sufficient disposable income as provided in 11 USC §1191(d), Debtor will sell sufficient equipment to make the shortfall so that all creditors' plan payments will be made.   The Plan Proponent has provided projected financial information in the Liquidation Analysis.

The Plan Proponent's financial projections do not show that the Debtor will have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2)(A), because the Debtor's business income is so difficult to project   However, that is not mandatory for confirmation of the Plan so long as §1191(c)(2)(B) is met, with which this Plan complies.

The final Plan payment is expected to be paid on the fifth anniversary of the Effective Date.   The "Effective Date" is the 15th day after the entry of the Order Confirming Plan.   Should Debtor be successful in the anticipated litigation with Viking, Debtor does reserve the right to pay the Plan payments in advance and file report of the same.

Since Debtor is having a great deal of trouble producing a "solid" operating budget, the Plan feasibility is based on the value of the various assets it owns.   Those are shown in the liquidation analysis.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

### Article 1: Summary

This Plan of Reorganization (the *Plan*) under chapter 11 of the Bankruptcy Code (the *Code*) proposes to pay creditors of **IDC Enterprises, Inc.** (the *Debtor*) from sale of assets, cash flow from operations, and other future income, including the proceeds from the adversary proceeding against Viking Lumber.

This Plan provides for:     1--class of priority claims;

2--classes of secured claims;

1--class of non-priority unsecured claims; and

1--classes of equity security holders.

Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately 100 cents on the dollar. This Plan also provides for the payment of administrative and priority claims.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

### Article 2: Classification of Claims and Interests

2.01   **Class 1** .........................   All allowed claims entitled to priority under § 507(a) of the Code (except administrative expense claims under § 507(a)(2) and priority tax claims under § 507(a)(8)). This includes the IRS, the Idaho State Tax Commission, and the Alaska Department of Revenue if appropriate.

2.02   **Class 2A** .....................   The claim of Bank of the Pacific, to the extent allowed as a secured claim under § 506 of the Code.

Debtor **IDC Enterprises, Inc.** Case number (*if known*) **20-20081**
Name

| | | |
|---|---|---|
| | **Class 2B**……………………… | The claim of Amur Equipment Financing, to the extent allowed as a secured claim under §506 of the Code. |
| 2.03 | **Class 3** ......................... | All non-priority unsecured claims allowed under § 502 of the Code. |
| 2.04 | **Class 4** ......................... | Equity interests of the Debtor. (If the Debtor is an individual, change this heading to *The interests of the individual Debtor in property of the estate.*) |

### Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees

| | | |
|---|---|---|
| 3.01 | **Unclassified claims** | Under section § 1123(a)(1), administrative expense claims and priority tax claims are not in classes. |
| 3.02 | **Administrative expense claims** | Each holder of an administrative expense claim allowed under § 503 of the Code, will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.  At this juncture, the only such claims known or expected are those of Debtor's accountant and attorney. |
| 3.03 | **Priority tax claims** | Each holder of a priority tax claim will be paid after the claim is allowed.   Debtor does not understand the claim of the IRS.   To Debtor's knowledge, all tax returns are filed.   The only excise tax within Debtor's knowledge is fuel tax, but Debtor believes the same was paid.  Debtor shall file an objection to this Claim to determine the amount and classification thereof.  After allowance, all tax claims will be paid within 60 months of the date of the filing of the Petition.<br>With reference to the claims of the taxing authorities:<br>(A) If the debtor or the successor in interest fails to make any deposits of any currently accruing employment tax liability or fails to make payment of any tax within 30 days of the due date of such deposit or payment, or if the debtor or the successor in interest fails to file any required tax return with 30 days of the due date of such return, then the taxing authority may declare that the debtor is in default of the Plan. Failure to declare a default does not constitute a waiver of the right to declare that the successor in interest or debtor is in default.<br><br>(B) If the taxing authority declares the debtor or the successor in interest to be in default of the debtor's obligations under the Plan, then the entire pre-petition liability shall become due and payable within sixty days after written demand to the debtor or the successor in interest.<br><br>(C) If full payment is not made within 30 days of such demand, or other arrangement agreed in writing, then the taxing authorities may collect any unpaid liabilities through their administrative collection provisions. The debtors and all the debtor's property shall be liable for such unpaid liabilities as if no bankruptcy had occurred |
| 3.04 | **Statutory fees** | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan have been paid or will be paid on the effective date. |
| 3.05 | **Prospective quarterly fees** | All quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code |

### Article 4: Treatment of Claims and Interests Under the Plan

Debtor  **IDC Enterprises, Inc.**                                              Case number (*if known*)  **20-20081**
         Name

4.01 **Claims and interests shall be treated as follows under this Plan:**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - **Priority claims** excluding those in Article 3 | x Impaired | See above. Debtor knows of no other priority claims but needs to determine the IRS claim. All allowed tax claims shall be paid with interest at 5% per annum in annual installments within sixty months of the Petition date of this case. The amount of each annual payment is not yet determined and cannot be until the IRS claim is resolved. |
| Class 2A – **Secured claim of Bank of the Pacific** | x Impaired | The amount of the claim is $344,315.88. Debtor shall pay such claim, including interest at 6.325% per annum, in annual installments of $100,110 per year, with first payment due on the 15th day of December, 2021, and for four years thereafter until paid.   In the year 2020, the payment shall be no less than $22,000, payable on December 15, 2020.   The Debtor is paying basically 'interest only' for the first year so that it can retrieve the equipment from Alaska.   Should Debtor not have sufficient disposable income by the payment date, Debtor will sell sufficient equipment from its list shown herein to make the payment.   Debtor disputes that BOP has a secured interest in any equipment OTHER than that shown in the Liquidation Analysis, and will either file an Objection to Claim or an adversary proceeding to determine the nature, extent, and validity of BOP's lien rights.   BOP shall retain its lien rights as so determined by the Court until its claim is paid in full. |
| Class 2B—**Amur Equipment Finance** | x Impaired | The amount of the claim is $33,351.84. The Proof of Claim states an interest rate of 8.99% but no rate is specified in the loan documents attached to the Plan.   Debtor shall pay such claim, including interest at 6.325% per annum, in annual installments of $8,000 per year, with first payment due on the 15th day of December, 2020, and each year thereafter until paid. Amur shall retain its lien rights until its claim is paid in full. |
| **Class 3 – Non-priority unsecured creditors** | x Impaired | All unsecured claims shall be paid in five annual installments with interest thereon at 2% per annum, in annual installments of $17,000 per year until paid.   The same payment schedule shall be applied as to that of Amur. |
| Class 4 - **Equity security holders of the Debtor** | x Impaired | The only equity security holder is Jason Lunders.   He shall retain ownership of the stock of Debtor, as this is a 'full payment' plan. |

**Article 5: Allowance and Disallowance of Claims**

| 5.01 | **Disputed Claim** | A *disputed claim* is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: |
|---|---|---|
| | | (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or |
| | | (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated. |
| 5.02 | **Delay of distribution on a disputed claim** | No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order. |
| 5.03 | **Settlement of disputed claims** | The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. |

### Article 6: Provisions for Executory Contracts and Unexpired Leases

| 6.01 | **Assumed executory contracts and unexpired leases** | 1. The Debtor assumes, and if applicable assigns, the following executory contracts and unexpired leases as of the effective date: US FOREST SERVICE QUAGMIRE SALVAGE CONTRACT TS244509. |
|---|---|---|
| | | 2. Debtor also assumes the US FOREST SERVICE PENMAN DECKS CONTRACT, the final terms of which Debtor believes are being extended.   The matter is in dispute; Debtor has paid for the contract, but a dispute arose in 2018 as to what trees can be removed for logging roads.   Debtor does not know a starting date. |
| | | (b)   Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section 6.01(a) of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date. |
| | | A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 10 days after the date of the order confirming this Plan. |

### Article 7: Means for Implementation of the Plan

Jason Lunders will serve as the President and sole Director of Debtor.   The plan shall be paid by income generated from Debtor's logging operations, pursuit of the amount due to Debtor under the Viking contract, and the sale of equipment as necessary to fund the Plan and not essential to Debtor's ongoing operations.   Debtor shall further be entitled to move any and all equipment now in Alaska to Debtor's Idaho location.   Any sales of equipment shall be for what Debtor believes to be a fair market value, and the Trustee and all creditors shall be given notice thereof.

### Article 8: General Provision

| 8.01 | **Definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan. |
|---|---|---|
| | | . |

Debtor **IDC Enterprises, Inc.**                                                                          Case number (*if known*) **20-20081**
       Name

| | | |
|---|---|---|
| 8.02 | **Effective Date** | The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| 8.03 | **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |
| 8.04 | **Binding Effect:** | The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
| 8.05 | **Captions** | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |
| 8.06 | **Controlling Effect** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Idaho govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. |
| 8.07 | **Corporate Governance** | As Debtor is a corporation with but one shareholder, there are no provisions necessary under 11 USC 1123(a)(6).  Should the Debtor merge with another entity or dissolve, then the Trustee shall be given notice thereof and have input in those proceedings.  None are anticipated. |
| 8.08 | **Retention of Jurisdiction** | The court will retain jurisdiction under this Plan until this Plan has been fully consummated, including but not limited to the following purposes: |

    A.   Classification of the claim of any creditor and the re examination of the claims which have been allowed for the purposes of voting, and the determination of such objections as may be filed to the creditors' claims.   The failure by the Debtor to object or examine any claim for the purposes of voting shall not be deemed a waiver of the Debtor's right to object to allowance thereafter.

    B.   Determination of all core proceedings

    C. The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this Plan or order of confirmation as may be necessary to carry out the purposes and intent of this Plan.

    D.   The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code.

    E.   To enforce and interpret the terms and conditions of this Plan.

    F.   Entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor and to impose such limitations, restrictions, terms and conditions as this court may deem necessary.

    G.   Entry of all necessary orders, judgments and decrees in the adversary proceeding to be filed in this action as set forth in Article II.

    H.   Entry of an order concluding and terminating this case.

**Article 9: Discharge**

**Discharge as Debtor is a corporation under Subchapter V**
If the Debtor's Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

| Debtor | IDC Enterprises, Inc. | Case number (*if known*) 20-20081 |
|---|---|---|
| | Name | |

    (i) imposed by this Plan; or

    (ii) to the extent provided in § 1141(d)(6).

If the Debtor's Plan is confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

    (i) on which the last payment is due after the first 3 years of the plan, or as otherwise provided in § 1192;

    or

    (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

### Article 10: Other Provisions

1. **Modification:**   The Plan may be modified as provided by §1193.   The Debtor may propose amendments or modification at any time prior to confirmation, upon notice to creditors. After confirmation, the Debtor may propose amendments on approval of the Court, and prior to substantial confirmation of the Plan,

    (a) so long as it does not materially affect the creditors, to correct defects or reconcile inconsistencies, or

    (b) to carry out the purposes of the Plan, in case of change in circumstances of Debtor or its business

2. **Payments to Trustee:**   All payments due shall be paid to Trustee and remitted to creditors by Trustee pursuant to §1194

3. **Lien Retention:**   Secured creditors Amur Finance and BOP shall retain their liens as determined by the Court.   Debtor consents that BOP may retain its lien rights i**n:**

    - Two John Deere 2054 logging machines with Waratah HTH 662B attachments;
    - Kobelco 330 with Waratah felling head;
    - Kobelco 290 yarder with Yoder winches and gear;
    - Linkbelt 290 with attachments;
    - Linkbelt 3400 with attachments.

    These items were to be secured for BOP's loans.   Debtor does not consent to lien rights in "all equipment" as stated in this Plan.

Respectfully submitted,

| X /s/ Jason Lunders | **Jason Lunders** |
|---|---|
| [Signature of the Plan Proponent] | [Printed name] |

3

| X /s/ D. Blair Clark | **D. Blair Clark    ISB #1367** |
|---|---|
| [Signature of the Attorney for the Plan Proponent] | [Printed name] |

# IDC ENTERPRISES, INC.
## Liquidation Analysis and Creditors Listing

**ASSETS:**

**Equipment:**

| | |
|---|---|
| 1995 500T Valmet & Spare head | $45,000.00 |
| 1995 892 Valmet Forwarder | $25,000.00 |
| 1987 518 Skidder & Parts skidder | $25,000.00 |
| D7F Dozer w/4-way hydraulics & winch | $37,000.00 |
| 1990 425 Prentice Loader | $30,000.00 |
| 225 Catepillar loader w/Pierce carrier | $20,000.00 |
| 5220 Case Mower tractor | $12,500.00 |
| Gallion Road Grader | $10,000.00 |
| 12G Catepillar Grader | $30,000.00 |
| 1993 Catepillar 240 w/Denhorco Stroke declimber | $20,000.00 |
| 2003 Timbco 425D w/360 degree head hotsaw | $100,000.00 |
| 1995 Kobelco 200 Jewell front log loader (Claim 5) | $40,000.00 |
| 2007 2054 John Deere w/Waratah 622B (Claim 5) | $90,000.00 |
| 2009 2054 John Deere w/Waratah 622B (Claim 5) | $90,000.00 |
| 1974 General log & pole trailer | $15,000.00 |
| 1944 Fruehauf log & pole pipe trailer | $12,000.00 |
| 1995 Teton 5th Wheel Camper | $17,000.00 |
| 1956 Reliance log & pole trailer | $15,000.00 |
| 1984 Kenworth truck tractor w/flatbed | $20,000.00 |
| 1986 Kenworth short logger (bad motor) | $8,500.00 |
| 2001 Kenworth with lockers | $60,000.00 |
| 2005 Ford F350 Cab & chassis | $15,000.00 |
| 2001 Wabash 53' Van Trailer | $7,000.00 |
| 1994 Lincoln 3 axle log & pole trailer | $15,000.00 |
| 2001 Ford F350 Pickup w/shop box | $10,000.00 |
| 2003 Ford F450 Pickup w/crane & winch (in Alaska) | $20,000.00 |
| 2003 Dodge pickup with tanks | $15,000.00 |
| 1997 Ford F350 (body damage) | $5,000.00 |
| 1995 Ford F350 | $10,000.00 |

**CLAIMS:**

**Unsecured Claims:**

| | |
|---|---|
| Alaska Power and Telephone (no claim) | $174.61 |
| Andrews Properties (no claim) | $1,490.00 |
| Rad Mulching & Excavating (Claim 2) | $40,385.00 |
| Feenaughty Machinery (Claim 4) | $1,859.14 |
| Petro 49 (Claim 6) | $4,628.27 |
| Les Schwab (no claim) | $11,500.00 |
| Alaska National Insurance (no claim) | $4,513.00 |
| Diesel & Machine, Inc. (no claim) | $14,000.17 |

**Secured Claims:**

| | |
|---|---|
| Bank of the Pacific (Claim 5) | $344,315.58 |
| Amur Equipment Finance (Claim 7) | $33,351.84 |

**Priority Claims:**

| | |
|---|---|
| IRS (Claim 1) | $97,991.23 |
| Id. State Tax Comm. (Claim 3) | $100.40 |
| Alaska Dept Revenue (no claim) | $0.00 |
| **TOTAL CLAIMS:** | **$ 554,309.24** |

| | |
|---|---:|
| 2007 Kenworth truck & tractor w/log bunk | $60,000.00 |
| 1989 Peterbuilt 379 log truck w/Peerless trailer (in Alaska) | $20,000.00 |
| 1988 Log trailer | $7,500.00 |
| 1973 Peerless log trailer (in Alaska) | $7,500.00 |
| 1979 65/70 ton Detach Lowboy | $40,000.00 |
| 1991 Western Log dog trailer | $15,000.00 |
| 2004 Standard equipment trailer | $3,500.00 |
| 1974 GIND Container Chassis | $1,500.00 |
| 1975 GIND Container Chassis | $1,500.00 |
| 2006 Western Star Truck w/tractor | $65,000.00 |
| 2006 620C Tigercat Skidder | $600,000.00 |
| 2005 290 Kobelco Jewell loader (Claim 5) | $185,000.00 |
| 2004 Kobelco 330 Jewell with head (Claim 5) | $105,000.00 |
| Tools, hoses, bolt bins, parts, freezer, bed frames, chainsaws, etc. | $100,000.00 |
| Bobcat 250 Welder | $2,000.00 |
| 2006 Linkbelt Jewell front log loader (Claim 5 $100K loan) | $100,000.00 |
| 1997 Linkbelt 3400 with Denarco processor (Claim 5 $100K loan) | $40,000.00 |
| **Total Equipment Assets** | **$2,172,500.00** |