Sheila R. Schwager, ISB No. 5059
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  208.344.6000
Facsimile:  208.954.5209
Email: sschwager@hawleytroxell.com

Attorneys for Creditor Bank of the Pacific

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>IDC ENTERPRISES, INC.,<br><br>Debtor | Case No. 20-20081-NGH<br><br>Chapter 7 |

# BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS OPPOSITION TO THE  DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)

Secured Creditor, Bank of the Pacific ("**Bank**"), by and through its attorneys of record, Hawley Troxell Ennis & Hawley LLP, hereby files this Closing Brief In Support of Its Opposition To the Debtor's Objection to Claim, as identified in Docket No. 95 and Docket No. 130 ("**Claim Objection Motion**"), based upon the evidentiary hearing that took place in regard to the Claim Objection Motion on the afternoon of February 18, 2021 (" **Hearing**").

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
1

58284.0001.13579137.1

## I. INTRODUCTION

The Bank of the Pacific retains a security interest in all of the equipment of which the Debtor, IDC Enterprises, Inc., ("**Debtor**") holds an interest, pursuant to three different signed Commercial Security Agreements. *See* Bank of the Pacific's Opposition to Debtor's Objection to Claim, Dkt. 112; Amended Proof of Claim, No. 5. Bank of the Pacific was owed approximately $367,000 as of October 29, 2020. *Id.* The fact that the Debtor owes Bank of the Pacific for two outstanding loans is not disputed by the Debtor. *See* Dkt. 95, Dkt. 130. Indeed, the Debtor states that the purpose of the claim objection is limited to the extent of the secured status of the Bank of the Pacific. Dkt. 130, p.2. As to the secured status, the Debtor claims that the Bank's secured claim is limited to certain items of equipment, rather than the "All Equipment" referenced in the multiple Commercial Security Agreements signed in favor of the Bank of the Pacific. The overwhelming evidence is to the contrary. There is no limit to the Bank's security interest in equipment.

### II. THE DEBTOR GRANTED A SECURITY INTEREST IN ALL EQUIPMENT TO THE BANK TO OBTAIN LOANS EXCEEDING $400,000.

**A. The Debtor Has Failed Its Burden To Establish It has Standing Under the Claim Objection Motion.**

Despite the issue of standing being raised in the Bank of the Pacific's opposition to the Debtor's Claim Objection Motion and despite having the burden of proof to establish standing, the Debtor provided no evidence of standing. *See* Dkt. 112, Dkt. 157. Thus, on this basis alone the Claim Objection Motion should fail.

The Debtor has the burden of proof to establish that it has standing to object the claim of the Bank of the Pacific. *Cheng v. K & S Diversified Invs., Inc. (In re Cheng)*, 308 B.R. 448, 454 (9th Cir. BAP 2004), *aff'd mem.,* 160 Fed.Appx. 644 (9th Cir.2005); *e.g. Wellman v. Ziino (In re Wellman),* 378 B.R. 416 n. 5 (9th Cir. BAP 2007); *In re Lona,* 393 B.R. 1, 4 (Bankr. N.D. Cal. 2008) (citing *In re Willard,* 240 B.R. 664, 668 (Bankr.D.Conn.1999); *Menick v. Hoffman,* 205 F.2d 365 (9th Cir.1953)). In that regard, the Debtor submitted no evidence of the current value of the equipment that the Debtor now asserts it holds an ownership interest in. According to the Claims Register, the claims filed against the Estate total $851,213.17; yet there is no evidence in the record that the Debtor currently asserts an interest in equipment that has a current value exceeding that amount[1]. The law is clear that a Debtor can only attempt to assert standing as to a claim objection if there is a surplus over the amounts owed to creditors of the Estate. *Cheng v. K & S Diversified Invs., Inc. (In re Cheng),* 308 B.R. 448, 454 (9th Cir. BAP 2004), *aff'd mem.,* 160 Fed.Appx. 644 (9th Cir.2005). Even in instances where a surplus is shown a debtor still has to establish that if it did not prevail on a claim objection, the debtor itself (in contrast of the creditors of the Estate) would be injured in fact. *Id.* Again, the Debtor failed to submit any evidence as to surplus or injury in fact. Accordingly, the Debtor's Claim Objection Motion should be denied.

---

[1] Although the Bankruptcy Schedules clearly indicate a value in excess of $851,213.17, the principal of the Debtor asserted through testimony at the Hearing that the Debtor does not hold an interest in all of those items. Although the Debtor should be bound by the schedules filed under penalty of perjury, the reality is the Debtor presented no evidence of how the Debtor claims standing to proceed with the claims objection in light of those assertions of a lack of interest in equipment.

## B. The Evidence Unequivocally Establishes that the Debtor Signed Three Separate Commercial Security Agreements Granting a Security Interest in All Equipment.

Despite initially testifying to the contrary under penalty of perjury at the prior hearing on September 15, 2020[2], the evidence submitted at the Hearing overwhelming establishes that the Debtor granted a security interest in all equipment to secure any and all obligations owed to the Bank of the Pacific, when the Debtor signed Commercial Security Agreements to obtain loans from the Bank of the Pacific. The attempt of the Principal of the Debtor, Mr. Lunders, to now assert otherwise, after the Debtor has obtained and spent all the loan proceeds is disingenuous. This is evidenced by Mr. Lunder's testimony on cross examination in which he admitted:

> **I couldn't even care less about what they were worried about collateral**. We made more money in the first six weeks to pay this whole think back if they [Viking Lumber] would have just paid us. **Collateral meant nothing** because I knew this was all going to be wiped off. We had it all paid for. I mean we would have it all paid for if they [Viking Lumber] would have paid for if they would have hauled the logs. **I wasn't concerned about it**.

*See* Audio of Hearing, commencing at 4:17:17. The reality is that the Debtor signed each and every loan document, including the Commercial Security Agreements, to obtain and expedite funding under the loans, and never once did the Debtor raise any concern or issue with the scope of the Collateral until the Debtor defaulted under the loans. Idaho law unequivocally precludes a contracting party after the fact to change the terms of a deal that is set forth under the express terms of signed agreements.

---

[2] See Audio Hearing regarding Mr. Lunders' cross examination regarding the prior testimony at the September hearing, at 3:44:32-3:48:40, Ex. 209, Ex. 222.

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)   -
4

58284.0001.13579137.1

As testified by Mr. Mesojednik, the loan officer responsible for issuing the loans at issue on behalf of the Bank of the Pacific, because Mr. Lunders was in Alaska when Mr. Lunders wanted the Debtor to obtain funds under a $300,000 operating line ("**Operating Loan**"), Mr. Mesojednik made accommodations to get the loan documents for the Operating Loan sent to Mr. Lunders in Alaska via electronic mail. *See* Exhibit 202. Indeed, on cross-examination and in light of the text messages that Mr. Lunders had sent to Mr. Mesojednik, Mr. Lunders finally admitted that he did receive those loan documents from the Bank, signed them, and had the bookkeeper of Viking Lumber email the signed loan documents back to Mr. Mesojednik on October 9, 2018. *See* Exhibit 214, p.3; Exhibit 223, p.38, Exhibit 202, Audio of Hearing re: Mr. Lunders Cross, 4:03:25-4:05:05 (discussing Exhibit 202); see also 3:53:53-4:02:55. Notably, those signed loan documents that Mr. Lunders caused the bookkeeper of Viking Lumber to send back to the Bank included the Commercial Security Agreement dated and signed on October 9, 2018, which stated in part:

> **COLLATERAL DESCRIPTION:** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement: **All Equipment; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.**

Exhibit 202, p. 10 (emphasis in the original).

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
5

58284.0001.13579137.1

The Debtor also agreed in the Commercial Security Agreement that:

> **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and Agreement of the parties as to the matters set forth in this agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Exhibit 202, p.12 (emphasis in the original).

Mr. Mesojednik testified that once he obtained those signed loan documents, he reviewed them for signatures and completeness, and once he was satisfied that all had been duly signed and returned, he authorized the funding of the $300,000 Operating Loan, with the first advance being made to the Debtor on October 10, 2018. Indeed, as admitted by Mr. Lunders, the Bank made the special effort, since Mr. Lunders was in Alaska, of driving the check for that first advance to another city to deposit in the Debtor's bank, Umpqua Bank. As set forth in Mr. Lunders text message on October 9, 2018, he was very anxious to obtain the funding under the Operating Loan as soon as possible. *See* Exhibit 214, 223, p.38. As testified by Mr. Mesojednik, the Bank would not have funded that loan without receiving all of the loan documents duly signed. Notably, Mr. Lunders at no time testified that he was not provided sufficient time to review and read the loan documents before he signed them and had them returned to Mr. Mesojednik on behalf of the Debtor. Further, as testified by Mr. Mesojednik, Mr. Lunders did not contact him and raise any issues with the scope of the collateral identified on the Commercial Security Agreement that he signed and caused to be sent back to Mr. Mesojednik on October 9, 2018.

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
6

58284.0001.13579137.1

Mr. Mesojednik further testified that the bookkeeper of Viking Lumber put the original wet-ink signatures of the loan documents that had been emailed to him in the U.S. Mail directed to his attention. Mr. Mesojednik testified he received those wet-ink signed documents, checked them for completeness and signatures and had those original loan documents placed in the Bank's vault. *See* Exhibit 204. Mr. Lunders did not dispute Mr. Mesojednik's testimony in that regard.

Mr. Lunders on behalf of the Debtor then testified that he wanted a second loan to purchase equipment. Thus, he obtained a loan for $100,575 in November 2018 from the Bank of the Pacific ("**Term Loan**"). Exhibit 208, Audio of Hearing, 4:05:10-4:06:35. At the Hearing, Mr. Lunders went on to admit during cross-examination on behalf of the Debtor that he had the Bank email the documents to "Katy" at the "Printshop" and she then printed off the loan documents for the Term Loan, he signed them, and she returned those signed loan documents to Mr. Mesojednik via email. *See* Exhibits 210, 211, 213; Audio of Hearing, 4:09:15-4:12:40. Indeed Mr. Lunders unequivocally conceded that he had the Printshop send back the loan documents that were attached to her email as set forth in Exhibit 213. *See* Exhibit 213, Audio Hearing, 4:10:40-4:11:43. At no time did Mr. Lunders testify that he was precluded by the Bank from having sufficient time to read and review the loan documents for the Term Loan before he signed them and had them returned to Mr. Mesojednik. Notably, included within those signed loan documents was a signed Commercial Security Agreement which provided in part:

> **COLLATERAL DESCRIPTION:** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
7

> Indebtedness and performance of all other obligations under the Note and this Agreement: All Equipment; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

Exhibit 213, p. 18.

> **CROSS-COLLATEALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others. . .

Exhibit 213, p. 18. The Debtor also agreed in the Commercial Security

Agreement that:

> **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and Agreement of the parties as to the matters set forth in this agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Exhibit 213, p.20 (emphasis in the original).

Mr. Mesojednik testified that when he did not receive the original wet-ink signed loan documents for the Term Loan in the mail, he followed up with Mr. Lunders several times. Finally, on July 25, 2019, Mr. Lunders went to the offices of the Bank in Aberdeen, Washington, wherein as testified by Ms. Naomi Avalos, he signed each of the loan documents for the Term Loan again, so that the Bank had a wet-ink original signature for its files. Notably, Ms. Avalos testified that Mr. Lunders signed each of the loan documents that are included in Exhibit 215, in

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
8

front of her, <u>as she took him through and explained each of the loan documents that were being signed</u>.  Ms. Avalos further testified that Mr. Lunders did not raise any issues with any of the loan documents, including the Commercial Security Agreement.  Significantly, Mr. Lunders did not dispute Exhibit 215 or any of the testimony of Ms. Avalos.

Thus, the overwhelming and undisputed evidence is that on three separate occasions, Mr. Lunders, on behalf of the Debtor signed three different Commercial Security Agreements, in which the Debtor clearly and unequivocally granted a security interest in any and all Equipment of which the Debtor then or thereafter held an interest, to secure any and all obligations owed to the Bank of the Pacific.  *See* Exhibits 202, 213, 215.

C. **<u>The Law is Clear That A Party is Bound By the Express Terms of A Signed Contract.</u>**

In light of the indisputable evidence that the Debtor indeed expressly granted a security interest in all Equipment, the Debtor now tries to point to emails that were in regard to insured collateral and values to attempt to argue that the Debtor is not bound by the signed Commercial Security Agreements.  In that regard, the Debtor pointed to the email exchange between Mr. Mesojednik and the Debtor's insurance agent dated <u>October 3, 2018</u> and an email from Mr. Mesojednik to Mr. Lunders dated <u>September 25, 2018</u>, to argue that the collateral in the Commercial Security Agreement signed on <u>October 9, 2018</u> was to be limited.  *See* Exhibit 103, Exhibit 108, Exhibit 204.  Further, the Debtor pointed to the email exchanges between Ms. Avalos and Mr. Lunders dated <u>October 26, 2018</u> and <u>October 21, 2018</u>, to again argue that the collateral in the Commercial Security Agreement dated <u>November 7, 2018</u>, was supposed to be limited.  Exhibit 102, Exhibit 215.  Ms. Avalos and Mr. Mesojednik explained the context of

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -  9

58284.0001.13579137.1

those emails, wherein the Bank did not require all the collateral to be insured but did require that there was enough specified items insured so that the loan to value was at least 75% of the insured items. Thus, the email communications (which were prior to each of the signed Commercial Security Agreements), had nothing to do with limiting the collateral. In any event, those email exchanges are not relevant under Idaho law. What is relevant under Idaho law is the fully integrated signed Commercial Security Agreements, in which Mr. Lunders, on behalf of the Debtor, granted a security interest in all Equipment.

As set forth above, each of the three Commercial Security Agreements signed by the Debtor, contain an express agreement that the Commercial Security Agreements "constitute the entire understanding and Agreement of the parties as to the matters set forth in this Agreement." *See* Exhibit 204, p. 5; Exhibit 213, p. 20; Exhibit 215, p. 21. Where the terms of an integrated contract are plain and unambiguous, questions of the parties' intent regarding the subject matter of the contract <u>may only be resolved by reference to the contract language</u>. *Steel Farms, Inc. v. Croft & Reed, Inc.*, 154 Idaho 259, 267, 297 P.3d 222, 230 (2012); CIT *Fin. Servs. v. Herb's Indoor RV Ctr., Inc.* 118 Idaho 185, 187, 795 P.2d 890, 892 (Ct. App. 1990) ("Plain and unambiguous terms dictate the intent of the parties and the obligations guaranteed."

A contract is "integrated" if it contains a merger clause. *Steel Farms, Inc.*, 154 Idaho at 267, 297 P.3d at 230 (citing *Howard v. Perry*, 141 Idaho 139, 142, 106 P.3d 465, 468 (2005)). A provision in an agreement which provides that it represents the entire agreement among the parties, constitutes a merger clause. *Howard v. Perry*, 141 Idaho 139, 141-142, 106 P.3d 465, 467-468 (2005).

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95) - 10

In *Howard v. Perry*, the Supreme Court summarized the purpose of a merger clause as follows:

> The purpose of a merger clause is to establish that the parties have agreed that the contract contains the parties' entire agreement. The merger clause is not merely a factor to consider in deciding whether the agreement is integrated; it proves the agreement is integrated. To hold otherwise would require the parties to list in the contract everything upon which they had not agreed and hope that such list covers every possible prior or contemporaneous agreement that could later be alleged.

*Id.* If a court determines that a contract is integrated, "evidence of prior or contemporaneous oral agreements relating to the same subject matter is inadmissible to vary, contradict, or enlarge the terms of the written agreement." *Valley Bank v. Christensen*, 119 Idaho 496, 499, 808 P.2d 415, 418 (1991).

"[W]hen a contract has been reduced to writing, which the parties intend to be a complete statement of their agreement, any other written or oral agreements or understandings . . . made prior to or contemporaneously with the written 'contract' and which relate to the same subject matter are not admissible to vary, contradict or enlarge the terms of the written contract." *Farnes v. Grover*, 106 Idaho 752, 754, 682 P.2d 1299, 1301 (Ct. App. 1984). A writing that is not a complete statement of the parties' agreement may be supplemented by evidence consistent additional terms, but it may not be contradicted by evidence of prior agreements. *Id.* Thus, in either case, "evidence which contradicts the written terms of the agreement is not admissible." *Id.*

Thus, where "a comprehensive agreement has been negotiated, reduced to writing and signed, evidence of an oral contemporaneous agreement is inadmissible to vary the terms of the

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95) - 11

58284.0001.13579137.1

written instrument." *Prouse v. Ranson*, 117 Idaho 734, 738, 791 P.2d 1313, 1318 (Ct. App. 1989); *See Valiant Idaho, LLC v. VP Incorporated*, 2018 WL 5668519, *8 (Idaho, 11/1/2018) ("Villelli's 'understanding' is not evidence and such a statement cannot create a material question of fact."); *First Security Bank of Idaho, N.A. v. Gaige* at 175-176, 765 P.2d at 686-687 (the parol evidence rule, as properly applied by the district court, will not allow the introduction of evidence of prior oral negotiations which contradict or vary the terms of a completed integrated writing); *Cristo Viene Pentecostal Church v. Paz*, 144 Idaho 304, 308-09, 160 P.3d 743, 747-48 (2007) ("Any informal oral agreement that the parties may have reached regarding the subject property was superseded by the written agreement and cannot now be relied upon to alter or change its plain language.")

The law in Washington is consistent with Idaho. *Kinne v. Lampson*, 58 Wash.2d.563,567, 364 P.2d 510 (1961) (It is a well established rule in Washington that parol evidence is not admissible to vary the terms of a written contract); *William g. Hulbert Jr., and Clare Mumford Hulbert Revocable Living Trust v. Port of Everett*, 159 Wash.App. 389,400, 245 P.3d 779 (2011) ("Extrinsic Evidence may not, however, be used to show an intention independent of the instrument or to vary, contradict, or modify the written word.").

Since the Debtor has only pointed to emails that were prior to the each of the applicable Commercial Security Agreements being executed, to attempt to materially alter the terms of the Commercial Security Agreements, such attempts fail as a matter of law.

If Mr. Lunders had indeed wanted to limit the collateral scope he needed to address that issue when he received the Commercial Security Agreements to sign, wherein he agreed, on the Debtor's behalf, to a collateral interest in all Equipment. Notably, Mr. Lunders never contended

he was precluded from reading the agreement nor that he was not given enough time to read the agreement. Instead, he signed the loan documents and had them sent back to the Bank so that the Debtor could obtain a $300,000 Operating Loan and then a $100,575 Term Loan. The law is clear that the Debtor is bound by the agreement it made, as identified in the signed agreement, which were signed to obtain the loan proceeds.

Further, to the extent the Debtor attempts to avoid its obligations by arguing that Mr. Lunders did not understand that the Debtor was granting a security interest in all Equipment, this is also prohibited under the law. The collateral description could not be simpler or more clear on the first page of each of the three different Commercial Security Agreements signed by Mr. Lunders on behalf of the Debtor. *See* Exhibits 202, 213, 215, p.1.

As early as 1937 the Supreme Court made it clear that a party is bound by what they sign. In *West v. Prater*, 57 Idaho 583, 67 P.2d 273, 274-277 (1937), the debtor argued that he did not intend to grant a security interest to secure the obligation, despite signing a security agreement doing just that. The debtor argued that he did not have his glasses with him and therefore did not read the documents. The court rejected the argument holding that:

> . . . voluntary failure or inability of a party to read [a] written contract before signing it is not grounds for setting it aside. . . [citations omitted]. One may be, and it sometimes happens that he is, estopped by his own negligence to deny liability on a written instrument signed by him without having read it. This is true where he had opportunity to read the document and was not fraudulent dissuaded or prevented from reading it.

*Id.*, 67 P.2d at 278. Similarly, in *Irwin Rogers Ins. Agency, Inc., v. Murphy*, 122 Idaho 270, 833 P.2d 128 (Ct. App. 1992), the Murphys did not contest it was their signature on the consumer promissory note, but they contended that the insurance agent tricked them into signing the note

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)   -
13

by presenting it as one of several insurance documents that needed their signature. *Id.* at 273 and at 131. The court rejected the Murphys' argument holding that they had the opportunity to read the document before signing it and there was no evidence that they were fraudulently prevented or dissuaded from reading it. *Id.* <u>The court went on to hold that "where the necessary information was readily ascertainable from the face of the instrument, there was no duty on the party of the insurance agent to speak."</u> *Id.,* at 274 and at 132 (emphasis supplied); *e.g. Robert Comstock, LLC v. Keybank Nat. Ass'n,* 142 Idaho 568, 572, 130 P.3d 1106, 1110 (2006) ("voluntary failure or inability of a party to read [a] written contract before signing is not ground for setting it aside."); *Cristo Viene Pentecostal Church v. Paz,* 144 Idaho 304, 308 160 P.3d 743, 747 (2007) ("Pastor's erroneous belief that he was signing a sale contract will not excuse his failure to read the contract's terms prior to signing, nor will it allow him to avoid the contract's terms on the ground that he did not understand them.").

The law in the state of Washington is no different[3]. *E.g., Nagle v. Snohomish County,* 129 Wash.App.703, 717, 119 P.3d 914 (2005) ("Nagle, as a signer of that real estate contract is charged with having read the document and knowing its contents."); *Nishikawa v. U.S. Eagle High, LLC,* 138 Wash.App. 841, 852, 158 P.3d 1265 ("Parties have a duty to read the contracts they sign. Courts will not casually depart from this principle and our law does not currently exempt a reader who reasonably relies on a translator or interpreter."); *Michak v. Transnation Title Ins., Co.,* 148 Wash.2d 788, 799, 64 P.3d 22, 28 (2003)("This follows the traditional duty to

---

[3] Some of the loan documents provide for a choice of law of Washington.

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
14

58284.0001.13579137.1

read in contract law: 'A party who signs an instrument manifests assent to it and may not later complain about not reading or not understanding.'").

The Debtor is bound by each of the agreements that Mr. Lunders caused it to sign. Accordingly, the Bank of the Pacific retains a security interest in all of the Debtor's equipment.

### D. The Change In Terms Unilaterally Modified by the Debtor Did Not Modify the Collateral Granted to the Bank.

The Debtor relies upon a unilateral change that Mr. Lunders made to a Change in the Terms document sent to Mr. Mesojednik on November 15, 2019, that was in regard to the Operating Loan promissory note, in which he crossed out all equipment and attached an email dated October 3, 2018 that itemized certain items of equipment to be insured, to attempt to limit the Bank's collateral. *See* Exhibit 207. The Debtor is bound by the contractual terms of the agreement he signed. *See Smith v. Idaho State Univ. Fed. Credit Union*, 114 Idaho 680, 684, 760 P.2d 19, 23 (1988) ("[A] court will not permit a party to avoid his, her, or its contractual obligations. The courts possess no roving commission to rewrite contracts.") (citation and quotation marks omitted). In this case the Operating Loan Commercial Security Agreement which does grant a security interest in All Equipment to secure any and all obligations owed by the Debtor to the Bank, provides that "no alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment." Exhibit 204, p. 5.

In this case, not only does the Debtor rely upon a Change In Terms that was only in regard to a promissory note, not the Commercial Security Agreement; and not only did the Debtor reject the Bank's offer by not accepting the terms of the Change in Terms by unilaterally

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
15

making modifications and not paying the pre-requisite amounts; but there is no dispute in this case that the Bank <u>never</u> signed a writing agreeing to modify its security interest.

The Debtor ignores this express term in the agreement and tries to argue that the unilateral change is binding because the Bank did not inform the Debtor otherwise. That argument falls for several reasons: First and foremost, it is contrary to the signed Commercial Security Agreement. *See* Exhibit 204, p.3. The only manner that the agreement could be modified was by a signed agreement by the party to be charged. *Id.* p. 5. The agreement does not provide the Bank will be bound if it does not respond to an attempted unilateral change via email. *Id.* The Bank did not agree to the change by a signed writing. Accordingly there was no change.

In addition, by making a change to the Change in Terms offered by the Bank and failing to make the pre-requisite payments, the Debtor rejected the Bank's offer and there was no binding change. *See Brunobuilt, Inc. v. Strata, Inc.*, 166 Idaho 208, 457 P.3d 860, 872 (2020) ("An acceptance of an offer, to be effectual, must be identical with the offer and unconditional, and must not modify or introduce any new terms into the offer.") (citation omitted).

Further, the Change in Terms was only in regard to the promissory note and only in regard to the Operating Loan, which was not disputed by the Debtor. There is no document the Debtor has presented which purports to modify the signed Commercial Security Agreement entered into when the Operating Loan was obtained. Exhibit 202. The Debtor is bound by the terms of the Commercial Security Agreement it signed granting a security interest in all Equipment.

In addition, although in the Debtor's counsel has made the legal argument that the Bank's security interest in the Collateral is limited because Mr. Lunders made a "request" under Section 28-9-210, when he sent back the Change In Terms with his handwritten notation "equipment list attached," and the Bank did not timely respond to that "request," that assertion has no merit.

Idaho Code Section 28-9-210 is titled "Request for accounting--Request regarding list of collateral or statement of account." The statute defines a "request" as "a record of a type described in paragraph (2), (3) or (4) of this subsection." Idaho Code § 28-9-210 (a)(1).

Relevant here is (3) which states that a "'[r]equest regarding a list of collateral' means a record authenticated by a debtor *requesting that the recipient approve or correct* a list of what the debtor believes to be the collateral securing an obligation and reasonably identifying the transaction or relationship that is the subject of the request." Idaho Code § 28-9-210(a)(3) (emphasis added).

Comment 4 to Section 28-9-210 explains the form of the request:

> **Permitted Types of Requests for Information.** Subsection (a) contemplates that a debtor may **request three types of information** by submitting three types of "requests" to the secured party. First, the debtor may request the secured party to prepare and send an `accounting' (defined in section 9-102). **Second, the debtor may submit to the secured creditor a list of collateral, for the secured party's approval or correction.** Third, the debtor may submit to the secured party for its approval or correction a statement of the aggregate amount of unpaid secured obligations. Inasmuch as a secured party may have numerous transactions and relationships with a debtor, **each request must identify the relevant transactions or relationships.** Subsections (b) and (c) require the secure creditor to respond to a request within 14 days following receipt of the **request.**

§ 28-9-210, Cmte. 4 (emphasis supplied).

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
17

58284.0001.13579137.1

In the present case, the Debtor did not present the Bank with any request pursuant to Section 28-9-210, which as noted requires a debtor to submit a 1) record authenticated by the debtor that 2) requests that the recipient approve or correct a list of what the debtor believes to be the collateral securing an obligation. Idaho Code § 28-9-210(a)(3). Here, as testified by Mr. Mesojednik, the Bank received no such record from the Debtor requesting that any list of collateral be approved or corrected, nor did the Debtor identify the relevant transaction or relationship. Instead, the Debtor sent back a Change In Terms that rejected the Bank's offered terms. There was nothing set forth in those Change in Terms by the Debtor, nor in the corresponding email that asked the Bank to approve or correct the list the Debtor attached to the Change in Terms.

Indeed, Mr. Lunders never testified at the Hearing that he was making such a request and Mr. Mesojednik said he never received such request. Accordingly, the Debtor cannot change or limit the Bank's collateral under § 28-9-210.

Finally, and in any event, Mr. Lunders admitted that there was no attempt to modify the Term Loan and the evidence is clear he signed two Commercial Security Agreements on behalf of the Debtor granting a security in all Equipment, to secure any and all obligations owed to the Bank of the Pacific as part of the Term Loan. Exhibit 213, Exhibit 215, Audio of Hearing, 4:13:05-4:13:53, Exhibit 207. He signed the first on November 7, 2018, and the second at the office of Ms. Avalos on July 25, 2019. *Id.* Thus, regardless of the arguments regarding the Change in Terms, the operating line is also secured by All Equipment under the terms of the Commercial Security Agreements signed with the Term Loan.

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)  -
18

58284.0001.13579137.1

### III. CONCLUSION

Based upon the evidence in the record, the testimony at the Hearing, and as a matter of law, the Bank of the Pacific respectfully submits that the Debtor's objection to its claim has no merit and should be denied in its entirety.

DATED THIS 1st day of March, 2021.

                                       HAWLEY TROXELL ENNIS & HAWLEY LLP

                                       By _____
                                             Sheila R. Schwager, ISB No. ISB No. 5059
                                             Attorneys for Creditor Bank of the Pacific

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of March, 2021, I electronically filed the foregoing BANK OF THE PACIFIC'S CLOSING BRIEFIN IN SUPPORT OF ITS OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95) with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| D. Blair Clark | dbc@dbclarklaw.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Patrick J Geile | PGeile@foleyfreeman.com;  ID21@ecfcbis.com |
| Gary L. Rainsdon | trustee@filertel.com |
| Randall A. Peterman | rap@givenspursley.com |

AND, I HEREBY CERTIFY that I have served the foregoing document to the following non-CM/ECF Registered Participants **via U.S. Mail** (list names and addresses):

IDC Enterprises, Inc.,
450 White Bird Street
Grangeville, Idaho 83530

Annette Moore
Bookkeeping Plus
4855 S Ten Mile Rd
Meridian, Idaho 83642

_____
Sheila R. Schwager

BANK OF THE PACIFIC'S CLOSING BRIEF IN SUPPORT OF ITS
OPPOSITION TO THE DEBTOR'S OBJECTION TO CLAIM (DKT. NO. 95)   -
20

58284.0001.13579137.1