# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| **IN RE:** | **Case No. 20-20081-NGH** |
| **IDC ENTERPRISES, INC.,** | |
| **Debtor.** | **Chapter 7** |

## MEMORANDUM OF DECISION

Before the Court is an "Objection to Claim, Motion for Determination of Secured Status, and Motion for Classification of Claim," Doc. No. 95 (the "Objection"), filed by IDC Enterprises, Inc. ("Debtor"), on September 21, 2020, while it was a chapter 11[1] debtor in possession. The case was subsequently converted to chapter 7, and the chapter 7 trustee declined to join Debtor's Objection. At the heart of the dispute is the extent of creditor Bank of the Pacific's ("BOP") security interest encumbering Debtor's equipment. Debtor argues BOP holds a lien encumbering six specific items of equipment. BOP, on the other hand, asserts a blanket UCC lien on all Debtor's equipment. BOP opposes the Objection but consents to its consideration as a contested matter rather than an adversary proceeding as required by Rule 7001(2).

A videoconference evidentiary hearing was held on February 18, 2021. The parties submitted written closing arguments, and the Court took the matter under advisement. After considering the submissions and arguments of the parties, the Court

---

[1] Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101–1532, and "Rule" citations are to the Federal Rules of Bankruptcy Procedure.

reaches the following findings of fact and conclusions of law pursuant to Rules 7052 and 9014.

**FACTS**

    **A.    First Loan Agreement Between Debtor and BOP**

Debtor is an Idaho logging company operated by Jason Lunders ("Lunders"), its president and sole equity holder.  Ex. 216 at 21–22.  In 2018, Debtor prepared to participate in a new logging venture near Craig, Alaska.  *Id*. at 20.  Viking Lumber Company, Inc. ("Viking Lumber") operated a lumber mill near Craig where Debtor planned to deliver timber harvested from nearby forests.  To participate in this new venture, Debtor needed to purchase and transport certain equipment to Alaska.  Lacking the capital required to fund this expense, Debtor unsuccessfully sought to obtain credit from Viking Lumber.  Viking Lumber referred Debtor to BOP's commercial lending officer Andrew Mesojednik ("Mesojednik").

On September 21, 2018, Lunders and Mesojednik met at a bar in Pullman, Washington, to discuss Debtor's funding needs.  At the meeting, Lunders indicated that Debtor would need a $300,000 line of credit to purchase, repair, and transport equipment to Alaska.  According to Mesojednik, Debtor submitted a commercial loan application at the meeting.[2]

On September 24, 2018, Mesojednik emailed Lunders, requesting authorization to view tax documents for Debtor and a related entity, IDC Equipment, and for Lunders personally.  Ex. 109 at 2–3.  Mesojednik also informed Lunders that he would speak with

---

[2] This commercial loan application was not produced at the evidentiary hearing.

Debtor's insurer "about a binder on the equipment that will be pledged as collateral." *Id.*

at 3.  Debtor responded to Mesojednik's email in relevant part:

> "[A]ll of our equipment except one piece is paid for and we do not currently
> have insurance on all of the pieces so I would need to know what pieces you
> would like to use for collateral so that I can put insurance on them for
> you[.]  [W]hat I may suggest if you are OK with it are the two bigger Kobelco
> pieces and one of the John Deere's that we are going to take to Alaska on
> Vikings [*sic*] job[.]   That should give you around $400,000 worth of
> collateral[.]  [I]f you wanted more we can sign them up but as I said I am
> going to try selling some of the pieces down here For [*sic*] operating
> capital[.]"

*Id.* at 2.

On October 3, 2018, Mesojednik emailed Kammy Fogleman about "[i]nsurance on

specific equipment."[3]  Ex. 103.  Mesojednik's email read:  "Attached is an equipment

listing for Jason's equipment that we will be using as collateral for our note.  If we could

get a binder for that, I would appreciate it."  *Id*.  The email contained an image of a list of

six items of equipment: a 2007 John Deere 2054, a 2005 Waratah HTH 622B, a 2009

John Deere 2954, a 2008 Waratah HTH 622B, a Kobelco 330 with a Waratah felling

head, and a 2004 Kobelco 290 Yarder with yoder winches and gear.  *Id*.

### 1.    Execution of the First Loan Agreement

BOP and Debtor were ready to execute the loan documents in October 2018.

However, Lunders was in Alaska, and did not have ready access to a computer and

printer while traveling.  On October 9, 2018, Mesojednik emailed Viking Lumber's

bookkeeper, Paul Wadsworth, with a secure link where Wadsworth could download and

---

[3] It is not clear from the evidence whether Fogleman was Debtor's insurance provider or BOP's,
but Mesojednik's September 24 email to Lunders and the language in this email that Fogleman could
"check with Jason" suggests Fogleman was Debtor's insurance provider.

print out several loan documents for Lunders to sign on Debtor's behalf.  Ex. 202 at 1.

Mesojednik's email read:

> Attached are Jason's documents.  The first 4 pages need no action.
> Signatures are needed starting with the corporate resolution and end [*sic*]
> with the notice of final agreement.  There are a few spots reserved for me, so
> they should be left blank.  Once signed, please scan and email back, and then
> mail the original signatures.

Ex. 202 at 1.  Wadsworth emailed the signed documents back to Mesojednik in one PDF

document.  *Id.*  That PDF contained the following loan documents: UCC Financing

Statement, Loan Checklist, Loan Request Summary, Business Loan Agreement,

Commercial Security Agreement, Corporate Resolution to Borrow/Grant Collateral,

Customer information profile, Certification of Beneficial Owner(s), Promissory Note,

Financial Statement Agreement, Commercial Guaranty, Funding Worksheet, Agreement

to Provide Insurance, Notice of Insurance Requirements, Disbursement Request and

Authorization, Notice of Final Agreement, Boarding Data Sheet, and Online Banking Set

Up.  Ex. 202 at 2–37.

Wadsworth emailed the documents to Mesojednik out of order, so Mesojednik

reorganized and initialed the documents and filed them.  The original "wet ink" loan

documents were mailed to BOP.  Ex. 204.  When received, Mesojednik reviewed these

documents for completeness and compared them to the emailed copy received earlier.  He

then initialed and signed the original documents of behalf of BOP, and had them filed in

BOP's vault in Aberdeen, Washington.

## 2.    Terms of the First Loan Agreement

The October 9, 2018 loan is identified as Loan No. 12683401 (hereinafter the "First Loan").  Ex. 204 at 1.  The promissory note for the First Loan permitted Debtor to draw up to $300,000 principal on the credit line with a maturity date of October 10, 2019. *Id.* at 1–2 (hereinafter the "First Note").  Debtor agreed to pay the outstanding principal in a lump sum payment on the maturity date and to pay regular monthly payments of the interest accrued each month.  *Id.* at 1.  The First Note states it is secured by collateral described in the "Commercial Security Agreement dated October 9, 2018."  *Id.* at 2. Lunders signed the First Note on behalf of Debtor.  *Id.*

The security agreement for the First Loan, Ex. 204 at 3–7 (hereinafter the "First Security Agreement") provides in relevant part:

> The word "Collateral" as used in this Agreement means the following described property, whether now owned or after acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:
>
>> All Equipment; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing[.]

*Id.* at 3.  The First Security Agreement also contains a cross-collateralization provision that provides:

> In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereinafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such

MEMORANDUM OF DECISION - 5

amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter become otherwise unenforceable.

*Id.*

The First Security Agreement also contains a merger clause that provides: "This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement." Ex. 204 at 5. It also limits modification of the agreement, providing: "No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment." *Id.*

The First Security Agreement also contains a choice of law provision that states: "This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington." *Id.* at 6.

Lunders signed the First Security Agreement on Debtor's behalf. *Id.* at 7.

**B.     The Second Loan Agreement Between Debtor and BOP**

Near the end of October 2018, Debtor sought an additional loan from BOP to purchase more equipment needed in Alaska. Lunders was in Idaho at this time while Mesojednik was in Washington. On November 7, 2018, Mesojednik sent Lunders an email with a secure link to new loan documents for a $100,000 term loan. Ex. 212. Lunders indicated he could not figure out how to forward the loan documents to the print shop where he intended to sign them. Ex. 210 at 1. Mesojednik then sent the loan

MEMORANDUM OF DECISION - 6

documents to an employee at the print shop named Katy Wensman.  Ex. 211.  Still on November 7, 2018, Wensman emailed the signed loan documents back to Mesojednik. The original documents were not mailed to BOP.  *See* Ex 214 at 11–12.  On July 25, 2019, Debtor re-executed the loan documents for this $100,000 loan in person at the BOP branch located in Aberdeen, Washington.  Ex. 215.  Anthony Ansler, another commercial lender at BOP, signed on BOP's behalf because Mesojednik was traveling to another office at the time.

### 1.    Terms of the Second Loan Agreement

The November 7, 2018 loan is identified as Loan No. 12683402 (hereinafter the "Second Loan").  Ex. 215.  The promissory note for the Second Loan obligated Debtor to repay $100,575 principal in sixty monthly payments of $1,970.68, with a maturity date of November 20, 2023.  *Id.* at 13–14 (hereinafter the "Second Note").  The Second Note states that it is secured by the collateral described in the "Commercial Security Agreement dated November 7, 2018."  *Id.* at 14.  Lunders signed the Second Note on behalf of Debtor.  *Id.*

The security agreement for the Second Loan, Ex. 215 at 19–23 (hereinafter the "Second Security Agreement") provides in relevant part:

> The word "Collateral" as used in this Agreement means the following described property, whether now owned or after acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:
>
>> All Equipment; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing[.]

MEMORANDUM OF DECISION - 7

*Id.* at 19.  The language in the re-executed version (Ex. 215) is identical to the language in the PDF of the loan documents emailed to Mesojednik (Ex. 213).  *Compare* Ex. 213 at 18 *with* Ex. 215 at 19.

The Second Security Agreement also contains a cross-collateralization provision that provides:

> In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereinafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter become otherwise unenforceable.

Ex. 215 at 19.

Like the First Security Agreement, the Second Security Agreement contains several other provisions important to resolving this Objection.  It contains a merger clause that provides: "This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement." *Id.* at 21.  It also limits modification of the agreement, providing: "No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment." *Id.*

The Second Security Agreement contains a choice of law provision that states:

> With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Collateral, this Agreement will be governed by federal law applicable to Lender and to the extent not preempted by federal

MEMORANDUM OF DECISION - 8

law, the laws of the State of Idaho. In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Note and this Agreement has been applied for, considered, approved, and made, and all necessary loan documents have been accepted by Lender in the State of Washington.

*Id.* at 22.

Lunders signed the Second Security Agreement on Debtor's behalf. *Id.* at 23.

### C.      Default and Change in Terms Agreement

On April 29, 2019, Mesojednik sent Lunders an email informing Lunders that the Debtor was "a few days past due" on both the First Loan and Second Loan. Ex. 104 at 6. On May 9, 2019, Lunders responded and indicated payments would be made. *Id.* On May 13, 2019, Mesojednik sent Lunders an email informing him the loans were 20 days past due and a payment needed to be made. *Id.* at 5. On May 26, 2019, Lunders replied to explain why Debtor had not made a payment. *Id.* at 3–5. On June 3, 2019, Mesojednik sent Lunders an email informing him the loans were 41 days past due and continued nonpayment would "make it difficult . . . to renew your line." *Id.* at 3. Lunders again responded with an explanation for why the loans were not current, but without a projected date for repayment. *Id.* at 2–3. On June 6, 2019, Mesojednik emailed Lunders to inform him that BOP would soon be retaining counsel to foreclose its lien encumbering Debtor's equipment unless payments were brought current. *Id.* at 1.

MEMORANDUM OF DECISION - 9

As the First Loan neared its maturity date of October 10, 2019, Ex. 104 at 1, BOP sent Lunders a proposed change in terms agreement which would give Debtor a 90-day extension on the maturity date. However, BOP's acceptance of the change in terms agreement was conditioned on Debtor bringing the loans current. This condition was communicated in emails sent to Lunders on October 8, 2019, and October 15, 2019. The October 9 email stated in part:

> You had stated a while back that we would likely see a payment from you in mid-October. We'll need to have interest caught up on the line along with the 90 day extension.

Ex. 205. The October 15 email, which was sent after the First Loan matured, stated:

> We are nearing 60 days, at which time we start the repossession process. I received approval to extend the line for 90 days if you bring the notes current. If that doesn't happen, we move on the equipment.

Ex. 206.

Debtor did not bring the loans current. On November 15, 2019, Lunders emailed Mesojednik the proposed change in terms agreement that was signed by Lunders on Debtor's behalf. Ex. 207. Lunders had modified the proposed change in terms agreement by striking out the description of collateral provision that listed "All Equipment" as the collateral and writing "Equipment List Attached" in the margin to the left of the description of collateral. *Id.* at 2. Lunders attached the October 3, 2018 email from Andy Mesojednik that included a list of six specific items of equipment. *Id.* at 5.[4] Mesojednik did not respond to Lunders' email containing the modified change in terms agreement, and BOP did not sign the document.

---

[4] This email is also in the record as an individual exhibit—Ex. 103.

MEMORANDUM OF DECISION - 10

**D.     Relevant Bankruptcy Proceedings**

On February 27, 2020, Debtor filed its chapter 11 petition, electing to proceed under subchapter V of chapter 11.  Doc. No. 1.[5]  BOP filed Proof of Claim No. 5 on April 8, 2020, asserting a fully secured claim in the amount of $344,315.58.[6]  Debtor objected to BOP's proof of claim on September 21, 2020.  Doc. No. 95.  Debtor's case was converted from chapter 11 to chapter 7 on November 30, 2020.  Doc. No. 99.

Debtor's objection to BOP's proof of claim argues BOP's collateral should be limited to six items of equipment because that is what the parties intended as collateral.[7]  BOP argues Debtor lacks standing to object to BOP's claim as a chapter 7 debtor and, even if standing exists, the objection should be denied on the merits as the security agreements in evidence provide for a security interest in all equipment.

**DISCUSSION AND DISPOSITION**

**A.     Standing**

BOP argues Debtor lacks standing to object to BOP's claim because it is a chapter 7 debtor.  As explained by the BAP:

---

[5] Pursuant to Federal Rule of Evidence 201(c), the Court takes judicial notice of the record in this case.  *See Rainsdon v. Garcia (In re Garcia)*, 465 B.R. 181, 188 n.6 (Bankr. D. Idaho 2011) (noting that in addition to taking judicial notice, the Court may give evidentiary weight to assertions in a debtor's schedules under Federal Rule of Evidence 801(d)) (citing *In re Schweizer*, 354 B.R. 272, 278 n.3 (Bankr. D. Idaho 2006); *In re Moore*, 269 B.R. 864, 869 n.7 (Bankr. D. Idaho 2001)).

[6] On October 29, 2020, BOP amended its claim to increase the amount to $366,557.72.

[7] Debtor's closing argument also raised a new argument regarding equitable subordination of BOP's claim under § 510(c).  Rule 7001(a)(8) provides that a "a proceeding to subordinate any allowed claim or interest" must be brought as an adversary proceeding.  BOP did not waive the requirements of Rule 7001(a)(8) and it has never had the opportunity to address this new argument.  Therefore, Debtor's equitable subordination argument is procedurally improper and will not be further addressed in this Decision.

MEMORANDUM OF DECISION - 11

> In the claim objection context, a chapter 7 debtor, "in its individual capacity, lacks standing to object unless it demonstrates that it would be 'injured in fact' by the allowance of the claim." *Cheng v. K&S Diversified Invs., Inc. (In re Cheng)*, 308 B.R. 448, 454 (9th Cir. BAP 2004), aff'd, 160 F. App'x 644 (9th Cir. 2005). In the case of a corporation, this includes its officers, directors, and agents. So when "the estate is insolvent, a chapter 7 debtor ordinarily lacks standing to object to proofs of claim." *Wellman v. Ziino (In re Wellman)*, 378 B.R. 416, 2007 WL 4105275, at *1 n.5 (9th Cir. BAP 2007) (unpublished). But when "there is a sufficient possibility of a surplus to give the chapter 7 debtor a pecuniary interest or when the claim involved will not be discharged[ ]" the chapter 7 debtor has standing. *Id.*

*Kraemer v. FS P'ship (In re Doorman Prop. Maint.)*, 2018 WL 3041128, at *6 (9th Cir. BAP June 19, 2018).

Here, there is a sufficient possibility this will be a surplus case. Debtor scheduled assets worth $1,467,656.11.[8] Ex. 216. The Court concurrently heard a Motion for Turnover, Doc. No. 116, in which Debtor asserted it did not own several of those scheduled assets. The Court, in granting Trustee's turnover motion, determined the equipment Debtor scheduled in its Schedule A/B, Ex. 216, and the equipment list, Doc. No. 28, was property of the estate. The Court also determined several other items of equipment not listed in Schedule A/B or the equipment list were also property of the estate. Thus, the bankruptcy estate potentially exceeds the $1,467,656.11 in scheduled assets. The claims register shows fourteen claims have been filed totaling of

---

[8] Debtor's Schedule A/B references an attached list of equipment which was not in fact attached. Page eight of Schedule A/B states in relevant part that a "PDF file has been attached to this document. This file will appear here when a PDF is created using the ECFiling button on the Print Documents window." Ex. 216 at 8. This document was later filed as Doc. No. 28. For purposes of this Decision, the Court's reference to the value of the scheduled equipment includes the value of the equipment listed in Doc. No. 28, because the total value of the property listed therein was listed in Schedule A/B. The Court will refer to the equipment list individually as Doc. No. 28.

MEMORANDUM OF DECISION - 12

$849,186.35.  As the potential value of the bankruptcy estate exceeds the total claims in this case and the administrative expenses,[9] there is a sufficient possibility of a surplus.

BOP argues that even if there is a surplus, the resolution of this Objection will not itself create or enlarge the surplus.  BOP is correct that resolution of the Objection will not enlarge any surplus, but the standard is merely whether there will be a surplus.  There is no requirement that the resolution of the objection in a debtor's favor enhance a surplus.  This is evident in the language in the line of cases BOP relies on: *Wellman v. Ziino (In re Wellman)*, 378 B.R. 416, 2007 WL 4105275, at *1 n.5 (9th Cir. BAP 2007) ("Furthermore, Wellman has an economic interest that would be harmed because there appears to be property of the estate under § 726(a)(6) that may be in excess of the amount necessary to pay allowed claims and administrative expenses in the case."); *Heath v. Am. Express Travel Related Servs. Co. (In re Heath)*, 331 B.R. 424, 429 (9th Cir. BAP 2005) (citing *In re Jorczak*, 314 B.R. 474, 479 (Bankr. D. Conn. 2004) (stating "if there is a sufficient possibility that the estate is solvent and will yield a surplus to the debtor, the chapter 7 debtor has standing to object to proofs of claim"); *In re Willard*, 240 B.R. 664 (Bankr. D. Conn. 1999) (a chapter 7 debtor has standing to object to claims "where assets are more than sufficient to pay all administrative expenses and creditors in full").  Notably absent from these cases is any requirement that the objection to the claim at issue give rise to the surplus.  A surplus need only exist for a chapter 7 debtor to have standing;

---

[9] To date, the Court has approved chapter 11 administrative expenses in favor of the subchapter V trustee in the amount of $3,525 (Doc. No. 139), Debtor's counsel in the amount of $30,140.40 (Doc. No. 136), and Debtor's accountant in the amount of $6,030.00 (Doc. No. 135).

MEMORANDUM OF DECISION - 13

how it comes to exist is not the critical question.  As there appears to be a surplus, Debtor

has standing to object to BOP's proof of claim.

### B.    Legal Standard

As stated by the Ninth Circuit BAP:

> A claim is deemed allowed absent objection from a party in interest, § 502(a), and a procedurally compliant proof of claim is prima facie evidence of the validity and amount of the claim.  Rule 3001(f).

> A mere formal claim objection, without evidence, cannot defeat a claim presumed to be valid under Rule 3001(f).  *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000).  To overcome the Rule 3001(f) presumption, the objecting party must present evidence tending to rebut the claim—evidence with probative force equal to that of the creditor's proof of claim.  *Id.*  As a practical matter, "the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."  *Id.* at 1040 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992)) (emphasis omitted).

> If the objecting party successfully rebuts the presumption, the claimant bears the burden of proof to show by a preponderance of the evidence that its claim is valid, and "the ultimate burden of persuasion remains at all times upon the claimant."  *Id.* at 1039.

> But if the objecting party does not rebut the presumption, the claims litigation ends there; the claim should be allowed without the claimant bearing any further burden to demonstrate the validity of its claim.  *Id.* at 1041.

*In re Desert Springs Fin., LLC*, 2017 WL 1434403, at *5–6 (9th Cir. BAP Apr. 20,

2017).

### C.    Effectiveness of the First Security Agreement

#### 1.    Applicable Law

The parties invoked the statutory and common laws of Idaho throughout their

arguments.  However, the First Security Agreement contains a choice of law provision

MEMORANDUM OF DECISION - 14

that provides: "[t]his Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions." Ex. 204 at 3. The Court must apply the applicable state law in adjudicating contract disputes. *Hopkins v. Saratoga Holdings, LLC (In re Colvin)*, 2008 WL 1957855, at *4 (Bankr. D. Idaho May 2, 2008) (citing *Rubenstein v. Ball Bros., Inc. (In re New England Fish Co.)*, 749 F.2d 1277, 1280 (9th Cir. 1984)). The parties do not argue the choice of law provision is unenforceable, and the Court finds no reason to invalidate the provision. *See PNC Bank v. Sterba (In re Sterba)*, 852 F.3d 1175, 1178 (9th Cir. 2017) ("Ordinarily, when parties to an agreement select the law they want to govern an issue, federal courts will enforce that choice."). Thus, the Court will apply Washington law as selected by the parties.

### 2.    Requirements for Attachment of Security Interest

Debtor's closing argument seemingly abandons its earlier argument that BOP could not prove the existence of a security agreement between BOP and Debtor, but a brief discussion of the effectiveness of the First Security Agreement, Ex. 204, is appropriate. Under Washington law:

> Except as otherwise provided in subsections (c) through (i) of this section, a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
>
> > (1) Value has been given;
> >
> > (2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
> >
> > (3) One of the following conditions is met:
> >
> > > (A) The debtor has authenticated a security agreement that provides a description of the

MEMORANDUM OF DECISION - 15

collateral and, if the security interest covers
timber to be cut, a description of the land
concerned[.]

RCW § 62A.9A-203(b).  The Court concludes the First Security Agreement met the

requirements of RCW § 62A.9A-203(b).  BOP gave value in the form of a $300,000 line

of credit.  Debtor had rights to pledge its equipment as collateral to secure the line of

credit.  And, Lunders signed the First Security Agreement on Debtor's behalf.  Ex. 204 at

7.  Though Debtor initially argued the first page of the security agreement in BOP's proof

of claim differed from that signed by Lunders, the evidence refutes this assertion.  The

First Security Agreement in the "wet ink" loan documents mailed to BOP, Ex. 204 at 3,

contains the same first page as the copy emailed to BOP on October 9, 2018.  *Compare*

Ex. 202 at 10 *with* Ex. 204 at 3.  The Court finds the First Security Agreement is

authentic and concludes it was effective to grant BOP a security interest in all of Debtor's

then owned and after-acquired equipment.

### 3.    Intent of the Parties as to the Collateral to Secure the First Loan

Most of Debtor's argument focuses on the alleged understanding of the parties

prior to execution of the First Security Agreement.  Debtor argues the October 3, 2018

email from Mesojednik to Debtor's insurer, which included a list of six items of

equipment to be used as collateral, Ex. 103, demonstrates the parties intended to use only

those six items for collateral for the First Loan.  BOP argues the First Security

Agreement's merger clause prohibits consideration of prior or contemporaneous

documents that contradict the terms of the agreement.

MEMORANDUM OF DECISION - 16

Absent fraud, accident, or mistake, a court may not use extrinsic evidence to contradict a written agreement containing a merger clause. *Microsoft Corp. v. Timeline, Inc.*, 2002 WL 339338, at *5 (Wash. Ct. App. 2002). In *Microsoft Corp.*, the Washington Court of Appeals amply summarized the effect of a merger clause on contractual interpretation under Washington law:

> When interpreting a contract, our primary goal is to determine the intent of the parties. *U.S. Life Credit Life Ins. Co. v. Williams,* 129 Wn. 2d 565, 569, 919 P.2d 594 (1996). We determine intent by the objective manifestations of the agreement rather than subjective intent of either party. *Max L. Wells Trust by Horning v. Grand Cent. Sauna & Hot Tub Co. of Seattle,* 62 Wn. App. 593, 602, 815 P.2d 284 (1991). This means that where, as here, the parties have put their agreement in writing and have indicated that the writing is the final and complete agreement of the parties, we must discern the parties' intent from the language of the writing. A voluntary signatory is generally bound to a signed contract even if ignorant of its terms. *Grand Cent.,* 62 Wn. App. at 602. And under the parol evidence rule, extrinsic evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a final and integrated written contract, in the absence of fraud, accident, or mistake. See *Berg,* 115 Wn.2d at 669. Because the meaning of language can rarely be determined without reference to the context in which the language is used, the Supreme Court in *Berg* held that a trial court may consider extrinsic evidence to determine the meaning parties have assigned to particular terms. But the *Berg* court qualified its holding by reaffirming the following principle of contract interpretation:
>
> > 'Such evidence, however, is admitted, not for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. Evidence of this character is admitted for the purpose of aiding in the interpretation what is in the instrument, and not for the purpose of showing intention independent of the instrument. It is the duty of the court to declare the meaning of what is written, and not what was intended to be written.'
>
> *Berg,* 115 Wn.2d at 669[.]

*Id.*

MEMORANDUM OF DECISION - 17

Here, the express language of the First Security Agreement states that "collateral" means "[a]ll equipment." Ex. 204 at 3. This language unambiguously indicates the parties intended that all of Debtor's equipment would serve as collateral for the First Loan. Debtor offered Exhibit 103, the email listing six specific items of equipment, in an effort to prove the parties intended to limit the collateral for the First Loan. However, this contradicts the express language of the First Security Agreement and is barred by the parol evidence rule. Further, while Debtor insinuates untoward actions on the part of BOP, Debtor has not invoked any exception to the parol evidence rule by arguing that Exhibit 103 shows fraud, accident, or mistake. Neither has Debtor provided evidence demonstrating such circumstances.

To the extent Debtor could have sought reformation of the First Security Agreement based on unilateral mistake, Debtor would have been required to show BOP acted fraudulently or inequitably by concealing material facts. *Washington Mut. Sav. Bank v. Hedreen*, 886 P.2d 1121 (Wash. 1994). Debtor did not introduce evidence of concealment of material facts or any other fraudulent or inequitable conduct on the part of BOP. Therefore, the Court cannot consider the October 3, 2018 email, Ex. 103, for the purpose of determining the pre-contractual intent of the parties.

Debtor also points to post-execution emails between Lunders and a BOP commercial documentation specialist, Naomi Avalos, which discuss collateral for the Second Loan. Exs. 101–102. In one of those emails Avalos wrote: "I believe we can finance 75% of the purchase which would be about $71,250[.] [D]o you want to do cash for the difference or pledge another piece of equipment?" Ex. 101 at 1. Debtor argues it

MEMORANDUM OF DECISION - 18

would be unnecessary for the parties to discuss additional collateral for the Second Loan

if BOP already had a security interest in all equipment securing the First Loan.

While consideration of these emails to show a contrary intention of the parties is

not barred by the merger clause,[10] this argument is nonetheless unpersuasive.

Mesojednik and Avalos testified BOP needed to ensure sufficient collateral was available

to fully secure the loaned amounts.  Put simply, holding a security interest in all

equipment does little to protect a lender's interests if the borrower does not have

sufficient equipment to cover the value of the loan.  A bank is not prohibited from taking

a belt-and-suspenders approach in collateralizing separate loan agreements.  The emails

discussing collateral for the Second Loan fail to conclusively establish the parties

intended the collateral securing the First Loan to be anything less than all equipment.

Therefore, the express terms of the First Security Agreement remain unaltered and

binding.

### D.    Effectiveness of the Second Security Agreement

The parties do not dispute the effectiveness of BOP's security interest arising from

the Second Security Agreement, but the Court will address it briefly.  The Second

Security Agreement's choice of law provision is somewhat unique.  It provides:

> With respect to procedural matters related to the perfection and enforcement
> of Lender's rights against the Collateral, this Agreement will be governed by
> federal law applicable to Lender and to the extent not preempted by federal
> law, the laws of the State of Idaho.  In all other respects, this Agreement will
> be governed by federal law applicable to Lender and, to the extent not

---

[10] The parol evidence rule applies only to prior or contemporary agreements. *Emrich v. Connell*,
716 P.2d 863, 866 (Wash. 1986); *Flower v. T.R.A. Indus., Inc.*, 111 P.3d 1192, 1200 (Wash. Ct. App.
2005) ("The parol evidence rule does not apply to subsequent agreements.").

MEMORANDUM OF DECISION - 19

preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Note and this Agreement has been applied for, considered, approved, and made, and all necessary loan documents have been accepted by Lender in the State of Washington.

Ex. 215 at 22. Here, the Court addresses the effectiveness of the Second Security Agreement, a substantive, rather than procedural, matter. Thus, Washington law applies.

The Court concludes the Second Security Agreement satisfies the requirements of RCW § 62A.9A-203(b). Value was given for the Second Security Agreement in the form of a $100,000 loan from BOP to Debtor. Debtor had rights in its equipment. And, Lunders signed the Second Security Agreement on Debtor's behalf twice—first, on November 8, 2018, and again on July 25, 2019. Thus, the Second Security Agreement, Ex. 215, was enforceable against Debtor with respect to all of Debtor's equipment.

BOP points out that the Second Security Agreement cross-collateralized the First Loan, and that even if the First Security Agreement somehow failed to grant BOP a security interest in all equipment, the Second Security Agreement did. BOP is correct. A cross-collateralization clause is valid even when it secures antecedent debt. *See Bastaich v. Kenworth Nw., Inc.,* 85 Wash. App. 1084, 1997 WL 206789, at *4 (Wash Ct. App. 1997) (concluding consideration for the cross-collateralization of a prior debt was given because additional credit was extended); RCW § 62A.9A-203(b)(1) (security interest is enforceable only when value is given); RCW § 62A.1-204(2) ("[A] person gives value for rights if the person acquires them . . . [a]s security for, or in total or partial satisfaction of, a preexisting claim"). In this case, the Second Security Agreement was effective in

MEMORANDUM OF DECISION - 20

cross-collateralizing the First Loan and Second Loan as additional credit was extended in consideration for the Second Security Agreement.

Therefore, even had Debtor been successful in establishing the First Loan was collateralized by six specific items of equipment, as of at least November 8, 2018, the entire debt owed to BOP by Debtor was secured by all of Debtor's then-owned and after-acquired equipment.

### E.    Change in Terms Agreement

The Court next turns to what effect, if any, the change in terms agreement, Ex. 207, had on BOP's collateral.  As a preliminary matter, the Court concludes the change in terms agreement, which only contemplated an extension of the maturity date of the First Loan, was not an effective modification to the First Security Agreement.

"Mutual modification of a contract by subsequent agreement arises out of the intentions of the parties and requires a meeting of the minds." *Jones v. Best*, 240, 950 P.2d 1, 9 (Wash. 1998).  "Without a mutual change of obligations or rights, a subsequent agreement lacks consideration and cannot serve as modification of an existing contract." *Ebling v. Gove's Cove, Inc.*, 663 P.2d 132, 136 (Wash. Ct. App. 1983).  One party may not unilaterally modify a contract. *Jones*, 950 P.2d at 7.  The burden of proving the parties intended to modify an earlier agreement rests upon the party asserting the modification. *Hanson v. Puget Sound Navigation Co.*, 323 P.2d 655, 658 (Wash. 1958).

Here, the First Security Agreement provided: "No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment."  Ex. 204 at 5.

MEMORANDUM OF DECISION - 21

The change in terms agreement was not signed by BOP, and both Lunders and

Mesojednik testified that BOP never agreed to the change in terms agreement.

Mesojednik testified further that BOP would not have agreed to any change in terms

unless Debtor brought both loans current.

Despite the ineffectiveness of the change in in terms agreement as a modification

of the First Security Agreement, Debtor argues BOP's collateral should be limited to the

list of equipment attached to the November 15, 2019 email containing the change in

terms agreement that Debtor signed and redlined, Ex. 207, because that email constituted

a request for a list of collateral pursuant to Idaho Code §§ 28-9-210 and 28-9-625(f).

Doc. No. 164 at 5–7.[11]  As noted earlier, the First Security Agreement is governed by

Washington law.  Under Washington law:

> [A] secured party, other than a buyer of accounts, chattel paper, payment
> intangibles, or promissory notes or a consignor, shall comply with a request
> within fourteen days after receipt:
>
>  . . .
>
> (2) In the case of a request regarding a list of collateral or a request regarding
> a statement of account, by authenticating and sending to the debtor an
> approval or correction.

RCW § 62A.9A-210(b).  "A secured party that claims a security interest in all of a

particular type of collateral owned by the debtor may comply with a request regarding a

list of collateral by sending to the debtor an authenticated record including a statement to

that effect within fourteen days after receipt."  RCW § 62A.9A-210(c).

---

[11] Debtor's closing argument did not address this argument, but it did not expressly abandon it
either.  Thus, the Court will consider it.

Further, RCW § 62A.9A-625(g)–(f) provides the remedy for a secured creditor's

failure to comply with a request under RCW § 62A.9A-210(b):

> (f) . . . A debtor or consumer obligor may recover damages under subsection
> (b) of this section and, in addition, five hundred dollars in each case from a
> person that, without reasonable cause, fails to comply with a request under
> RCW 62A.9A-210.  A recipient of a request under RCW 62A.9A-210 which
> never claimed an interest in the collateral or obligations that are the subject
> of a request under RCW 62A.9A-210 has a reasonable excuse for failure to
> comply with the request within the meaning of this subsection.

> (g) . . . If a secured party fails to comply with a request regarding a list of
> collateral or a statement of account under RCW 62A.9A-210, the secured
> party may claim a security interest only as shown in the list or statement
> included in the request as against a person that is reasonably misled by the
> failure.

However, a "'[r]equest regarding a list of collateral' means a record authenticated by a

debtor **requesting** *that the recipient approve or correct a list of what the debtor believes*

*to be the collateral securing an obligation* and reasonably identifying the transaction or

relationship that is the subject of the request."  RCW § 62A.9A-210(a)(3) (emphasis

added).

In this case, Debtor's redlining of the change of terms agreement fails to meet the

definition of a request for a list of collateral because it did not request "that the recipient

approve or correct a list of what the debtor believes to be the collateral securing an

obligation."  Debtor's redlining signaled a rejection of, and counteroffer to, the change in

terms agreement, rather than a request for information regarding the First Security

Agreement.  The Court is not persuaded that a simple strikethrough of one line on a

contemplated modification agreement should trigger the statutory duties of  RCW

§ 62A.9A-210 when the plain language of that section requires the debtor to request

MEMORANDUM OF DECISION - 23

approval or correction of a list of collateral.  Therefore, the Court concludes the unexecuted change in terms agreement, and the modifications thereto, had no effect on BOP's security interest in Debtor's then-owned and after-acquired equipment.

**CONCLUSION**

Based on the foregoing, Debtor's Objection will be overruled.  The First Security Agreement is valid and grants BOP a security interest in all of Debtor's equipment.  The Second Security Agreement is also valid, granting BOP a security interest in Debtor's equipment and cross-collateralizing the prior debts owed to BOP.  The proposed change in terms agreement did not satisfy the contractual requirements for a modification to the terms of either security agreement, nor did it constitute a request for a list of collateral. As such, BOP retains a security interest in all of Debtor's equipment acquired prepetition.[12]  The Court will enter an appropriate order.

DATED:  April 13, 2021



_____
NOAH G. HILLEN
U.S. Bankruptcy Judge

_____
[12] *See* § 552(a); *Arkison v. Frontier Asset Mgmt. LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330, 335 (9th Cir. BAP 2004) ("Section 552(a) cuts off security interests on property acquired by the debtor after the petition date even if there is an "after-acquired" clause in the security agreement.").

MEMORANDUM OF DECISION - 24