Sheila R. Schwager, ISB No. 5059
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  208.344.6000
Facsimile:  208.954.5209
Email: sschwager@hawleytroxell.com

Attorneys for Creditor Bank of the Pacific

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>IDC ENTERPRISES, INC.,<br><br>Debtor | Case No. 20-20081-NGH<br><br>Chapter 7 |

**BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION (DKT. NO. 183)**

Secured Creditor, Bank of the Pacific ("**Bank**"), by and through its attorneys of record,

HAWLEY TROXELL ENNIS & HAWLEY LLP, hereby files this Response to the Trustee's Motion for

Substantive Consolidation, Dkt. No. 183 ("**Trustee's Motion**"), filed on May 14, 2021.

1.     The Bank of the Pacific retains a security interest in all of the non-titled

equipment of which the Debtor, IDC Enterprises, Inc., ("**Debtor**") holds an interest, as indicated

and set forth in the Debtor's bankruptcy schedules.  *See* Claim No. 5; and Order denying

Debtor's objection to the claim of Bank of Pacific, Dkt. No. 182.  The Bank of the Pacific was

BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION (DKT. NO. 183)  - 1

owed approximately $220,000 as of June 7, 2021, after liquidating eight (8) items of equipment in Alaska via auction.  *See* 2nd Amended Proof of Claim to Claim #5, filed on June 11, 2021.

2.      The Bank of the Pacific also has an unsecured claim against Jason Lunders, a guarantor of the obligations due and owing to the Bank of Pacific by the Debtor.

3.      Mr. Lunders testified at the Debtor's creditors meetings that he solely owns and controls the Debtor, and two related entities, IDC Equipment, LLC ("**IDC Equipment**") and IDC Land, LLC ("**IDC Land**").  The Debtor, IDC Equipment and IDC Land are collectively referenced herein as the "**IDC Entities**."

4.      The Trustee was appointed on September 30, 2020.

5.      On November 6, 2020, the Trustee had to file a Motion for Turnover, due to Mr. Lunders' refusal to turn over equipment and titles of vehicles that were itemized in the Debtor's bankruptcy schedules.  *See* Dkt. 116.

6.      After an evidentiary hearing, on April 13, 2021, this Court entered an Order requiring the Debtor to turnover all the property identified as estate property in the Memorandum of Decision, which remained in its possession or control.  *See* Dkt. 180.

7.      On May, 28, 2021, the Trustee filed a Motion for Contempt representing that as of May 28, 2021, the Debtor had completely ignored this Court's order and directive.  In that regard, no property had been turned over to the Trustee, Mr. Lunders had not cooperated in any manner to grant the Trustee's auctioneer access to any property, and no titles were provided to the Trustee.  *See*  Dkt. 184.

BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION (DKT. NO. 183)  - 2

8.      The Trustee filed the Substantive Consolidation Motion, stating that there is a disregard of corporate formalities between Mr. Lunders and the IDC Entities, the commingling of assets and funds, and harm to the Estate and creditors.

9.      Based upon Mr. Lunders' testimony at the creditors meeting held on March 31, 2020 and on January 25, 2021, the Trustee's assertions appear to be well founded:  For example:

a.  It is evident that the corporate formalities of the IDC Entities, have been completely disregarded, since Mr. Lunders acquired the Debtor.  Indeed, Mr. Lunders testified at the creditors meeting held on January 25, 2021 ("**January CM**"), that he had no operating agreements, bylaws, or meeting minutes, since he acquired the Debtor.

b.  Notably, at the January CM, Mr. Lunders testified that he did not have a personal bank account until recently, and merely used the funds from the account of the Debtor to pay all of his personal living expenses.  Further, when Mr. Lunders was asked at the March 30, 2020 creditors meeting ("**March CM**"), how he lived where he had testified that he did not take a salary from the Debtor, he explained that he just used the Debtor's account to pay for all of his living expense.  Attached as Exhibit A is a true and correct formal transcript of the March CM; see Ex. A, pp.36-38.

c.  As to IDC Equipment, Mr. Lunders testified at the March CM, that he had told his bookkeeper to transfer equipment from the Debtor to IDC Equipment to attempt to limit liability in case one of the vehicles were involved in an

BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION (DKT. NO. 183)  - 3

accident, but he stated he had "no idea" what the bookkeeper had moved over

and thought "it wasn't much."  See, Ex. A pp. 22-23.

d. At the time of the "transfer," by the bookkeeper, IDC Equipment was not an

operating entity, and therefore was not generating its own money.  Indeed, it

appears that until after the bankruptcy filing, IDC Equipment had no

employees or generated any funds.  Despite not operating, Mr. Lunders did

recall using funds in an IDC Equipment account to purchase a road grader.  In

that regard, he did not identify the underlying source of funds for that

purchase, where IDC Equipment did not generate income.  Then, as to another

item of equipment, he explained that even though a "skidder" was in the name

of IDC Equipment, all the paper work and money to pay for the skidder was

through the Debtor.  Ex. A, pp. 22-23.  Candidly, Mr. Lunders testified that

"nothing was as clean cut as I would have liked it to be." *Id.*   He also

admitted that "its just me and everything is really closely woven together,

whether its supposed to be or not." Ex. A, p. 30.  Toward the end of the

creditors meeting, Mr. Lunders admitted that he did not know if anything

could be "called under IDC Equipment without causing a squabble." Ex. A,

p. 108.

e. Mr. Lunders further explained when the Kamiah ranch was purchased he

personally paid about $15,000 for equipment located on that property and then

put that equipment in IDC Equipment. Ex. A, pp. 27-28.  Query where Mr.

Lunders obtained the personal funds, since he had no personal bank account at that time, according to the testimony at the January CM.

f.   In regard to IDC Land, Mr. Lunders testified that he paid $80,000 from the Debtor's account for the purchase of the Red River property, which he put in the name of IDC Land. Ex. A, pp. 40-42. Apparently he also paid $90,000 from the Debtor's account to make the down payment for the Elk City property, titled in the name of IDC Land. Ex. A, p.118.

g.   When Mr. Lunders was asked how IDC Land made payments for the remaining $80,000 owed to purchase Red River (as IDC Land is not an operating entity with employees), he explained that they came from the Debtor's account, but they were really from him because the Debtor owed him "close to a half a million dollars," so "its probably going to take an accountant to figure it out…. And it's all a bookkeeping nightmare." Ex, A, p.77.

h.   At another point he said there may have been a lease between IDC Land and the Debtor, but he did not know if one existed or not. Notably, there is no lease identified in the Debtor's schedules in that regard.

10.   Further, in reviewing the financials that Mr. Lunders provided to the Bank of the Pacific in 2018, to obtain the loans that are the basis for the Bank's claims, Mr. Lunders does not even reference IDC Land or IDC Equipment in the financials. Indeed, despite the financial statement requesting information as to investments in closely held companies, there is no information submitted. Instead, Mr. Lunders represented in his signed financials that he personally owned the following assets: deposits of $13,800, a RV of $35,000, 42 head of cattle

BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION (DKT. NO. 183) - 5

worth $60,000 and the real properties that he now claims are owned by IDC Land. In that regard

he represented he owned property in Grangeville, Idaho worth $300,000; the Ranch valued at

$390,000, the property in Elk City worth $280,000, and the Red River property worth $180,000,

with another 19 acres worth $75,000.  As to the Debtor, Mr. Lunders submitted a balance sheet

to the Bank of the Pacific representing the Debtor owned vehicles worth $66,699.79 and

equipment worth $1,129,513.21.  Attached to the financials were the 2015 Federal Depreciation

Schedules of the Debtor itemizing the equipment owned by the Debtor, supporting the balance

sheet.

11.     The lack of cooperation of Mr. Lunders on behalf of the Debtor is s evidenced by

the fact that the Trustee had to file a turnover motion and now a contempt motion.  The lack of

separateness is evidenced by (i) Mr. Lunders' admission that he comingled funds amongst

himself and all the IDC Entities; (ii) Mr. Lunders' testimony that he did not follow corporate

formalities; and (iii) his testimony that he moves assets to the different IDC Entities, at his

pleasure; which all now appear to be attempts to interfere with the Trustee's liquidation of non-

exempt assets for the benefit of the creditors and Estate.  Further, based upon Mr. Lunders'

testimony at the creditors meeting, it appears that the assets of Mr. Lunders and the IDC Entities

materially exceed the amounts that are owed to all creditors.  Thus, those creditors of Mr.

Lunders and the other IDC Entities would not be harmed by the consolidation.

12.     Accordingly, the Bank of the Pacific, as both a secured creditor of the Debtor and

an unsecured creditor of Mr. Lunders, supports the Trustee's Motion.

DATED THIS 11th day of June, 2021.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By _____

Sheila R. Schwager, ISB No. ISB No. 5059
Attorneys for Creditor Bank of the Pacific

BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION (DKT. NO. 183) - 7

58284.0001.13817155.1

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 11th  day of June, 2021, I electronically filed the foregoing BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR SUBSTANTIVE CONSOLIDATION (DKT. NO. 183), with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| D. Blair Clark | dbc@dbclarklaw.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Patrick J Geile | PGeile@foleyfreeman.com;  ID21@ecfcbis.com |
| Gary L. Rainsdon | trustee@filertel.com |
| Randall A. Peterman | rap@givenspursley.com |

AND, I HEREBY CERTIFY that I have served the foregoing document to the following non-CM/ECF Registered Participants **via U.S. Mail** (list names and addresses):

IDC Enterprises, Inc.,
450 White Bird Street
Grangeville, Idaho 83530

Sheila R. Schwager

BANK OF THE PACIFIC'S RESPONSE TO TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION (DKT. NO. 183)  - 8

58284.0001.13817155.1

**Audio Transcription** 1

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

In Re:                                    )

IDC ENTERPRISES, INC.,                    )   Case No.

        Debtor.                          )   20-20081-TLM

_____ )

## TRANSCRIPT OF RECORDED 341(A) MEETING

## MARCH 31, 2020

TRANSCRIBED BY:

JEFF LaMAR, C.S.R. No. 640

Notary Public



In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 2

```
 1  The Trustee:  Gary L. Rainsdon (Present Telephonically)
 2              APPEARANCES OF COUNSEL:
 3  For the Trustee:
 4      OFFICE OF THE UNITED STATES TRUSTEE
 5      BY MR. BRETT L. CAHOON
 6      720 Park Boulevard, Suite 220
 7      Boise, Idaho 83712
 8      brett.r.cahoon@usdoj.gov
 9  For Creditor Bank of the Pacific:
10      (Present Telephonically)
11      HAWLEY, TROXELL, ENNIS & HAWLEY LLP
12      BY MS. SHEILA R. SCHWAGER
13      877 Main Street, Suite 1000
14      Post Office Box 1617
15      Boise, Idaho 83701-1617
16      sschwager@hawleytroxell.com
17  For the Debtor:
18      (Present Telephonically)
19      LAW OFFICES OF D. BLAIR CLARK, PLLC
20      BY MR. D. BLAIR CLARK
21      1513 Tyrell Lane, Suite 130
22      Boise, Idaho 83706
23      dbc@dbclarklaw.com
24  Also Present:
25      Mary Beth (Present Telephonically)
```

---

Page 3

```
 1              I N D E X
 2
 3           W I T N E S S E S
 4  JASON LUNDERS                          PAGE
 5  Examination by Mr. Cahoon                 6
 6  Examination by The Trustee               67
 7  Examination by Ms. Schwager              76
 8  Further Examination by Mr. Cahoon       113
 9  Further Examination by The Trustee      122
10
11              EXHIBITS
12
13            (NONE MARKED)
14
```

---

Page 4

```
 1      MR. CAHOON: This is the case of IDC
 2  Enterprises, Inc., case No. 20-20081-TLM.  Today is
 3  March 31st, 2020.  It's now approximately ten o'clock
 4  a.m.  My name's Brett Cahoon.  I'm an attorney in the
 5  office of the United States Trustee, which is a
 6  component of the U.S. Department of Justice.  And the
 7  U.S. Trustee supervises the administration of
 8  bankruptcy cases under the bankruptcy code.  The
 9  debtor's required to appear and be examined under oath
10  regarding the bankruptcy case.  The examination is
11  being recorded.  All persons questioning the debtors
12  must state their name and indicate who they represent
13  when -- when I open it up for questions by creditors or
14  other parties.  Creditors will be given an opportunity
15  to ask questions of the debtor, as well as the trustee
16  in this case, Gary Rainsdon.
17      For purposes of the record -- and I first
18  want to thank everybody for allowing us to conduct this
19  meeting by telephone.  I know this isn't how we
20  normally do these things, but these aren't really
21  normal times, and we're kind of just working through
22  the logistical challenges of all of these -- of all of
23  this with the coronavirus pandemic.  So thank you to
24  everyone for accommodating.
25      Hopefully this works smoothly.  I know we
```

---

Page 5

```
 1  can't see each other, so we'll just do our best to try
 2  not to talk over one another.  As I ask questions,
 3  please let me finish the question before responding.  I
 4  know we won't have a lot of the nonverbal cues that we
 5  would get being in person.  But we'll go ahead and get
 6  started.
 7      Mr. Lunders, if I could have you raise your
 8  right hand to the square.
 9      MR. LUNDERS: Okay.
10      MR. CAHOON: Do you swear or affirm to tell the
11  truth, the whole truth, and nothing but the truth?
12      MR. LUNDERS: I do.
13      MR. CAHOON: Okay.  And if I could have you
14  speak up just a little bit more.  I didn't pick that
15  up, and I don't believe the recorder would have picked
16  that up.  Let me repeat that.
17      MR. LUNDERS: Okay.
18      MR. CAHOON: Do you swear or affirm to tell the
19  truth, the whole truth, and nothing but the truth.
20      MR. LUNDERS: Yes, I do.
21  ///
22  ///
23  ///
24  ///
25  ///
```

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

Page 6

1        JASON LUNDERS,
2 having been called as a witness by The Office of the
3 United States Trustee, first duly sworn to tell the
4 truth relating to said cause, testified telephonically
5 as follows:
6
7      MR. CAHOON: Thank you.
8       Can I please have you state your name for
9 the record.
10      THE WITNESS: Jason Lunders.
11      MR. CAHOON: And debtor's counsel.
12      MR. CLARK: Blair Clark.
13      MR. CAHOON: Thank you, Blair.
14
15        EXAMINATION
16 BY MR. CAHOON:
17     Q.  Mr. Lunders, can you please verify the
18 capacity in which you represent the debtor.
19     A.  I'm the president.
20     Q.  Okay.  And I believe you're also the sole
21 owner of the debtor.
22      Is that correct?
23     A.  Yeah, that's correct.
24     Q.  And can you verify that the corporation
25 properly authorized the filing of the bankruptcy.

Page 7

1     A.  Yes, it did.
2     Q.  Does the debtor currently have directors
3 and officers insurance in place?
4     A.  I don't know what that is.
5     Q.  It's a type of insurance policy that
6 protects either the directors and officers or the
7 corporation against the conduct of directors and
8 officers.  If you don't know what it is, you probably
9 don't.
10      Does that sound like anything that the
11 debtor has?
12     A.  Probably not.
13     Q.  Okay.  Did you read the Chapter 11
14 guidelines from the U.S. Trustee's Office?
15     A.  Yes.
16     Q.  Did you sign the petition, schedules,
17 statement of financial affairs, and related documents,
18 and are the signatures your own?
19     A.  Yes, they are.
20     Q.  Did you read the petition, schedules,
21 statement of financial affairs, and related documents
22 before you signed them?
23     A.  Yes.
24     Q.  Are you personally familiar with the
25 information contained in those documents?

Page 8

1     A.  I am.
2     Q.  To the best of your knowledge, is the
3 information contained in the petition, schedules,
4 statements, and related documents true and correct?
5     A.  Yes.
6     Q.  Are there any errors or omissions to bring
7 to my attention at this time?
8     A.  Not that I've thought.
9     Q.  Are all of the debtor's assets identified
10 on the schedules?
11     A.  Everything we could think of.
12     Q.  Okay.  Are there -- are there other assets
13 that you believe there might be that aren't listed on
14 the schedules?
15     A.  No.  No.  Everything we could think of is
16 on there, so...
17     Q.  Okay.  And have you given those assets a
18 fair value?
19     A.  Yes.
20     Q.  Have you listed all of the debtor's
21 creditors on the schedules?
22     A.  Yes.
23     Q.  Are the amounts listed as paid to debtor's
24 counsel in the Attorney Fee Disclosure, Statement of
25 Financial Affairs, and Employment Application a correct

Page 9

1 statement of all amounts that the debtor has paid to
2 the attorney or that have been paid on the debtor's
3 behalf?
4     A.  I'm not sure I understand what you're
5 saying.  I just -- I gave Blair one check when I hired
6 him, and that was all we've done so far.
7     Q.  Okay.  And how much was that check for?
8     A.  I don't remember.
9      Do you have that, Blair or Mary Beth?
10     MR. CLARK: He brought us 10,000 even to start
11 with.
12     Q.  (BY MR. CAHOON):  Does that -- Mr. Lunders,
13 does that sound like the correct amount and all amounts
14 that have been paid to your attorney?
15     A.  Oh, I'm sure it is, yes.
16     Q.  Okay.  And are you aware that if you
17 identify any incorrect information in the petition,
18 schedules, statement of affairs, or related documents
19 that you need to file an amendment with the Court?
20     A.  Okay.
21     Q.  Has the debtor -- debtor ever previously
22 filed for bankruptcy?
23     A.  IDC Enterprises?
24     Q.  Right.
25     A.  No.

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 10

```
1    Q. Okay. Have you filed bankruptcy on behalf
2  of any other entities, you personally?
3    A. A personal bankruptcy, yes.
4    Q. Okay. But you've never -- you've never had
5  another entity that you owned or controlled that's
6  filed bankruptcy before?
7    A. No. We've never had anybody not pay us
8  like this before.
9    Q. Okay. And do you understand that as a
10  debtor-in-possession you're essentially acting as a
11  trustee and that you owe a fiduciary duty to your
12  creditors?
13    A. I think so.
14    Q. Is there any reason that you wouldn't be
15  able to fulfill that duty and that responsibility?
16    A. No.
17    Q. Do you understand the obligation to file
18  monthly operating reports and to pay quarterly U.S.
19  Trustee fees?
20    A. Yes.
21    Q. Have all of your prepetition tax returns
22  been filed?
23    A. Mr. Clark's been checking on that. I don't
24  know where we're at with that.
25       Do you know for sure, Blair?
```

Page 11

```
1       MR. CLARK: I don't. I have to get ahold of
2  your accountant up in Lewiston and find out, because
3  Forsmann's records that we got didn't have any tax
4  returns in them.
5       MR. CAHOON: Okay.
6    Q. And I think I saw where you had -- in
7  Docket 22 that you filed with the Bankruptcy Court, it
8  looks like you attached a 2018 corporate income tax
9  return.
10       Are you familiar --
11       MR. CLARK: That's one that the gentleman in
12  Lewiston prepared.
13       MR. CAHOON: Okay.
14    Q. And was that -- is that a true and correct
15  copy of the tax return that you filed with the IRS?
16    A. Sorry. Are you asking me a question or
17  Blair?
18    Q. Yeah. That was to you, Mr. Lunders. The
19  2018 tax return that you filed with the Court, is it a
20  true and correct copy of the tax return that you filed
21  with the IRS?
22    A. It was something that the accountant gave
23  to -- gave to Blair for this. I'm sure it's the same
24  as what he turned in. I...
25    Q. Okay. Do you know if that return was filed
```

Page 12

```
1  with the IRS, the 2018 return?
2    A. I don't know.
3    Q. Um --
4       MR. CLARK: Brett.
5       MR. CAHOON: Yeah.
6       MR. CLARK: If I can interject here a minute.
7  Part of the problem in answering the question about the
8  tax return is looking at the IRS's claim that they
9  filed, it appears that there's some excise tax returns
10  and some other returns that maybe didn't get done.
11  That's part of the reason that Jason and his company
12  left Forsmann, which is an accounting firm up in
13  Cottonwood, and went to the firm in Lewiston. But the
14  firm in Lewiston, they're good on preparing returns,
15  but that's all they do. They don't do any accounting
16  and such to try to straighten the books out.
17       MR. CAHOON: Okay. And we'll talk a little bit
18  more about the IRS proof of claim a little bit later.
19    Q. Where are things at with the 2019 tax
20  return, Mr. Lunders? Do you know?
21    A. No, I do not. We -- so our company,
22  the tax year ends in May. And so when Forsmann's were
23  dropping the ball on us, my uncle's secretary came to
24  help. So she -- she went over and got all the
25  information she could, and we put her on the -- she
```

Page 13

```
1  does the online banking where she could go into our
2  bank account and get all the checking -- checking
3  information and put it onto QuickBooks. And then she
4  would take the QuickBooks up to Gerald Parkins. Gerald
5  Parkins -- and we worked out of their office in Moscow.
6  It's not listed all the time, but the Moscow.
7       Anyway, so -- so Gerald would have the
8  QuickBooks information that Janey [phonetic] put
9  together, and he would -- he was doing the taxes on it
10  then. And the -- so when you say 2018, that would be
11  from June of '17 till May of '18 and then from June of
12  '18 till May of '19 is how that -- that tax year breaks
13  down. It's not in January.
14    Q. Okay. And so the May of '19, the period
15  ending May of '19, would that be your 2019 tax return?
16    A. I'm not -- I really couldn't tell you what
17  we've got going. I know he -- Gerald told me that he
18  had payroll information up to December of '19, because
19  she was running the payroll through QuickBooks, but
20  she'd only entered the check register through May or
21  June with just enough for him to do the taxes for up
22  till May of '19, I think is what he said.
23    Q. Okay. And I'm looking at your tax return
24  now. I don't know if you have this in front of you,
25  Docket 22, that you filed with the Court. Page 10 of
```

**M & M Court Reporting Service**
(208)345-9611(ph)  (800)234-9611  (208)-345-8800(fax)

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 14

1  21 of that document looks like it shows a 2018 return
2  and the period beginning June 1st, 2018, and ending
3  May 31st, 2019.  So it looks like perhaps the May -- in
4  May 2020 is when your 2019 return would be due.
5      Does that -- does that sound right?
6  A.  Yeah.
7  Q.  Okay.
8  A.  It's not [unintelligible] for the book.
9  Q.  And so do you plan to retain a bookkeeper
10  or an accountant in connection with this bankruptcy
11  case?
12  A.  Yeah.  Blair has one that he's recommended
13  and he has worked with before and does a real good job,
14  so I'm wide open to everything.
15  MR. CLARK: We've got the -- Mr. Lunders'
16  signature on that application.  We're just waiting for
17  Annette [phonetic] to sign it and send it back so we
18  can get it filed.
19  MR. CAHOON: Okay.
20  Q.  Kind of in -- in the context of these --
21  the tax returns discussions, it's important to know
22  that failure to timely file tax returns or to pay taxes
23  that come due after the bankruptcy is filed is cause
24  for dismissal or conversion of the case, so it's
25  important to stay on top of those requirements and

---

Page 15

1  obligations.  Also, the failure to file monthly --
2  monthly operating reports is also grounds for
3  conversion or dismissal of the case, so it's important
4  to stay on top of those reporting requirements as well.
5      Does the debtor have appropriate and
6  customary insurance maintained naming the
7  debtor-in-possession as the insured and providing
8  notice to the U.S. Trustee of any changes or
9  cancellation of that policy?
10  MR. CLARK: We've sent to Mr. Crawford
11  [phonetic] all of the insurance coverage that IDC has.
12  And it looks like it is, yes.  We also sent in the
13  workers' comp certificate.  We thought we'd sent that
14  earlier, but he said he needed it, so we sent it again.
15  Q.  (BY MR. CAHOON)  Okay.  Does the debtor
16  understand the duty to keep estate funds in a
17  debtor-in-possession account at an authorized
18  institution?
19  A.  What do you mean by that?
20  Q.  So all of the funds of the debtor should be
21  held in a debtor-in-possession account, a bank account.
22  I believe I got an --
23  A.  [Unintelligible].
24  Q.  Sorry.  What was that?
25  A.  Yeah, yeah.  That's what we just opened.  I

---

Page 16

1  didn't understand what you meant.  Yeah, we opened a
2  checking account just for this, that DIB account.
3  Q.  Great.  Thanks.  And I think I got an
4  e-mail confirming that from Mary Beth.
5      Have you -- have you been able to move all
6  of the funds of the debtor into that account?
7  MR. CLARK: He's had a lot of trouble even
8  getting that account open up there.  Most of the banks
9  didn't even want to work with it, because he was an
10  existing customer of theirs, which is something I'd
11  never heard before.  But Wells Fargo finally did as of
12  yesterday.  So he still needs to move the money over,
13  but the account's finally got opened.
14  MR. CAHOON: Okay.  Great.  Thanks.
15  MR. CLARK: Jared's [phonetic] been helping us
16  with that.
17  MR. CAHOON: Perfect.  Thanks.  Yeah.  And if
18  you could just as soon as possible get the money moved
19  over into that account, I'll -- all of the funds need
20  to -- to be held in that account and all the funds need
21  to go through that account.
22  Q.  Does the debtor understand that the
23  debtor's not to engage in cash transactions?
24  A.  No, I don't really [unintelligible].  What
25  do you mean by that?

---

Page 17

1  MR. CLARK: It means you're supposed to use the
2  checking account so there's a record of it and not use
3  green money out of your wallet to pay bills.
4  THE WITNESS: Okay.  All right.
5  MR. CAHOON: Thanks, Blair.
6  Q.  And so you understand that at this point
7  now that the money --
8  A.  Yeah.
9  Q.  -- needs to be through the DIP account?
10  A.  Yes.
11  Q.  Do you understand the limitation on the use
12  of cash collateral or making payments on prebankruptcy
13  debts?
14  A.  If you can -- do you have a minute to tell
15  me so I'm clear on it?
16  Q.  What was that?
17  A.  Can you -- can you tell me real quick so
18  I'm clear on it?
19  Q.  So if you have any cash that a creditor has
20  a lien in, you -- there's limitations on the use of
21  that cash.  If you were to sell any property that had a
22  lien on it and the lien extended to the -- to the cash,
23  that there's limitations on the use of that.
24      Do you understand that there's those
25  limitations in the bankruptcy?

---

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 18

1   A.  Okay.  Yeah.  I know what you mean now,
2   yeah.  There's no cash, and IDC Enterprises doesn't
3   have any land or anything, so...
4   Q.  Do you -- do you understand that you can't
5   make payments on prebankruptcy debts?
6   A.  Yes.
7   Q.  And do you understand that there's
8   limitations on engaging in transactions outside the
9   ordinary course of business?
10   A.  What would be outside the ordinary course
11   of business?
12   Q.  So for example, sales of --
13   A.  [Unintelligible.]
14   Q.  What's that?
15   A.  I don't understand what you mean.
16   Q.  So -- so the debtor has a business, it
17   operates a business, and it has kind of ordinary
18   business activities.  Any conduct or transactions
19   outside the ordinary course of business typically
20   require Bankruptcy Court notice and approval.
21   Do you understand that there's limitations
22   on -- on the types of transactions that you can enter
23   into in the bankruptcy context?
24   A.  I think so.  If anything came up that's
25   not -- not just what we normally do or have done, I

---

Page 19

1   guess I'd run it by Blair first, of course, to make
2   sure --
3   Q.  Right.  You --
4   A.  -- make sure if we need to talk.
5   Q.  Right.  And you can visit with Mr. Clark
6   more about these limitations and everything, and I
7   strongly encourage you to do so.
8   MR. CLARK: He's been --
9   MR. CAHOON: Yeah, Blair.
10   MR. CLARK: Brett, he's been real good about
11   asking us questions that -- pretty much whatever he
12   wants to do.
13   MR. CAHOON: Okay.
14   MR. CLARK: So...
15   MR. CAHOON: Thanks.
16   MR. CLARK: We'll just -- we'll take him through
17   a step at a time.
18   MR. CAHOON: That sounds good.  Thanks.
19   Q.  Do you understand that a report of sale
20   must be filed regarding all sales conducted outside the
21   ordinary course of business?
22   A.  Yeah.
23   Q.  Are the -- we kind of touched on this
24   earlier, but the tax returns that you provided to the
25   U.S. Trustee, are they the returns that you filed with

---

Page 20

1   the IRS?
2   A.  To the best of my knowledge, yes.
3   Q.  Has the debtor paid any prepetition debts?
4   A.  No, not since we filed.  We were making
5   payments on -- and we talked to this -- to, I guess --
6   yeah, we have monthly -- monthly bills that come in,
7   whether it's fuel bills or power bills or parts bills
8   or whatever, and that's what we were paying right up
9   till -- till we filed.  And then Blair said just wait
10   on this, we have to wait on -- wait on everything now.
11   So we're just waiting on everything right now.
12   Q.  Okay.  Does the debtor own or control any
13   other businesses?
14   A.  Yes.  I -- I have my personal -- my
15   personal stuff, and I also have -- when we -- when
16   we -- we formed IDC Enterprises in about 2007 or '8,
17   and when we started selling a lot of hop poles over
18   around the Yakima Valley and stuff, we were hauling
19   them over there ourselves.  And so -- with our own
20   trucks.  And I was concerned about the trucks being a
21   liability if there was an accident or anything like
22   that.  So I asked Forsmann's to form an IDC Equipment,
23   LLC, and start moving equipment over to that LLC so it
24   was separate from the trucks.
25   And then when we purchased some pack here,

---

Page 21

1   we formed an LLC -- or Forsmann did, an LLC called IDC
2   Land.  And when we bought the pasture, that's what --
3   you know, the land is under IDC Land, LLC, and then --
4   and that equipment's a real -- there's one road grader
5   I know I wrote a check to out of that account for,
6   but -- the IDC Equipment.  I don't know what Forsmann
7   ever got moved over there or anything.  That -- that
8   box of paperwork that we took down the other day, we
9   didn't see anything like a bill of sale or anything
10   from IDC Enterprises to IDC Equipment that there's --
11   there was a couple pieces of equipment that we
12   purchased just from -- IDC Equipment bought them
13   themselves, but it's -- the bookkeeping's been a
14   real -- real problem.
15   Q.  Okay.  So a couple follow-up questions on
16   that, so just so I can understand what you were saying
17   there.
18   So IDC Enterprises was formed in 2007/2008,
19   you said?
20   A.  I think so, yeah.
21   Q.  And then -- and then you formed IDC
22   Equipment at a later time.
23   And when was that formed?  Do you know?
24   A.  Yeah.  No, I don't remember for sure.
25   Q.  So did -- did IDC Enterprises, the debtor,

---

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

---

Page 22

1  did the debtor transfer equipment to IDC Equipment?
2      A.  Well, I -- so I was over in Forsmann's
3  office with our accountant, and I -- and I just told
4  her that this is what I wanted to do.  I wanted to have
5  another company that had the equipment in it so that,
6  you know, if a truck got in a wreck or anything, they
7  couldn't come and take everything that we had.  And so
8  I just left it at that.  And I don't know what she got
9  done.  I just left it in her hands and I -- I went back
10  to work.
11      Q.  Okay.  So do you know if IDC Equipment
12  actually owns anything?
13      A.  Well, I know -- I know that there are
14  pieces of equipment listed under IDC Equipment.  And I
15  know that one of the road graders, I went up to Deary
16  and bought it from a guy and wrote him a check with
17  that new checking account, because it was the very
18  first check wrote out of it when we got the checkbook.
19  So I know that that road grader is -- is under that
20  entity.  And I don't know what all Brandi did move
21  over.
22          When we talked to Mr. Parkins, I know that
23  one of the -- he said he saw where one of the skidders
24  was, and then the -- the new -- the new skidder that we
25  have a loan on, it -- he said that it was under IDC

Page 23

1  Equipment, but all the paperwork that we did on it --
2  and I remember doing it because we bought it from back
3  East, it was under IDC Enterprises.  And the payment
4  for that skidder comes out monthly out of the IDC
5  Enterprises checking account.
6          So nothing was as clean cut as I would have
7  liked it to be.  And she probably would have got it
8  done in time; she was just busy with other stuff and
9  didn't get everything moved over to the other entity,
10  so...
11      Q.  Okay.
12      A.  If IDC Enterprises -- or IDC Equipment has
13  anything, the only thing that I can tell you for sure
14  was they had the skidders -- two of the skidders listed
15  and I know that one of the road graders was, but I
16  really don't know what else she had in there.
17      Q.  Okay.
18      A.  It wasn't very much.
19          Do you remember Blair?
20      MR. CLARK:  I don't.  That's part of what
21  Annette needs to do is go through and find out what was
22  actually put where.
23      Q.  (BY MR. CAHOON):  Okay.  So in your -- in
24  your schedule --
25      MR. CLARK: Parkins said -- now, Mr. Parkins

Page 24

1  indicated that he could not actually trace, from the
2  records he had, equipment between the entities.
3      MR. CAHOON:  Okay.
4      MR. CLARK:  So that's part of it.  And we
5  finally went and got the source document box from
6  Forsmann.  They finally turned it loose.  And Annette
7  has that now.
8      MR. CAHOON:  Okay.  Thanks.
9      Q.  So in your schedules -- do you have your
10  schedules in front of you, Mr. Lunders?
11      A.  I've got everything spread out here on the
12  counter.
13          Which one are the schedules?
14      Q.  So this is -- I'm looking at Docket 23.
15      A.  I got a 931, a 410, a 206, 401, Chapter 11
16  guidelines.
17      Q.  So this is --
18      A.  I have an equipment list.
19      Q.  Yeah, there's an equipment list.  And so
20  you have Schedules A and B that you filed, and it's on
21  Official Form 202.  And then the third page in, it's
22  a -- it says, "Schedule A and B.  Your assets, real and
23  personal property."
24          Do you see that?
25      THE WITNESS: Do you know if I have that, Mary

Page 25

1  Beth?  I've got the 201 here.  Do you have that in the
2  file?  Okay.
3      Q.  (BY MR. CAHOON):  Let me -- let me just
4  show you what I see here.  So on page 4 it asks you to
5  list machinery, fixtures, and equipment.  And you
6  say -- in the first line it says, "See attached list of
7  equipment," and it shows a current value of all of that
8  attached list of equipment at $967,000.  And then it
9  shows a 2006 290 Link-Belt Jewell front log loader, and
10  a 2006 620C Tigercat skidder, a 2005 290 Kobelco Jewell
11  yoder, a 2004 Kobelco 330 Jewell front, and then it
12  lists "van/trailer contents, tools, hose press,
13  compressor, hot water pressure washer, freezer," and it
14  values all of that at 340,000.
15          So the -- the road grader and the two
16  skidders that you talked about that IDC Equipment might
17  own, are those -- is that included -- is that the
18  Tigercat skidder that you're -- that you've listed
19  here, or is that something different, one of the
20  skidders?
21      A.  That [unintelligible].  So sorry, I don't
22  see that page you're talking about.  I go from 202 to
23  20--- the next page in this pile is Form 204.  But
24  anyway, I do have that equipment list.
25          And so the -- that Tigercat skidder is the

In Re:    **Audio Transcription**    Transcript of Recorded 341(a) Meeting
IDC Enterprises, Inc.    March 31, 2020

---

Page 26

1 one that he had said is on there. But that's the one
2 that I know all the paperwork is -- it's IDC
3 Enterprises, you know, has bought that skidder. So
4 he's somehow -- that's not right. IDC Enterprises has
5 been making the payment and bought that skidder.
6    Q. Okay. So the --
7    A. There's a Caterpillar 518, 1987,
8 Caterpillar 518 skidder that's owned by IDC Equipment.
9    Q. Okay. And I think I see that on your
10 equipment list. And you valued that at 25,000.
11        Is that the skidder we're talking about?
12    A. Yeah. It's the skidder, and then there's
13 also -- there's a parts skidder that has a few more
14 serial numbers that goes with it.
15    Q. Okay. So all of the equipment that IDC
16 Equipment may own, is that all listed in your
17 schedules? Is there -- is there any equipment that IDC
18 Equipment owns that's not listed in your equipment list
19 or in your schedules for the debtor?
20    A. Yeah. There's stuff -- when we bought the
21 ranch down at Kamiah, there's an old D4D Cat and an old
22 disc and cultivator, just some miscellaneous stuff like
23 that that they came with the ranch. And that's under
24 IDC Equipment also. And I don't think that that was
25 listed, you know, when we listed.

Page 27

1        So -- so the list -- what we went off of
2 for the list was when -- when -- when Andy said he
3 wasn't going to rewrite this line of credit, I went to
4 Northwest Farm Credit and asked them about doing a --
5 an operating line for us. And so I -- I was making a
6 list of everything we had for the -- the loan
7 application or whatever that they wanted. And so I --
8 I gave that -- or that's what I was going over when
9 Mary Beth and I were making this list out.
10        So everything that I have is on that
11 equipment list. And it wasn't until later that I asked
12 Mr. Parkins what was -- what did -- you know, what was
13 transferred to IDC Equipment, what is not part of IDC
14 Enterprises. And that's when he -- he said, you know,
15 nothing is real clear. He had both of those skidders.
16 And I said I knew about the road grader. And he
17 said -- he mentioned the stuff that we bought with that
18 Kamiah ranch was, you know, that old D4 and stuff like
19 that was something that Brandi listed under IDC
20 Equipment.
21    Q. Okay. And so the purchase of that ranch,
22 IDC Equipment is the one that paid to purchase that
23 ranch and all the equipment that came with it?
24    A. No. No. The ranch was purchased, and then
25 the equipment list was bought separately with a

Page 28

1 separate check. That wasn't part of the purchasing of
2 the land.
3    Q. Okay. So who paid for the equipment in
4 connection --
5    A. [Unintelligible.]
6    Q. -- with that purchase? Sorry.
7    A. I did.
8    Q. You personally?
9    A. Yeah.
10    Q. And how much did you pay for that
11 equipment?
12    A. I can't remember if it was maybe 12 or
13 $15,000 or something. It wasn't very much.
14    Q. Okay. And the ranch that you purchased,
15 does IDC Equipment own the ranch?
16    A. No. No, IDC -- it's under IDC Land.
17    Q. And who paid for the -- land? Who paid
18 for the ranch?
19    A. Well, I have a -- I have a loan on it
20 through Northwest Farm Credit Service.
21    Q. And who's the borrower on that loan? Is it
22 IDC Land or you personally or IDC Enterprises or...
23    A. I think it's just -- I think it's me
24 personally, but it might -- it might be under IDC Land.
25 I know the tax was -- when the taxes come out, they say

Page 29

1 "IDC Land" on them. But I don't know how the loan --
2 you know, if Northwest Farm Credit just has IDC Land,
3 LLC, or if they've got my name too.
4    Q. Okay. And how does IDC Land make the --
5 make the payments on that loan? Where does IDC Land
6 get the money?
7    A. Well, they have for a couple years. So
8 the -- we've always had cows. And I'd sell the cows to
9 make a payment on the land.
10    Q. Okay. Does -- does the debtor, IDC
11 Enterprises, do business with IDC Land?
12    A. Oh, absolutely. You know, oftentimes when
13 we would have -- this time of year, you know, when we
14 couldn't have guys working in the woods, we'd go down
15 there and make fenceposts and build fence and work on
16 buildings. And Cody [unintelligible] asked one of the
17 kids that worked for me for years, I mean he was real
18 good. He'd help me with the cows. And Wyatt
19 [phonetic] would be gone, he'd go down there and feed
20 and stuff.
21        And, you know, but during the springtime
22 when we were down there for several days in a row, it
23 was always paid out of my personal account. But if it
24 was just in the wintertime and he'd run down there and
25 feed one day for me or something, his -- his day wages

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

Page 30

1    were just paid with his normal -- normal monthly
2    paycheck, so...
3        Q.   Okay.  And how about --
4        A.   And just -- it's just me, and everything is
5    really closely woven together, whether it's supposed to
6    be or not.
7        Q.   Okay.  Does IDC Enterprises lease the ranch
8    or any portion of the ranch from IDC Land?
9        A.   No, we haven't leased that.  Since I sold
10   the cows, we rented it out to another rancher, our
11   neighbor, down there.
12       Q.   Okay.  Who has possession of the debtor's
13   books and records?
14       UNIDENTIFIED SPEAKER: [Unintelligible] does.
15       THE WITNESS: So Janey -- you know, whatever
16   Janey has down there.  But I guess all she would -- so
17   what she did was, like I said, get on the online
18   banking and pull everything down so she could put it on
19   QuickBooks.  And then I took -- I got a thumb drive
20   from her and took it up to Gerald Parkins.  Gerald
21   Parkins, whatever he's printed out and stuff, the --
22   between Parkins and whatever he gave -- came to be that
23   I took down to Mary Beth and Blair.
24       Is that what you mean by "books"?
25       Q.   (BY MR. CAHOON):  Yeah, uh-huh.  And what

Page 31

1    types of books and records do you keep?  I think you
2    said you use QuickBooks.
3        A.   Yes.
4        Q.   Have there been any allegations of
5    misconduct against the debtor's principals, officers,
6    directors, or owners?
7        A.   What do you mean?
8        Q.   Have -- has anyone alleged that the
9    debtor's principals or owners, essentially you, has
10   engaged in any misconduct?
11       A.   No.
12       Q.   Does the debtor claim to be a victim of
13   embezzlement, theft, or anything along those lines?
14       A.   No.  What we had -- we had a few years ago
15   some people broke into the shop in Grangeville and
16   stole a bunch of stuff.  We had to file a police report
17   on it.  It was around $15,000 worth of stuff that was
18   stolen, but they'll never -- they'll never do anything
19   about it.
20       Q.   Were you able to make an insurance claim on
21   that or...
22       A.   No.
23       Q.   And the shop that was broken in to, where
24   is that shop?
25       A.   Grangeville --

Page 32

1        Q.   And who owns --
2        A.   -- Industrial Park.
3        Q.   Who owns the shop?
4        A.   Boil [phonetic] Lunders.
5        Q.   And does the debtor lease that -- the shop?
6        A.   It's my grandma.  I just use it.
7        Q.   Okay.  Did the debtor transfer anything
8    worth more than $5,000 within the two years prior to
9    filing for bankruptcy?
10       A.   Well, I -- well, it wouldn't have been in
11   two years.  I mean Brandi -- whatever Brandi was -- you
12   know, when I asked her to transfer, it's been longer
13   than two years since she's done anything, so there
14   wouldn't -- no, there wouldn't be any transfers.
15       Q.   Okay.
16       A.   We've sold some stuff in the last couple
17   years, but that's listed on the -- you know, our papers
18   there and stuff.
19       Is that what you mean or --
20       Q.   Yeah.  And think of "transfer" as broadly
21   as you can.  If you gave anybody something, if you sold
22   something, if you transferred it kind of like you're
23   thinking from one entity to another.
24       Any transfers of anything worth more than
25   $5,000 in the two years prior to bankruptcy?

Page 33

1        A.   Yeah.  No, there wouldn't have been --
2    well, like I said, on the transfers, the only
3    transferring that would have been done is anything that
4    Brandi had done that we would find in the books.  But
5    I'm sure nothing in the last two years, because she
6    hasn't been helping us since prior to that.
7        But we did -- we sold -- we were -- when we
8    were going to Alaska, they were going to supply us with
9    a lowboy.  And so we made an agreement with a friend of
10   mine Shane Anderson that he would buy my lowboy.  So I
11   sold him that lowboy and carried the paper on it for
12   him.  And -- oh, yeah, it seems like there was one
13   other thing in there.
14       Do you remember what it is, Blair, the last
15   couple years something else that we sold or --
16       MR. CLARK: I don't.
17       Q.   (BY MR. CAHOON):  So the lowboy that you
18   sold, that's related to the note receivable that you've
19   listed, I believe.
20       The 1992 Aspen lowboy, is that it?
21       A.   Yep, yep.  That's it.  Yep.
22       Q.   And who was the buyer on that?
23       A.   Shane Anderson.
24       Q.   And in your schedules you've listed the
25   amount -- oh, the face amount, total face amount owed

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 34

1 is 28,000, but the full amount is doubtful or
2 uncollectible.
3     And why have you listed it that way?
4     A. [Unintelligible]. Well, no, that's not
5 what we talked about. The total -- the total sales
6 amount, 20 -- 28,000 or 24,000 or something. Anyway,
7 we divided that by three and -- because his annual
8 payments were 8,400 something or 8,300 something. So
9 we just -- three annual payments that he was going to
10 make in November. But he wasn't -- he wasn't able to
11 make his payment in November, and maybe that's why --
12 when we did -- when we did the paperwork and stuff, it
13 was doubtful whether he was going to be able to make
14 it. And then his -- yeah, he came into some money this
15 spring and has made part of that payment earlier, but
16 it was probably after we did some of that paperwork. I
17 think he'll -- I mean I'm sure he'll pay me whenever he
18 can.
19     Q. And did you already transfer the title to
20 him? Is it --
21     A. I have the title. So I mean it's in his
22 name and me as a -- I'd have to look at it now. But,
23 you know, I'm down in the corner. So the State -- so I
24 give him a bill of sale and the titles. And when he
25 took it in to get the title switched to his name, the

---

Page 35

1 State sent him to me, because I'm a lienholder, I
2 guess.
3     Q. Okay. So you do have a lean on the -- on
4 the trailer?
5     A. I have the title. And we have a -- you
6 know, a purchase order wrote up. It's -- Mary Beth has
7 a copy of that, the sales -- you know, sales agreement
8 or whatever.
9     Q. Okay. What do you think that lowboy
10 trailer is worth?
11     A. It's worth around 3- -- it's actually -- he
12 was thinking about cashing us out, and another friend
13 of mine wanted to buy that trailer before we -- about
14 the same time we sold it to Shane, and he's still
15 interested in that trailer for around 30,000, so...
16     Q. Okay. Any other transfers that you can
17 think of in the last couple years?
18     A. Well, we've bought a lot of stuff. But off
19 the top of my head, I can't think of anything that was
20 sold.
21     Q. Okay. Has the debtor transferred anything
22 to you as the owner during the two years prior to
23 filing for bankruptcy, other than customary salary?
24     A. Well, not even that, but no.
25     Q. And what -- any draws that you've made from

---

Page 36

1 the debtor in the last two years?
2     A. No.
3     Q. And how does your salary with the debtor
4 work? How much are you paid and how often? Is it a
5 regular salary or --
6     A. She doesn't have anything set up. I
7 never -- never got a check from IDC Enterprises, just
8 made out to Jason Lunders or anything.
9     Q. So you don't receive any salary or money
10 from -- from IDC Enterprises and have never received
11 money from IDC Enterprises?
12     A. It's -- it's owed to me; I've just never
13 taken it. We've put more money back into it.
14     Q. Okay. And how much of your time is
15 dedicated to working for IDC Enterprises?
16     A. It's just that's pretty much what I do.
17     Q. Okay. And so if you don't get money from
18 IDC Enterprises, where do you get money from to live
19 on?
20     A. Well, I -- I get -- like that's what I was
21 just telling Blair earlier this morning. So like if
22 I'm headed to camp or something and I go in on a Sunday
23 night to get groceries and everything, that was all
24 always purchased with an IDC debit card. And the same
25 way on my -- well, like the land. You know, when I

---

Page 37

1 bought the land, I -- I just never pulled any money out
2 of IDC Enterprises, because we were always using it.
3 And rather than pulling it out and putting it back in
4 and stuff. Brandi had a payroll set up for me, and I
5 don't know if it was because, you know, the State --
6 for the workman's comp or whatever, they say you're
7 supposed to make 1800 a month or whatever the number
8 is. I don't know if that's what she went by or
9 something, but I -- you know, I never paid any
10 attention to this until this whole deal was going down.
11     And I talked with Mr. Parkins about it, and
12 he said, "Well, you know, truthfully IDC Enterprises
13 owes Jason Lunders 400-some-thousand-dollars, because
14 you've never taken a check or anything." And so I
15 really don't know how -- it wasn't something I ever
16 looked into. We just -- I just -- we just kind of kept
17 things rolling along. And I don't -- I don't know how
18 to explain it more than that.
19     The power -- like out at the shop or where
20 we lived for the last several years, like we spent four
21 or five years working up in Elk City. IDC Enterprises
22 rented one apartment that was a four-bedroom apartment
23 and one house. And our bill -- well, at one place the
24 power bill and everything was covered. But the phone
25 bill and stuff like that was always under IDC

---

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 38

1 Enterprises. So I didn't -- I wasn't writing any
2 checks from Jason Lunders, because I lived up there
3 seven days a week working and stuff. I did -- I don't
4 have another house anywhere that -- that was in like --
5 you know, that required me to write personal stuff out.
6 The shop and stuff like that, the power bill
7 [unintelligible] under IDC Enterprises. And all the
8 expenses always just came out of the company.
9    Q.   Okay. So does IDC -- I believe you
10 mentioned the shop was owned by your grandmother; is
11 that correct?
12    A.   Yeah.
13    Q.   And does IDC Enterprises pay your
14 grandmother rent for use of the shop?
15    A.   No.
16    Q.   But it pays like the utilities for the
17 shop?
18    A.   Yeah.
19    Q.   And it's paid for all of your living
20 expenses over how many years?
21    A.   The shop -- there's also -- you know, when
22 we quit renting from Framing Our Community in Elk City
23 and we bought the shop in Elk City, that -- there's
24 some rental -- there's some rental set up between IDC
25 Equipment and IDC Land on the two pieces in Elk City.

---

Page 39

1 And I think Blair -- Blair probably has that number,
2 Blair or Mary Beth. But there is a rental set up
3 between IDC Enterprises and IDC Land for that shop that
4 we use up there. That's -- that was the main shop,
5 because we've always been in Elk City.
6    Q.   Okay. So IDC Land owns a shop in Elk City?
7    A.   Yes.
8    Q.   And that's different than the -- from the
9 ranch?
10    A.   Yes.
11    Q.   Okay. And where -- where's --
12    A.   It's like 7 -- 7.8 acres or something like
13 that up in Elk City.
14    Q.   Okay. And what -- what were the rental
15 terms for the use of the shop in Elk City?
16    THE WITNESS: Do you have that, Mary Beth?
17    MARY BETH: No, I don't. I -- not in front of
18 me.
19    THE WITNESS: Oh, okay. That Parkins brought up
20 is how I -- was the only thing I knew -- the only
21 reason I knew about it. But yeah, Brandi had -- Brandi
22 and Forsmann had something set up on -- on that.
23    Q.   (BY MR. CAHOON): Okay. So does -- does
24 IDC Land, do they owe money on the Elk City shop?
25    A.   Yes.

---

Page 40

1    Q.   And is it IDC Enterprises that's typically
2 paying that mortgage payment or...
3    A.   That -- well, yeah, it does, because it
4 rents it. So we don't rent to anybody else. There's
5 no income up there, other than IDC Enterprises. We --
6 we always rented a shop and two log yards up there.
7 And we rented the shop and one log yard from Framing
8 Our Community. And then when this place came
9 available, we -- we bought it -- we put some money back
10 in our own pocket. We -- IDC Enterprises rented the
11 shop and that -- and one of the log yards, and we still
12 have our other yard up [unintelligible] renting from
13 Yorks [phonetic].
14    Q.   Okay. And so tell me -- tell me all the
15 properties that IDC Land owns. There's the Elk City
16 shop, there's a ranch.
17    And what else?
18    A.   A 52-acre pasture at Red River.
19    Q.   And where is the ranch located again? I
20 think you may have said that, but...
21    A.   Kamiah, K-a-m-i-a-h. It's between Kooskia
22 and Kamiah.
23    Q.   Okay. And the 52-acre pasture at Red
24 River, does IDC Land owe money on that property?
25    A.   Yes.

---

Page 41

1    Q.   And so does ID- -- has IDC Enterprises been
2 paying the payments for that land -- on that loan as
3 well?
4    A.   Haven't made any payments on that since we
5 quit getting paid in Alaska.
6    Q.   You haven't made payments on the -- on the
7 pastureland you said, the 52 acres?
8    A.   That's right.
9    Q.   But prior to the -- the work in Alaska kind
10 of fizzling out or falling apart, IDC Enterprises was
11 paying those payments?
12    A.   No. IDC Land -- I don't -- I don't know if
13 IDC Enterprises had a -- I don't know if Brandi had a
14 rental for that place at all. I don't -- I don't think
15 so. I think -- I think -- you know, with the two
16 houses we had rented and then, you know, the stuff up
17 there for the log yards and that shop, but I don't -- I
18 don't know if she had anything wrote up on -- on
19 that -- on this piece at, you know, IDC, the 52 acres.
20 I'm not sure what she had there.
21    I do know -- I mean so when I met with that
22 man, it was an older guy from south Idaho that I bought
23 that from, and when I met him up there and he said what
24 he wanted for it and I told him I would give him half
25 down if he would take the rest -- you know, carry the

---

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 42

1  paper on the rest and he said he would, I gave him a
2  check from IDC Enterprises right there for that half,
3  because that's the only checkbook I could
4  [unintelligible].
5    Q.  Okay.  And when was that?
6    A.  I don't remember how long we had that
7  place.  Maybe five or six years.
8    Q.  And how much was that, the check?
9    A.  I think it was -- I don't -- I don't
10  remember now.  I think -- I think we gave 3 -- just
11  under or right around 3,000 an acre, and I gave him
12  half.  So around 80,000.  70 or 80,000, somewhere in
13  there.
14    Q.  Okay.  Can you briefly describe the
15  debtor's business, source of income, number of
16  employees, just what the debtor does and kind of a
17  short history of the debtor's business operations.
18    A.  Sure.  When we -- when we started it, we --
19  we bought some equipment, started -- started doing fuel
20  reductions and thinnings and stuff like that.  And we
21  were working on -- on pasture improvement thinnings
22  where landowners would get some money from the AFCS,
23  stuff like that.  And so we -- we could go in and we --
24  we'd logged before, so we had markets or some of the
25  materials, so we could go in and, you know, utilize a

---

Page 43

1  lot of it.  And then we bought a post and pole peeler
2  so we could utilize the material clear down to 3 and
3  4 inches.  And then we got into masticating, and so we
4  could masticate the stuff that was smaller than that.
5  And some of that's where Ely [phonetic] started helping
6  us.
7      And we started -- the County was putting up
8  jobs, just solely for mastication, whether it be fuel
9  reductions or pasture improvements or different things.
10  And Ely would just take some of those under his wing
11  and completely do them, you know, all by himself.  And
12  just we were the ones that they were contracting
13  through, whether it was through the County or the State
14  or whatever.  So he was just subbing for us.
15      And then we -- we started just -- just kind
16  of going more and more into larger scale logging jobs.
17  If neighbors wanted us to come in and clear out their
18  property, we would.  And then the -- they sold -- well,
19  we did a couple other smaller Forest Service sales, I
20  guess.  But anyway, they sold -- a fire salvage sale up
21  in Dixie/Elk City area and this roadside salvage stuff,
22  roadside [unintelligible] kind of.  And so we purchased
23  that.
24      And it was all -- they waited too long
25  really to put it up for sale, so the wood wasn't any

---

Page 44

1  good for saw logs anymore, or very little of it was.
2  And we -- we had worked with a couple farms for hop
3  poles when we were doing the post and pole stuff.  And
4  they -- anyway, just the right time when a lot of these
5  farms were wanting to put in a lot more hop fields.
6      So we were -- we would sell -- we would cut
7  the hop poles directly off of that Forest Service sale
8  in Elk City.  And that's where -- well, we had two or
9  three other sales up there too.  It wasn't just one.
10  But mostly the one big sale.  We were up there for four
11  or five or five or six years.  And we would make hop
12  poles right out in the woods, and then haul them
13  directly to the farms, like over around Yakima and
14  south Idaho and stuff, selling them these hop poles by
15  the piece.
16      And -- and then some of the larger --
17  larger trees that were house log quality, we would sell
18  a lot of the -- the house logs over to Montana where a
19  lot of them went.  And some of them to Grangeville too.
20  But so that's where we started renting the log yard.
21  We started just originally with the one we were renting
22  from Leon up there.  And so we would haul a lot of
23  these mixed loads down to our yard, then the house log
24  buyers could come over and pick through, you know, the
25  ones they wanted.  Everybody wants their own special

---

Page 45

1  thing.
2      And we also during the time of year or even
3  between snowstorms or whatever it was, if we had a
4  chance to just shove a bunch of -- a lot of loads off
5  of the -- off the mountain right down to our log yard
6  where we could dump, you know, two or three or
7  sometimes four loads a day into our log yard, instead
8  of only being able to take one load all the way to
9  Yakima or bring it all the way out to Grangeville,
10  so -- so we would put things in our yard there.
11      And then in the spring of a year, like this
12  time of year when we can't work at all, we'd go into
13  our yard and go through those decks and have -- have
14  different log buyers come over, if they wanted to buy
15  house logs, or we would take some lodgepole -- and
16  sometimes we'd buy lodgepole from other contractors up
17  there and take it down there in long log form, like 40,
18  45-foot logs.  We would move one of our processors down
19  to the yard and make them into hop poles or different
20  things right in the yard.  And then we'd have our truck
21  and some of our subcontractors being able to work a
22  little -- you know, a few more months out of the year
23  by hauling out of our yard.
24      So then we -- then we had that -- that one
25  covered the [unintelligible] pole, and that's why we

---

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 46

1  rented the one from Framing Our Community. And that
2  had a shop with it, too, because we were -- we were
3  just doing a lot of maintenance on stuff. It was nice
4  to have that shop. So there was that. And then once
5  that other place presented itself from Murray Boffman
6  [phonetic], we bought that 7 or 8 acres over there that
7  had its own shop and started making it our own.
8          So we -- so we did that. And then -- oh,
9  we did some cedar. Some of the -- some of the farmers
10  wanted to raise organic hops, and so they couldn't put
11  treat on the poles. So we did a couple cedar sales.
12  And we did one for IFG from Sawmill. And then they
13  also -- IFG bought a -- bought a timber sale from the
14  Forest Service down in south Idaho. And it was heavy,
15  heavy, heavy with the lodgepole, and a lot of it was
16  smaller lodgepole. So they asked us to do that sale
17  for them because the majority of it was small wood that
18  we were, you know, kind of in the right business for
19  and had the right equipment for more so than just their
20  full -- you know, full-bore logging companies that were
21  used to just logging bigger -- bigger trees.
22          And then -- and then we went -- when we
23  were working on one job over in Kamiah and one job back
24  on the Selway, both those were cedar jobs is when that
25  opportunity came to go to Alaska. But a friend of

---

Page 47

1  mine -- well, Chris -- Chris was up there cutting. And
2  his brother and his oldest boy were helping me down
3  here. And he said, you know, he was going to Alaska to
4  cut for this outfit and they had 4 million feet on the
5  ground, and the logger backed out, didn't want to work
6  with them. And so they needed somebody to come up
7  there and get this wood in in a big hurry because he
8  was afraid he wasn't going to get paid.
9          And so we -- they took me up there to meet
10  with them. And one of the owners drove me around
11  Alaska for about a week. And we made an agreement to
12  go up and help them. And that was -- they -- they did
13  all the cutting and all we had to do was go in and pick
14  up the logs, get them to the road to get them put on a
15  truck. They were going to take care of the trucking
16  and everything like that. So we -- we had some other
17  contractors.
18          We had -- I can't think of his name.
19  Anyway, we hired a -- Kyle Freedman [phonetic] from
20  south Idaho. Kyle Freedman finished up one of the
21  contracts for us. Brown Brothers finished up one of
22  the contracts for us. And -- oh, oh, you know what?
23  We did sell a skidder, but that's been a lot longer
24  than two years ago. Anyway, we sold -- we sold it
25  to -- anyway, it will be -- it's in that paperwork, I'm

---

Page 48

1  sure, because Mary Beth and I saw it when we were going
2  through that stuff with Forsmann.
3          Anyway, we sold a skidder to another kid
4  here that was starting to log and let him finish up the
5  one cedar sale over above Kamiah for us. So we
6  moved -- we moved everything up to Alaska and worked up
7  there through -- through -- well, the last day we
8  really had to work was in May of last year, 8th of May,
9  and then [unintelligible] around up there until we came
10  around the 4th of July. And that's -- that was -- so
11  that was the whole start of our business.
12          That's the reason we're in bankruptcy right
13  now is we went up there, poured all of our money into
14  that. They set us up with a line of credit. Andy, you
15  know, came over and gave us a line of credit. And so
16  we would keep working, keep working, get everything
17  moved up there, and they just quit -- they quit paying
18  us. They even quit falling timber, so we couldn't even
19  work. We got e-mails running out of our ears. The
20  Forest Service is e-mailing them, wanted to know why
21  there wasn't timber cut in these units that are
22  supposed to be cut for us.
23          We just flat could not work. They did not
24  pay us for the work we did. And what we had -- this
25  big line of credit by then with Andy over there, around

---

Page 49

1  240,000. And I called Andy and I said, "Andy, these
2  guys aren't hauling our logs."
3          He said, "Don't worry. They will. They
4  will."
5          Next time I called him, I said, "Andy, you
6  know, they're not hauling logs. We don't have enough
7  money to make payments."
8          He said, "Well, you just got to keep these
9  payments up. Just keep paying the interest. Don't
10  worry. We'll rewrite this."
11          I'm getting excited now. Anyway --
12      Q.  Um --
13      A.  -- they told me they would rewrite that
14  line of credit for us or term it out with the equipment
15  that we had pledged. And when it came time in July,
16  one of the -- one of the carrots they threw us when --
17  first they said, "Oh, don't worry. We'll get -- we'll
18  get you trucks. Just keep going. We'll get trucks up
19  here."
20          So we borrowed some more money. I sold all
21  my cows. We put that money into putting logs in the
22  deck for them up there. We had over $250,000 worth of
23  logs in the deck waiting to be hauled. And they
24  wouldn't haul them. So we sent a bunch of the guys
25  home. And they came out and said, "Listen, just we

---

Page 50

1　really just need you to keep working, keep working.
2　We'll advance you payments on the decks."
3　　　　So they came out and they advanced us a
4　little bit here and a little bit there, just enough to
5　keep us going.  And finally they quit doing that.  So I
6　have e-mails, text messages asking them, telling them
7　we need this much advanced.  They would okay it.
8　　　　One of the last ones we said, "Listen, you
9　know, we still have" -- I don't remember the number --
10　but "200-some-thousand-dollars worth of logs decked in
11　these different units.  And we need to get an advance
12　on this so we can start catching up on our payments."
13　　　　And one of the owners and the secretary
14　sent me an e-mail back saying, "Yep, Don," which is the
15　mill manager, "has approved this advance.  And yep,
16　Paul's going to have them out on -- I'll try to get him
17　out on Friday to you."
18　　　　So I said, "Thank you."
19　　　　And then the next time we got an e-mail
20　from one of the mill owners and he said, "No, we're not
21　giving you any advance."  So we -- we had -- by then I
22　had been talking to an attorney.  And I told him, I
23　says, "You know, we're not abandoning this, but you
24　don't have anyone on the ground for us, you haven't in
25　over six weeks, we haven't been able to work, so we're

Page 51

1　going to vacation for 30 days and let you guys get some
2　wood on the ground so that -- so that we can come back
3　and be able to work in a normal fashion for a while."
4　　　　And I -- and I called Andy after that and
5　said, "Listen, these guys aren't hauling our logs.
6　They aren't even giving us our advances now.  I don't
7　have any money to pay you."
8　　　　And he said, "Well," he said, "in 60 days
9　I'm going to get attorneys involved.  In 90 days I'm
10　going to come get your equipment."
11　　　　And I said, "Well, what happened to terming
12　it out, Andy?"
13　　　　He said, "No, we're not going to do that."
14　　　　So that was when, like I say, I went to
15　Northwest Farm Credit to get them.  And the guy I
16　worked with over there, he's a young kid, and he said,
17　"Yeah," he goes, "I don't see a problem with this at
18　all."  He said, "Just get us your tax returns and
19　stuff, and we can write a 300,000" -- I asked him for
20　$300,000 both to pay them off and just be done with
21　them.
22　　　　And he said, "Yeah, yeah.  We can get that
23　done."
24　　　　Well, then I find out, you know, that our
25　taxes haven't been taken care.  So I started getting

Page 52

1　Janey, asking her to -- pushing on her a little bit
2　faster to get them done.  But, you know, we're in line
3　with everybody else up at Gerald Parkins.  And he's
4　done a great job in trying to help us out so speedy on
5　getting everything down there for you guys.  But he's
6　got a million people knocking on his door.  And he has
7　a small ranch too.  He was busy with haying when I
8　first started calling him asking him if he could help
9　me.
10　　　Q.  All right.
11　　　A.  So everything's just kind of piled right
12　up.
13　　　Q.  Okay.  Well, thanks.  My next question was
14　going to be explaining the cause of bankruptcy, but I
15　think you kind of covered that as well.
16　　　A.  Uh-huh.
17　　　Q.  So you mentioned kind of in that
18　explanation it sounded like you had done some work that
19　you didn't get paid for; is that correct?
20　　　A.  [Unintelligible.]
21　　　Q.  And how much money --
22　　　A.  Yeah.
23　　　Q.  How much money are you owed and who owes
24　you the money?
25　　　A.  Well, we don't -- I don't have an exact

Page 53

1　number.  We just barely started, and I was just --
2　Blair and I are going to work with this.  And the last
3　e-mail I sent was as if we were ready to start, you
4　know, getting together with all the paperwork on it.
5　And he said not yet.  He wanted to make sure and get
6　this meeting taken care of with you first.
7　　　　So some of the things -- well, I don't know
8　how much do you want me to talk about that, Blair?
9　　　MR. CLARK:  Go right ahead.
10　　　Q.  (BY MR. CAHOON):  Well --
11　　　MR. CLARK:  You're doing fine.
12　　　Q.  (BY MR. CAHOON):  Well, who -- who -- is it
13　that?
14　　　A.  [Unintelligible.]
15　　　Q.  Who is it that owes you the money?
16　　　A.  Viking Lumber.
17　　　Q.  What's the name of it?  And can you spell
18　that.
19　　　A.  Viking Lumber.
20　　　Q.  Oh, Viking Lumber.  Okay.  I've got it.
21　　　　And do you know approximately how much they
22　owe you?
23　　　A.  And don't -- yeah, don't let me get off
24　track here, but I want to make sure and mention, so
25　while we were up there, there's two things.  So we

Min-U-Script®

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 54

1    had -- when we were working in Elk City -- and I don't
2    know if you guys got part of this news or not. But
3    anyway, when we were working up there, the Highway 14
4    slid shut. There was a big -- big disaster. And so we
5    couldn't -- we couldn't get through. I mean nobody
6    could get through. The highway was completely closed
7    and it was in -- you know, about this time of year,
8    maybe even. About this time of year, I think.
9         Anyway, the highway was completely closed,
10   so we couldn't haul any logs out or anything else. And
11   they couldn't get anything in. They started doing
12   bucket [unintelligible] for groceries and beer and
13   stuff like that. But finally the County got together
14   from two different sides and opened up one of the
15   Forest Service roads clear up over the top of the
16   mountain to get through. But of course, they wouldn't
17   let us haul our poles or anything like that. So we
18   couldn't sell anything. And all of our operations were
19   up there.
20        For Andy -- Andy went in at that time and
21   set us up. They got a small business loan through the
22   SBA -- or through some disaster thing. But it was
23   somehow tied to the SBA, too, if I remember right.
24        Anyway, this loan was for 20,000 or 40,000.
25   I don't remember which. There has been 40,000. And

---

Page 55

1    Brandi had it set up. So when Brandi was still doing
2    our books and everything, she was making the payments
3    all the time. Well, when she -- you know, I didn't
4    know she quit doing the books. She just kind of fell
5    down on it, and she wasn't turning in some reports.
6    And of course, all of a sudden this payment was getting
7    made, but I didn't know about it.
8         And so I'm sorry. So anyway, this disaster
9    loan was [unintelligible], we couldn't sell logs and we
10   were behind the highway. And a fair number of
11   businesses up there were wanting to get this disaster
12   relief. And something -- something to do with Brandi,
13   it would be a good idea to do this because it's going
14   to help a few other businesses in the community be able
15   to get loans too.
16        So we got this loan to help us buy fuel and
17   keep paying wages so we could work and stuff up there.
18   And -- and the -- long story short, this loan, payments
19   weren't getting made and stuff. So two years ago, you
20   know, Ely [unintelligible] time. And so two years ago
21   Ely did a job for us, and we just had enough operating
22   capital. When it came time to get paid for this check
23   for the job we did, it was maybe a $40,000 job or
24   something, we didn't get a check.
25        I got an e-mail saying "Hey, we're holding

---

Page 56

1    some money out of this -- this deal you owe SBA."
2         So then I started calling and checking on
3    it, and I -- it turned out this is what it was. "This
4    was this loan that you had took out for this disaster
5    deal."
6         And so I talked to a lady there, and I
7    said -- you know, I explained the whole thing to her.
8    I said, "I'm sorry. I just wasn't paying enough
9    attention to this. And Brandi was taking care of the
10   payments when she was helping us, and didn't do it and
11   didn't tell me she wasn't doing it, and so I need to
12   make a deal with you on the rest of this loan."
13        So we had a payment -- payment deal set up
14   for the rest of this loan. And so this year the stuff
15   that Ely did for us this year, and of course his
16   business is growing every year. So I said, "You know,
17   let's get something wrote up."
18        And so he -- he and I have a contract, and
19   I've got copies of that that I gave to Mary Beth and
20   stuff, that says, you know, I will pay Ely this much
21   for doing this project. And it was up around Deary
22   this year. They -- even though I had -- and I called
23   them beforehand and said, "You know, we've got this
24   payment set up, so you guys aren't going to attach the
25   money, because right now all my operating money is tied

---

Page 57

1    up in Alaska." And I said, "I don't have the money to
2    pay him out of my pocket this year."
3         They said, "Nope, you've got payment plan
4    set up. And as long as you're making payments, then
5    we're not going to attach any of your money."
6         Well, they did. So they pulled the rest of
7    that money out. And that's why -- Ely did a job up
8    there, and he -- he is owed that money. And so I want
9    to make sure you understand, I mean that's not
10   something he's saying I did $4,000 worth of work and I
11   want $40,000 in interest. That -- every dime that Ely
12   is owed is for work that he did.
13        Q. Okay. And when you're referring to "they"
14   as attaching the money, is that Bank of the Pacific?
15        A. No. No. The -- the SBA or whoever it was
16   that did this disaster loan that we had the payment
17   deal set up with.
18        Q. Okay. I'm just looking at your schedules
19   here to try and get an idea of who -- who that is that
20   you're referring to.
21        A. Well, it's been a couple years ago --
22        Q. Is that --
23        A. -- when we were in Alaska [unintelligible].
24        Q. Is that loan paid off? Did you pay off
25   that SBA loan?

---

**M & M Court Reporting Service**
(208)345-9611(ph)  (800)234-9611  (208)-345-8800(fax)

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

Page 58

```
 1      A.  Well, they did themselves.  They took Ely's
 2  money.
 3      Q.  Oh, okay.  So you -- they're not a creditor
 4  anymore.  They took the money.  Okay.  I'm following
 5  you now.
 6          So what -- so I have a couple follow-up
 7  questions to all of that.  So it sounds like you're
 8  saying that Viking Lumber owes you money.  In your
 9  schedules you don't list any accounts receivable, and
10  you also don't list any contingent or unliquidated
11  claims or causes of action that the debtor has rights
12  to or an interest in.
13          Do you believe you have claims against
14  Viking Lumber?
15      THE WITNESS: So where are we at, Blair?
16      MR. CLARK: Well, we get a lot of answers to
17  that question.  Viking Lumber has tried to impound some
18  of his equipment that's up there.  We're filing an
19  adversary proceeding against them to get that back and
20  also to determine who owes who how much.  I don't know
21  how much money they claim or how much money right now
22  he's actually owed.
23      MR. CAHOON: Okay.  And --
24      MR. CLARK: So we should have put -- we should
25  have put something down there as a contingent asset on
```

Page 59

```
 1  that part, yes.  But we're going to need to commence
 2  the litigation to resolve that.
 3      MR. CAHOON: Okay.
 4      Q.  And, Mr. Lunders, I believe you said you
 5  had talked to an attorney about those claims against
 6  Viking Lumber.
 7          Who -- who did you talk to about that?
 8      A.  I'm sorry.  What was that?
 9      Q.  I believe --
10      MR. CLARK: The guy in Alaska, who was your
11  lawyer up there?
12      THE WITNESS: Brian Scholl [phonetic].
13      Q.  (BY MR. CAHOON): Okay.  And -- and do you
14  plan on retaining him for any purposes in connection
15  with this bankruptcy case or --
16      THE WITNESS: Blair.
17      MR. CLARK: Not unless we need to.  I'd prefer
18  to do it down here.
19      MR. CAHOON: Okay.
20      Q.  So in your statement of financial affairs,
21  the debtor shows gross revenue for 2018 of
22  approximately $703,000.
23          What -- what was your gross revenue in
24  2017?
25      A.  I don't have that.  I'm sorry.  Yeah, I
```

Page 60

```
 1  don't have that.  Is that --
 2      Q.  Would it be more or --
 3      A.  Like what is our total gross income?
 4      Q.  Yeah.  Gross revenue in 2017.
 5      A.  I'm sure we were over a million, but I -- I
 6  don't know.
 7      Q.  Okay.  So you think over a million in 2017,
 8  and then it went down in 2018 to about 700,000?  So --
 9      A.  Yeah.  That's when we went up -- yeah, we
10  quit working in -- in August -- August or so of that
11  year to start getting everything ready to go up to
12  Alaska.
13      Q.  Okay.  What kind of gross revenue did you
14  have in 2019?
15      A.  Well, not very much.  That was most of what
16  we were up in Alaska, so we didn't get -- didn't get
17  it.
18      Q.  Do you have like a ballpark figure of 2019
19  what you would have done?
20      A.  Well, I know part -- part of the draws they
21  gave us, I remember part of the draws were
22  150-some-thousand -- [unintelligible].
23      Q.  The draws, what is that?  That's money that
24  Viking Lumber gave you?
25      A.  Yeah, when they couldn't -- when they
```

Page 61

```
 1  couldn't get the logs hauled [unintelligible] on the
 2  logs that we had back waiting to be hauled.  I totaled
 3  up -- I totaled up the advances one time, and I
 4  remember 150-some-thousand.
 5      Q.  So do you think that would have been
 6  approximately your gross revenue for all of 2019,
 7  around 150,000?
 8      A.  No.  No.  We came back down here, we -- I
 9  just sent that to you, Blair [unintelligible]
10  DF Development was -- was it 50?  Right at 50,000, I
11  think.  I'm sorry.  I'm thinking out loud.
12          But anyway, we did another 50 once we got
13  down here.  And the -- what they had paid us when we
14  first went up there was probably equal to about what
15  they had advanced us.  Maybe we did -- maybe we --
16  maybe we did 350 or something.  And so less the
17  $247,000 operating line, that would be close to half a
18  million, then what I took out selling the cows and
19  everything to cover -- yeah.  Yeah, we -- they probably
20  paid us, you know, maybe -- maybe 300,000 and then
21  DF Development gave us 50.  I don't remember if we did
22  anything else.
23      Q.  Okay.
24      A.  Well, let's say.  '19 would put clear
25  through May of this year, so we did -- we did sell
```

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 62

1    some --
2        Q.   And --
3        A.   -- lumber to IFG.
4        Q.   Yeah.  And sorry.  Let me interrupt you
5    there.  Sorry.
6            On your statement of financial affairs, you
7    show it by the calendar year for 2018.  So that's kind
8    of what I was looking for.  So say the calendar year
9    for 2020, so just the first three months of this year,
10   what kind of gross revenue have you had?
11       A.   From January 1 till now?
12       Q.   Yeah.
13       A.   One of the checks from K&D, I don't think
14   it came through till after the 1st of January, so I
15   don't remember how much it was.  It was around 8,000.
16   And then I think we did around 15,000 through Idaho
17   Forest Group.  And I -- I think that's about it.
18           Oh, you know, Shane's -- Shane's payment on
19   the lowboy, or partial payment, was after the first of
20   the year.  That would be about it for income.
21       Q.   Okay.  So he -- so Shane has made a payment
22   to you recently?
23       A.   The one that was due in November, he made
24   part of it, yeah, this -- this [unintelligible].
25       Q.   And how much did he pay you?

---

Page 63

1        A.   I don't remember for sure.  I'd have to
2    look back.  His girlfriend put the check, just
3    automatic deposited it into my personal account in
4    Moscow.  I'd have to look and see what it was.
5        Q.   Okay.  And so that was money that was to be
6    paid to IDC Enterprises but it went to your personal
7    bank account?
8        A.   I don't know it needed to go to IDC
9    Enterprises, because I put all my cow money and
10   everything else into IDC Enterprises.  I'm not -- I
11   guess I need to ask you how I should really look at
12   the...
13       Q.   Yeah, you should treat each of your
14   entities as separate and distinct entities.  And it's
15   important to do that, to respect each one's corporate
16   organization and structure.
17           What kind of work does IDC Enterprises
18   currently have lined up to do?
19       A.   We've got four pending jobs, and right now
20   we're -- trucks -- one of the trucks is still running.
21   We're moving some poles around and stuff like that.
22   We've got work for this spring as soon as the weather
23   cuts loose.  And we're going to take one of the
24   processors out.  There's just a day or two worth of
25   work at the end of this week.  And then we've got some

---

Page 64

1    work in Cascade too.
2        Q.   What do you project your gross revenue to
3    be for the rest of the calendar year?
4        A.   Well, this is where -- so Blair and I have
5    been going over this too.  And I mean I don't
6    [unintelligible] uncertain as everything is with this
7    whole corona thing and so much of the work we do is --
8    right now for the second quarter of this year is
9    weather dependent, and after that it's market
10   dependent.
11           We -- you know, like last year -- last year
12   when we were up there working in Alaska, we were
13   running a pretty full crew.  I think we had 17
14   different -- 17 different employees last year.  And
15   now, you know, we don't have any operating capital or
16   anything.  And I'm just kind of wanting to pipe
17   everything up and make sure we get through this without
18   going into too much more debt or anything.  And I don't
19   know the right way to answer that.
20       Q.   Okay.  And how do you -- how do you -- can
21   you briefly explain how you expect to reorganize in the
22   bankruptcy process in order to make payments to your
23   creditors.  I guess one specific creditor is the IRS
24   that filed a proof of claim.
25           Have you reviewed the IRS's proof of claim?

---

Page 65

1        A.   Yeah, that's -- well, I'm not sure if it's
2    the proof of claim that I reviewed, but I saw where
3    they had a -- they did possibly [unintelligible].  I
4    mean we don't have anything that -- we can't figure out
5    what that is.  So we talked to [unintelligible], and
6    near as he could figure it's some reports that weren't
7    filed and so they just kept multiplying and
8    multiplying.
9            We don't -- we bought a -- we bought a
10   truck [unintelligible], might have been in about '07 or
11   sometime from Canada, and it was several years later
12   that one of the axles they came back and billed us for.
13   And I remember I thought that was [unintelligible].
14   But I mean we don't buy and sell fuel.  So I -- I mean
15   that -- their claim is incorrect.
16           The only debt we have is Andy -- well, Andy
17   got that line of credit, and when we were ready to go
18   up there to Alaska, they said, "Gosh, you know, you got
19   to get another loader up here."
20           I said, "All right.  I'll buy it and you
21   can send it up there on the early barge."  I said, "I
22   can use part of the money that Andy got from this line
23   of credit, but," I said, "you have to make sure that
24   he'll put it -- put that much over on a term loan so I
25   have that full line of credit available again."

---

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

Page 66

1   And they said, "Yeah, yeah, no problem."
2 They'll do that.
3   I got ahold of Andy, and Andy wrote a
4 $100,000 loan on 2006 I think it is, Link-Belt with a
5 Jewell front on it. So there's -- there's that loan.
6 There is the Tigercat skidder through Amur Financial.
7 Oh, and that -- so that -- and I talked to Blair about
8 that. That's the loan that takes $1,755 a month out
9 of -- out of the bank account that was at Umpqua Bank.
10 I --
11   Q. Yeah.
12   A. Anyway, that loan is maybe $40,000 left on
13 it. The only debt that IDC Enterprises has, the only
14 loan that's out there is through Andy with Bank of the
15 Pacific on that operating line and on that loader. And
16 once -- once -- once that Viking Lumber clears up with
17 us, they'll be more than paid off.
18   MR. CAHOON: Okay. I may have a few more
19 questions, but right now I want to give creditors and
20 also the Trustee an opportunity to ask any questions.
21 And maybe we'll start first with the Trustee,
22 Mr. Rainsdon.
23   Do you have any questions of the debtor?
24   THE TRUSTEE: I do have some, Brett. Do you
25 want me to go ahead?

Page 67

1   MR. CAHOON: Yeah, go for it.
2   THE TRUSTEE: Okay.
3
4   EXAMINATION
5 BY THE TRUSTEE:
6   Q. The documents that I was provided that show
7 insurance coverage only show liability insurance
8 coverage.
9   Do you have any property insurance coverage
10 for any of your equipment or vehicles?
11   A. Just the -- the four items that we pledged
12 for Bank of the Pacific, there's two John Deeres and
13 two Kobelcos, and they have replaced the
14 [unintelligible] on them.
15   And then a couple of the other pieces as
16 we -- as we use them Cammie [phonetic] takes them on
17 and puts them -- takes them -- puts them on the policy
18 and takes them off the policy. Same way with our --
19 some of our titled vehicles. We only carry insurance
20 on them when we're using them. We don't have any --
21   Q. So as of right now, do you have any
22 property insurance coverage for anything other than
23 those four items that you indicated are pledged to the
24 bank, for the insurance pledged to the bank?
25   A. Yeah. Yeah. But I don't know what that

Page 68

1 is. I could get the list for you. I just don't know
2 what it is right now.
3   Q. Will you get that for me?
4   A. Sure. Yeah. Cammie -- Cammie would have
5 that.
6   And maybe you have it, Blair.
7   MR. CLARK: I had insurance on what you sent me.
8 And I asked you about it, and you weren't using
9 anything at the time so you didn't.
10   THE WITNESS: If there's just whatever --
11 whatever extra pieces are on there besides the two
12 Kobelcos and two John Deeres. I'm not sure what she
13 has on there, but I can -- I can sure call and ask her.
14   And then the -- on the titled vehicles, I
15 don't know -- I don't know that there's full coverage
16 on -- there's full coverage on the -- on the one camper
17 trailer that we have up there that we camped in in
18 Alaska and full coverage on the 2014 Ford. I don't
19 think there's -- there might be -- there might be full
20 coverage on one of the log trucks when we're using it.
21   But we -- we just -- we call -- we're
22 through Progressive Insurance, and we can call them 24
23 hours a day, and they just add the stuff on and take it
24 back off as we're not -- as it's in our yard.
25   Q. (BY THE TRUSTEE): Okay. Will you provide

Page 69

1 me documentation of any property insurance coverage you
2 have, because everything I've received so far shows
3 just liability insurance.
4   A. If I [unintelligible].
5   Q. Okay. Your -- this 2018 tax return that
6 you filed in the schedule -- or in the docket and that
7 we've talked about today, is that an accurate tax
8 return?
9   A. Well, you -- I got to be honest with you,
10 I -- I asked -- I've asked Janey for help on that,
11 and I'm sure she did the best she could do. And
12 together we took that information to Gerald Parkins and
13 asked him as fastly as he could to get them filed. And
14 I mean I sure didn't ask him to cheat on it or anything
15 like that. I don't -- I don't know how they would.
16   Q. Okay. But do you believe that it's
17 accurate?
18   A. I haven't reviewed it.
19   Q. Okay. Who is it that you're hiring to --
20 employing in this bankruptcy to straighten out the
21 books and be the accountant?
22   MR. CLARK: Gary, her name is Annette Moore.
23   MARY BETH: Bookkeeping Plus.
24   MR. CLARK: They call it Bookkeeping Plus here
25 in Boise. We had the same problem that Jason has with

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 70

1  a hotel last year -- last two years ago over in Baker.
2  And she ended up having to go through and reconstruct
3  the books in that case and did, and did a beautiful job
4  of it. So she knows how to do this, and she knows
5  about bankruptcy reporting.
6         THE TRUSTEE: Okay.
7         MR. CLARK: She's only $30 an hour, as opposed
8  to 200.
9         THE TRUSTEE: Is she a CPA?
10        MR. CLARK: No.
11        THE TRUSTEE: So are you going to have a CPA
12  work on these taxes?
13        MR. CLARK: I don't know that we need to. She's
14  a -- she's a certified tax preparer for the IRS. She's
15  got her -- she's got that designation. She could
16  probably do them. If you want Parkins to review them,
17  we could probably do that. I'm trying to keep the
18  costs down.
19        THE TRUSTEE: How far back do we have to go
20  before we get to a tax return that you can say this is
21  an accurate tax return?
22        MR. CLARK: From what Mr. Parkins told me, I'm
23  note 100 percent sure.
24        Q. (BY THE TRUSTEE): Mr. Lunders, do you
25  know?

---

Page 71

1         A. Well, I think '15 or '16, somewhere right
2  in there, is when Brandi and her husband decided they
3  were going to build their own house. And that's kind
4  of when she started dropping the ball. But up until
5  that point she was doing a great job. So they should
6  all be all the same time, my personal and all three
7  entities, whatever year she did those last. I'm
8  guessing around '15 or '16.
9         Q. Okay. When is your typical operating
10  season for this company?
11        A. Usually from June -- June's real weather
12  dependent. But usually from June until February is
13  when we're able to go at full tilt.
14        Q. Okay. And when do you typically collect
15  the money, the income, in an operating season?
16        A. Sure. So when -- so when we're working
17  like -- if we -- the contract we have with
18  DF Development down there or when we are selling logs
19  to any of the sawmills, any -- any of the logs that we
20  haul in there and that they -- they'll scale them,
21  anything we haul in between the 1st and the 15th of the
22  month, they have a check ready on the 25th.
23        Now -- now, Viking up in Alaska -- and that
24  was different too. We worked straight through the
25  spring months up there last year -- or in '18/'19. But

---

Page 72

1  anyway, their -- their policy's real similar, it was
2  just an extra five or ten days later. Everything you
3  did on the 1st through the 15th, I think they paid on
4  the 1st of the next month instead of the 25th. The --
5  or maybe it was the 5th. But anyway, typically every
6  two weeks we see a check.
7         Now, on -- when we sold -- sold hop poles,
8  like when we purchased those sales from the State or
9  Forest Service and we would haul the hop poles to the
10  farms and invoice them weekly, and most -- most all the
11  farmers that we were working with apparently are, you
12  know, good about -- good about paying us within --
13  within a week or two.
14        Q. Okay. For the coming operating season that
15  we'll be starting here in June, do you have any work
16  lined up?
17        A. Yes. Yeah.
18        Q. What are those -- what are those jobs you
19  have lined up?
20        A. The job with -- the job with
21  DF Development, and that is the same as what we did
22  last fall before -- before we got snowed out. And that
23  will start, you know, May, June.
24        Also, for K&D Lumber in Alaska and some
25  possibly for Jim Harrison's mill, and he calls it

---

Page 73

1  Alaska Gold or something like that. But they -- so
2  those small mills up there, that will probably be about
3  a week project up there, and that would fill their mill
4  yards up until November.
5         And what we did this fall we went up in
6  November and filled their mill yards up to get them
7  through until what they thought would be April but now
8  they're thinking May. So if we go up there two
9  different times per season, we'll be able to keep those
10  mills going.
11        Q. Do you have contracts for those jobs or are
12  they just word of mouth?
13        A. All word of mouth. Even with Idaho Forest
14  Group, it's all word of mouth. We've never had a
15  written contract with any of the -- any of the sawmills
16  down here. We've done sales agreements with them when
17  we're selling them logs, but any of the jobs, logging
18  jobs, contracting jobs we do for them, they never write
19  contracts. It's always just shake a hand.
20        With DF Development, we've got a contract
21  with them, a written contract, and that is for -- we
22  get $40 a ton for -- and this was last year, so the
23  markets may affect this contract. The $40 a ton is
24  what we were getting to cut, skid, and deck the timber.
25  And then there was -- from that specific job site was

---

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

Page 74

1  $24.27 a ton for the loading and hauling. And fuel
2  may -- fuel may reflect on that haul price as well.
3      The hop poles, we sell the 20-foot inside
4  poles, the ones that all stand straight up and down
5  inside all the hop fields, we get $20 apiece out of the
6  5-inch and bigger ones. The ones -- there's one farm
7  that has a lot lighter variety of hop, and they'll take
8  a 4-inch pole. And we sell those 4-inch poles for $18
9  apiece.
10      Then every -- every different farmer's just
11  like a different rancher up here, they all want a
12  different thing. And some of the farms for the anchor
13  poles out on the end want a 24-footer that's 8 inches
14  at least on the small end, and we get $28 for those.
15  One of the farms, a 23-footer, and it could be 6 to
16  7 inches. They're not too picky. But we're 23 -- or
17  $28 on 23-footers.
18      And then another farm Reggie Burlet
19  [phonetic], Ron's daughter, he wants 22-foot poles.
20  And they can be --
21      Q.  Right. I didn't -- I didn't mean for you
22  to get into the specifics of what your different
23  products are. It's just more -- more of what jobs do
24  you have lined up that -- that you may have to help
25  with the cash flow, not -- not what you charge.

Page 75

1      A.  Okay. Well, the -- Reggie -- Reggie called
2  and ordered two loads, and maybe three. So that will
3  likely be around 600 for the inside poles and 150 on
4  the anchor poles.
5      Q.  Okay. That --
6      A.  We've got their order --
7      Q.  Right.
8      A.  [Unintelligible.]
9      Q.  So when we -- when we consider what it is
10  that you have lined up this year versus a typical year,
11  is this year -- do you have work lined up at
12  100 percent of what you've had in the past? at
13  80 percent? 50 percent? Where are you on having things
14  lined up?
15      A.  Well, most of our equipment, that's up
16  there in Alaska. So with what we can do down here,
17  we'll probably be around three-quarters of a million on
18  gross this year. Maybe -- maybe a million. I guess
19  it's just going to depend a lot on the market.
20      THE TRUSTEE: Okay. I think that's all the
21  questions I have right now, Brett.
22      MR. CAHOON: Okay. Creditors?
23      MS. SCHWAGER: Yeah. Brett, would you mind if I
24  jump in?
25      MR. CAHOON: That would be great, yeah.

Page 76

1      MS. SCHWAGER: Okay.
2
3          EXAMINATION
4  BY MS. SCHWAGER:
5      Q.  Mr. Lunders, this is Sheila Schwager. I
6  represent the Bank of the Pacific. And we had a few
7  questions in reviewing the bankruptcy schedules.
8      How are you? Are you still doing okay? Do
9  you need any type of break?
10      A.  Oh, no, I'm fine. Good ahead.
11      Q.  Okay. And are you able to hear me okay?
12      A.  Yes.
13      Q.  Okay. Just let me know if you do need to
14  take a break or you can't hear me or my questions
15  aren't clear. I can certainly rephrase them.
16      But you had -- you were talking about IDC
17  Land owning the 52-acre pasture in Red River, the
18  Kamiah ranch, and then the Elk City shop; is that
19  correct?
20      A.  That's right.
21      Q.  And you had said that Elk City's mortgage
22  is being paid because you have a lease with IDC
23  Enterprises, the debtor.
24      But where did IDC Land get the money to pay
25  the remaining 80,000 purchase price that's being

Page 77

1  carried by the seller on Red River?
2      A.  From me.
3      Q.  From you personally, not from IDC
4  Enterprises?
5      A.  Well, IDC Enterprises owes me close to half
6  a million dollars, so I guess that might be -- it's
7  going to probably take the accountant to figure out
8  whether I should have had a check wrote to me. And so
9  a lot of the times a lot of the payments I've made out
10  of the checking account, you know, that's IDC Land
11  to --
12      Q.  Uh-huh.
13      A.  -- Inland Title & Escrow or whoever it's
14  to. The -- but there has been times that I know,
15  Sheila, I've wrote a check out of the IDC Enterprises
16  account knowing full well that IDC Enterprises
17  internally owes money to IDC Land or to Jason Lunders.
18  So -- so that is all -- well, a bookkeeping nightmare,
19  I guess. But I -- I mean, I know that I have done
20  [unintelligible]. I'm sure now that it's wrong, just,
21  you know. If we would have been paid for the work we
22  did, we would have never been in this problem and
23  everything would have been fine, so...
24      Q.  Yeah. And I'm not attempting, you know, to
25  place blame or say that you did something wrong. I'm

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 78

1 just trying to under- -- I'm just trying to understand
2 the underlying facts.
3     Because does IDC Land generate any money on
4 its own?
5     A.  Just from the rentals of those properties.
6     Q.  Does it rent all --
7     A.  [Unintelligible.]
8     Q.  Go ahead.
9     A.  That's all internally done.  And so the
10 renting these properties was all internally --
11 internally done over there with Forsmann.  And so
12 whatever is in that box that you get down to -- that I
13 took down to Blair and Mary Beth, why most of that will
14 unravel everything.
15     Q.  Is IDC Enterprises renting any land from
16 the Red River property?
17     A.  I don't know what she has.
18     Q.  Okay.
19     A.  When I talked to Gerald Parkins, I -- I
20 don't remember if he said there was two different
21 things or -- you know, he was unclear on it, too,
22 because, like I said, we -- I've really been begging
23 him to rush, rush, rush into this.  And it's all
24 brand-new to him, you know, less than a year.
25     Q.  Okay.

---

Page 79

1     A.  So nobody's real familiar with any of that,
2 other than Forsmann.
3     Q.  Would IDC Enterprises be doing anything on
4 the Red River property?
5     A.  Yeah.  I went up there when I first bought
6 the property, one of the neighbors had me dig -- well,
7 and Malcolm did it, one of the guys who works for us.
8 But we took our excavator up there and dug out a --
9 wanted us to dug a pond for him and then stuck a
10 culvert straight up and down in it and filled it back
11 full of river rock.  That was where he was getting his
12 water source.
13     And so while I had the excavator over
14 there, I walked it over to my property, adjoining
15 property too.
16     Q.  Uh-huh.
17     A.  I walked the excavator over there and dug
18 around -- I dug two holes on my property just to see
19 where it was, and I put a creek crossing in.
20     Q.  Okay.
21     A.  I was on [unintelligible].
22     Q.  So as its regular business operations, is
23 there anything for IDC Enterprises to do in regard to
24 the Red River?  For instance, in Elk City you have a
25 shop that IDC Enterprises is operating out of; correct?

---

Page 80

1     A.  Correct.  And -- and the log yards.
2     Q.  And the log yards.  But in Red River is
3 there any --
4     A.  One provides the land and one is
5 [unintelligible].  The Red River, no.  It -- so that
6 Red River property has -- has some timber around the
7 edges of it.
8     Q.  Uh-huh.
9     A.  And if we went in and harvested that to
10 sell that timber, I would -- I would do the work, you
11 know, IDC Enterprises would go in and do the logging
12 for IDC Land.
13     Q.  Right.
14     A.  And just pay them the stumpage value or
15 whatever.
16     Q.  Right.  Right.  But right now there's no
17 business, actual business operations going on at Red
18 River by IDC Enterprises?
19     A.  You can't even get there right now.
20     Q.  Okay.  Kamiah Ranch, similar type of
21 questions, whether or not IDC Enterprises is operating
22 any business operations there.
23     A.  No.  No, we don't have anything.
24     Q.  Okay.
25     A.  That's just -- I got that rented out now to

---

Page 81

1 one of the neighbors there that had cows.
2     Q.  Okay.
3     A.  The only --
4     Q.  And their --
5     A.  [Unintelligible] that I wanted to make
6 clear that, you know, IDC Enterprises did have with
7 that is that I know -- I know some of the time I was
8 paying guys that might have been down there putting
9 cows back in one afternoon when they had been working
10 up at the shop or something, and their -- that -- I
11 didn't break down a half a day's pay and say, All
12 right, this was IDC Enterprises that owes you for that
13 half a day.  I just --
14     Q.  Right.
15     A.  That's where I mean it was all kind of
16 jumbled together like that more than it should have
17 been, I guess.
18     Q.  Okay.  And then so some of the payments
19 were coming out of IDC Enterprises for IDC Land, but
20 some of it it was personally coming out of your bank
21 account; is that correct?
22     A.  Yeah.  Yes.
23     Q.  Okay.
24     A.  My personal bank account and -- and IDC
25 Land.

---

**Audio Transcription**

Page 82

1  Q.  Okay.  And then you said -- and your
2  bookkeeper, you think, is going to be able to go back
3  and figure out exactly what IDC Enterprises was putting
4  in, versus you, versus IDC Land?
5  A.  Oh, I had hope so, yeah.
6  Q.  Okay.  And that's what you guys are working
7  on.
8  Now, you had said that the Bank of Pacific
9  had talked to you about trying to term out your loan;
10  correct?  You had those conversations with Andy?
11  A.  Well, one conversation where he said,
12  "Don't worry about it.  We will either rewrite that
13  line of credit for another year, or we can term it out
14  with the equipment you have pledged."
15  Q.  And then -- and this was before Viking
16  Lumber defaulted on your contract; is that correct?
17  A.  Well, Viking Lumber breached that contract
18  several different times.  It's hard to say at which
19  time you mean.
20  Q.  Well, when you -- because wasn't there a
21  period of time when Andy had reached out to you because
22  IDC Enterprises had stopped making payments and it had
23  stopped making payments because of Viking Lumber not
24  paying you and he --
25  A.  Yes.

Page 83

1  Q.  -- had said that --
2  A.  [Unintelligible] called me.  And I mean --
3  and over and above what -- you know, not just every
4  banker would probably call you just to make sure you
5  got the sniffles or how come you didn't make a payment
6  yesterday, but Andy was just good about either calling
7  me, text messaging me, or reminding me and saying "Hey,
8  you know, you got to get a payment in here.  And he --
9  so and he set up another account, set up an account
10  down there and said, "Listen, this will make it easier.
11  I'm going to open this other account up for you.  You
12  just put the money into this account whenever you get a
13  chance, and then we can pull it out of this account to
14  make the payments when they're due."
15  Q.  Uh-huh.
16  A.  So -- and by all means, yeah, that's great.
17  If we would have had cash flow, we could have done
18  that.
19  Q.  Right.
20  A.  So and -- and Andy and I had a lot of
21  conversations, and some of them on e-mails and some
22  texts.  But yeah --
23  Q.  Right.
24  A.  -- I called him up with concerns from the
25  very first one.  I said, "Andy, these guys aren't

Page 84

1  hauling the logs like they said they're supposed to.  I
2  don't have any money to pay it."
3  He said, "Well" --
4  Q.  Right.
5  A.  -- "just pay the interest."
6  Q.  Because --
7  A.  [Unintelligible.]
8  Q.  And then didn't Andy explain that if the
9  loan's not current then the bank won't allow him to
10  renew or term out that loan?
11  A.  Yes [unintelligible].  And most of that was
12  all [unintelligible].
13  Q.  Right.  After --
14  A.  They were [unintelligible] --
15  Q.  Right.  So -- so when he was talking to you
16  about terming out your loan, you were current on your
17  loan, Viking Lumber hadn't defaulted yet; right?
18  A.  Viking had long before
19  that [unintelligible] -- I mean I don't know that --
20  you know, we brought that loan current.  There's two
21  different loans, and one of the last times -- one of
22  the last times Andy and I talked was he told me what
23  had to be -- he told me what had to be brought current.
24  And I think we only had enough money to bring one of
25  the loans current, and we -- we brought the equipment

Page 85

1  loan current but not the -- not the line -- I'm trying
2  to remember here.  This may not be right.  But I mean
3  it's all in the bookwork, I'm sure.
4  Anyway, we only brought one of the loans
5  current.  And I don't know if they were -- for the last
6  six months I don't know if they were ever current, but
7  they were within 30 days type of thing.  I don't -- I
8  don't think we ever got paid ahead or had them right up
9  to snuff, because we were constantly behind, behind,
10  behind after we [unintelligible].
11  Q.  Right.  Right.  Right.  Okay.  So -- and on
12  your -- just turning gears here.
13  You had -- and the Trustee had kind of went
14  over some of this.  But you have a list of 35 items of
15  equipment that you filed in your bankruptcy that you
16  valued at about 967,000.
17  Do you remember that document?
18  A.  I --
19  Q.  And you --
20  A.  I'm sure I do.
21  Q.  Yeah, you called it --
22  A.  [Unintelligible.]
23  Q.  -- IDC Enterprises, Inc., equipment list.
24  Okay.
25  Q.  And on that -- so when -- I was kind of

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

Page 86

1 confused when you were talking to the Trustee, because
2 there's 35 items listed on this identified equipment
3 list. And then in your schedules you have the
4 skidsteer that is financed by Amur. I'm sure I'm
5 saying that wrong, but of the other financing, starts
6 with an "A." And then you also have listed your --
7 sorry, let me get to that document. Your -- is it
8 Kobelco? Yeah, Kobelco listed in your schedules. Does
9 that sound familiar?
10    A. Okay. So there's -- I guess I'm not
11 sure -- so I think -- I think one thing you're talking
12 about is -- is our -- is our log skidder. That's a
13 four-wheeled tractor that will back up --
14    Q. Right.
15    A. -- and pick up the logs when --
16    Q. And that's --
17    A. We've got that --
18    Q. That's financed by someone else; right?
19 Amur Equipment?
20    A. Amur, Amur Financial --
21    Q. Okay.
22    A. -- or something. Correct, yeah. Yep.
23    Q. Okay.
24    A. That's the one we [unintelligible].
25    Q. Okay. So my questions -- I'm trying to

Page 87

1 understand this equipment list that you have filed with
2 your schedules that itemizes the value at 967,000. It
3 does have lots of vehicles on it as well.
4        And I presume that for the vehicles you
5 have no lienholders; correct? There's nobody --
6    A. The only loan -- the only loan we have is
7 Amur Financial and Andy's.
8    Q. And Bank of Pacific?
9    A. Yeah.
10    Q. Okay. And -- okay. So -- so your
11 vehicles, if they -- if Bank of Pacific is not listed
12 on there, are owned free and clear by you? You have
13 nobody that is perfected or isn't listed as a
14 lienholder on those titles; correct?
15    A. No.
16    Q. Okay. On the equipment that you listed
17 out, there's 35 items, which does include vehicles,
18 you -- where did you get the values for each of them?
19 And I'll just give you one example to maybe get your
20 mind back on this document. Your first item is a 1995
21 500T Valmain [phonetic] and Spearhead [phonetic] listed
22 at 45,000 for a value.
23    A. Yes.
24    Q. So how did you come up with the values on
25 this itemized list that you filed?

Page 88

1    A. Okay. So -- so a lot of that, I -- and you
2 can tell, I mean we purchased in the last three and
3 five years a lot of equipment --
4    Q. Uh-huh.
5    A. -- and titled vehicles as well. So -- and
6 we also -- I watch historically the Ritchie Brothers
7 auctions, and I look at their -- their price list, and
8 also Rich over at Cascade Trader, and Tony Foglio, who
9 sells equipment for Cascade Trader, is a good friend of
10 mine. And so I bounce a lot of these numbers off of
11 him. And I said -- you know, I'm not trying to shoot
12 pie in the sky, but we laughed and joked about when --
13 so some -- some representative of Andy's bank had went
14 up there -- and, you know, like our $200,000 Kobelco
15 290 up there, now what this is is Kobe Steel started
16 making excavators, and they were called Kobelco
17 excavators. And Jim Kirkpatrick [phonetic] formed
18 Jewell Manufacturing, and he ended up over in Portland
19 over there.
20        He would take the Kobelco excavator and
21 completely rebuild -- well, he offered several
22 different packages. But on that one particularly he'd
23 completely go through and rebuild the undercarriage and
24 make it a higher clearance so you can walk over
25 [unintelligible] to make it wider for better stability.

Page 89

1 He added rollers in the track grade, and made it a lot
2 heavier track range for a woods application.
3        And then over in the body of it, we
4 completely take all of the excavator guarding off,
5 re-guard the whole machine, thicker iron. Some of the
6 machines you put bigger oil coolers in and bigger
7 radiators in. But the guarding package, and then he
8 would also add a high-rise cab to it, so it would --
9 [unintelligible].
10    Q. So are you saying --
11    A. [Unintelligible.]
12    Q. And this might help get through this a
13 little bit quicker for you: Are you saying that --
14 that the values are higher than perhaps the bank would
15 expect them to be because they have different
16 improvements on them than a standard, you know -- if
17 you were to just look at the book value?
18    A. Oh, oh, absolutely. If somebody wasn't
19 familiar with that -- with that equipment -- type into
20 a computer say Kobelco 290 or Link-Belt 290, the only
21 thing that will pull up is the excavator version of
22 that, because Kobelco didn't ever make from the factory
23 a logging application machine, yeah. So that's an
24 extra. And that machine in particular we have two
25 hydraulic winches on that machine and a hydraulic slack

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

Page 90

1 kicker in the boom. That machine's got over $300,000
2 worth of additions to it over --
3 Q. Okay.
4 A. -- the excavator package. So yeah, that's
5 an easy way to say it.
6 Q. Okay. So did you take the entire 35-item
7 list to the gentleman that you mentioned that is an
8 auctioneer?
9 A. No.
10 Q. Okay.
11 A. And [unintelligible] gentlemen that I
12 mentioned are auctioneers.
13 Q. Okay.
14 A. Ritchie Brothers is the auctioneer company.
15 Rich Lennox owns Cascade Trader. Tony Foglio has owned
16 logging companies at different times, and he is a
17 salesman for Cascade Trader.
18 Q. Uh-huh.
19 A. He also [unintelligible] hauls logs
20 [unintelligible]. But those --
21 Q. So --
22 A. -- guys are selling equipment every day.
23 Q. Okay.
24 A. So I bounced some of the numbers off of
25 them. And then some of the equipment is stuff that we

Page 91

1 purchased recently enough that I just put down our
2 purchase price for.
3 Q. And --
4 A. That's the -- [unintelligible] that is
5 the -- so that's a '95 Valmain [phonetic]. What that
6 is is a Fisco [phonetic] harvester that levels -- it's
7 just like a combine, so you can get on hillsides. And
8 it -- and it has a slide boom on it that was an
9 addition to it. And that machine was bought for the
10 pasture thinning and stuff that we were doing, working
11 around lots of leave trees that has a head out on the
12 front of it that's all computerized that tells you --
13 it tells you the diameter -- it knows the diameter of
14 the tree when you grab it and will only let the saw go
15 out as far as that diameter is, and the saw won't go
16 all the way through and get stuck on the other side of
17 the tree when it falls down. And it -- so it -- so we
18 have two heads for that. That's a spare head in there
19 [unintelligible]. And that thing then falls the tree,
20 tips it over, and cuts it into measured log lengths.
21      That machine was 280-some-thousand-dollar
22 machine when it was new. To replace that, the newer
23 model of that machine now is 700,000. And we just put
24 a new Cummins motor in that that has about 400-some
25 hours on it. So that's why we came up with 45,000. We

Page 92

1 were very, very conservative on most of these values.
2 Q. Okay. And so essentially it's based on
3 your experience of buying and selling these -- this --
4 these types of equipment and then talking to those in
5 the business?
6 A. Yeah.
7 Q. Okay. On your job that you have set up
8 with DF Development, what did you make from them last
9 year?
10 A. I -- I -- and I don't know. We could look
11 back in the e-mail because I just -- oh, you know what?
12 Hang on here. I bet I've got -- so I just looked that
13 up in the last day or two to give it to Blair. So hang
14 on just one second and I'll tell you exact.
15      Okay. It looks like from September 9th to
16 October 28 we received $99,010.41. So what that is --
17 and let me -- let me just say this real quick, so -- as
18 I said earlier, we got $40 per ton for the logging,
19 let's say.
20 Q. Uh-huh.
21 A. And then there was $24.27 a ton was for the
22 trucking.
23 Q. Uh-huh.
24 A. So that is all included in that. And we
25 paid out the 24.27 to subcontractors. So out of

Page 93

1 that -- out of that say hundred thousand, we got 40 out
2 of every $24 [sic].
3 Q. Okay. So you have to subtract the, what,
4 24,000 from the 99?
5 A. $24.27 per ton. I can't --
6 Q. No, that's fine.
7 A. [Unintelligible.]
8 Q. I'm just trying to get an understanding of
9 what you think that you will bring in from
10 DF Development on this new year when you start in June.
11 A. Well, so DF -- DF Development is owned by
12 those -- the Wilks brother out of Texas.
13 Q. Uh-huh.
14 A. They came up and -- they own a lot of other
15 things. They purchased all or most of the old Boise
16 Cascade mill ground in south Idaho.
17 Q. Uh-huh.
18 A. And they have some caretakers that are
19 going in and putting up timber sales in different parts
20 of it for forest health and to -- maybe they want to
21 make it hunting grounds or whatever their deal is, but
22 that is very market related. And the work that we do
23 is more specialty work and costs more. So they may not
24 have us doing some $40 work this year if the market is
25 low. They may not sell a single tree if the market's

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 94

1  low enough. But they may also curtail us back to some
2  easier stuff. We may be doing some 25 or $30 work for
3  them so they have more money left in the jar.
4      Q. Okay. I understand that, and that's
5  helpful.
6          Do you have just a range of if they only
7  have you do the less payable work what you would net
8  out of that work versus if they give you the higher
9  priced work? So do you have a range of what you could
10  obtain on that job for 2019?
11      A. Not right now. Not right now, just because
12  that's -- that's all kind of up in the air. Our
13  contracts usually won't get wrote until, you know, May,
14  middle of May sometimes, as we're getting --
15      Q. Okay.
16      A. -- further, closer into the season and they
17  know what the next 90-day sales value is before they'll
18  put up their -- their -- which areas we're going to
19  harvest.
20      Q. Okay. And then what about the small mills
21  in Alaska, the K&D Lumber and the Alaska Gold that you
22  go up in November, have you --
23      A. Yes, we [unintelligible].
24      Q. -- for sure talked to them?
25      A. And I may not have said that right, but

---

Page 95

1  that's Jim Harrison's mill if you need to check on
2  their end for sure. But Jim doesn't know for sure
3  what -- what he's going to have us do.
4      Q. Uh-huh.
5      A. Both of these mills bought timber sales.
6  And when I talked with Keith last week, he -- he said
7  his markets are still good. The guys up there he's
8  selling that cedar to still want it.
9      Q. Right.
10      A. So he's still real positive. When we went
11  up in November, we took around 25 loads into -- into
12  his mill yard. And he said that -- you know, that
13  should get us through with what he had from other guys
14  in there, he said, "I should be okay until middle of
15  April." I would come back up middle of April and do
16  about the same. And so middle of April now he's got
17  enough wood, he said it's probably going to be May. So
18  I would come up in May.
19          Now, what they were paying was -- they took
20  care of the timber cutting and everything, just like
21  normal up there, and they took care of the hauling. We
22  got 145, I think it was, or $155 a thousand for putting
23  wood on board a truck. And then I have one of our
24  trucks up there, so I did some of the trucking too.
25  And I can't remember what he was paying on the hall on

---

Page 96

1  that for sure. I could probably [unintelligible] --
2      Q. Do you have an estimate? Do you just have
3  an estimate of what you think that you'll be able to
4  net if he in fact goes forward for 2020?
5      A. Oh, I -- yeah, for the first half, if we go
6  up there in May, we'll -- and again, I don't want you
7  to think I'm lying to you, just telling you what we're
8  planning on. But what he's currently planning on now
9  is if we go up there now, we'll probably do around
10  $30,000 worth of logging and there might be some
11  additional work for the truckers. And so there's some
12  gross on top of that, whatever the trucking does. But
13  he's not sure because a friend of his up there just
14  bought a truck and he wants to try to give him some
15  business too.
16      Q. Okay. Would it make sense for IDC
17  Enterprises to liquidate some of that equipment that is
18  up there, versus, you know, just having it sit waiting
19  to see whether a job comes in in Alaska? Because it's
20  expensive to move back; right?
21      A. Oh, it's -- you could move it back. They
22  had that in mind when they drug us up there, no doubt.
23  The problem with that is -- do you feel that Bank of
24  Pacific is giving -- giving us fair values for what
25  they -- what they have put toward Blair there, the

---

Page 97

1  prices that they thought that equipment was worth?
2      Q. Has Bank of Pacific given you values?
3      A. Yeah, they did.
4          Right, Blair?
5      MR. CLARK: Yeah.
6      Q. (BY MS. SCHWAGER): And what --
7      A. [Unintelligible]. So one of those in
8  particular -- and this is one of the funny ones that I
9  remember speaking to Tony about [unintelligible] --
10      Q. Oh, you're talking about the private sale?
11      A. [Unintelligible.]
12      Q. You're talking about the private sale.
13  Okay. Sorry.
14      A. [Unintelligible.]
15      Q. Yeah. It's my fault. I was trying to
16  figure out what you were talking about.
17      A. [Unintelligible]. So the only -- the only
18  companies that were really interested in purchasing our
19  equipment were owned by Viking Lumber that owes us all
20  that money. So there's really some issues there. And
21  they -- I believe they offered 40-some-thousand for
22  that piece of equipment that is, you know, on lots down
23  here for 280,000.
24      Q. Okay.
25      A. So that's --

---

Page 98

1    Q.   So it might be worth it to move it for the
2  $10,000 it would cost to move it to sell it down here
3  for 280?
4    A.   Well, I think we're missing the -- my --
5  our company -- our company has been profitable. We
6  provide a lot of good jobs, and we provide a lot of
7  good business to local businesses in our community,
8  whether it be the fuel companies, the parts house,
9  different mechanic shops around, and our local
10 sawmills.
11         What we -- we got taken advantage of by
12 going up there to help people in Alaska. And what we
13 need to do now is get figured out what equipment we can
14 leave up there to help K&D Lumber and Jim Harrison and
15 anybody else that needs some help up there, but we need
16 to be able to bring most of that equipment back home
17 and get it back to work down here where it can, you
18 know, start providing again.
19    Q.   Do you have any idea where you would get
20 the operating cash in order to move that equipment to
21 the States or to, I'm sorry, Idaho?
22    A.   Viking Lumber owes us a lot of money, plain
23 and simple as that. And when -- when we can get, you
24 know, representation for whatever we need to do, then
25 they -- when they make things right with us, we will

Page 99

1  have the Bank of Pacific paid off and we will have
2  enough operating money to get our equipment back here
3  and get to work.
4    Q.   Okay. Well, do you have a problem getting
5  jobs in Alaska due to the dispute with Viking?
6    A.   Absolutely not. Actually --
7    Q.   Okay.
8    A.   Well, I better -- no.
9    Q.   Okay.
10   MR. CLARK: He's got -- he's got people right
11 now that want to use him.
12   Q.   (BY MS. SCHWAGER): Is -- is the whole --
13 is your feasibility, your ability to reorganize IDC
14 Enterprise totally contingent upon getting money out of
15 Viking Lumber?
16   MR. CLARK: Totally? I wouldn't think so.
17   Q.   (BY MS. SCHWAGER): Well, from where will
18 the cash come to operate?
19   A.   [Unintelligible]. Oh, I'm sorry.
20   Q.   Go ahead.
21   A.   That [unintelligible].
22   MR. CLARK: He's got jobs down here that once
23 the weather breaks he can start. That's what he was
24 saying earlier.
25   THE WITNESS: [Unintelligible] we left enough

Page 100

1  equipment down here, Sheila, for a cap side and a line
2  side.
3    Q.   (BY MS. SCHWAGER): Uh-huh.
4    A.   We also left trucks down here. We left
5  enough equipment, which you can see in that equipment
6  list, down here to work. What our -- our problem was
7  is we felt -- and I shouldn't say -- what my problem
8  was I put way too much faith in those guys turning
9  around and doing the right thing. I waited too long,
10 and I put almost everything I had into them waiting for
11 them to do the right thing.
12        Fortunately, I -- I have some land. I do
13 have more than enough equipment, if the Trustee might
14 allow me to take out a small loan if we need to. But
15 fortunately right now, we're able to keep the ball
16 rolling with some small trucking jobs and small jobs
17 like for the processor and things like that to where
18 once the weather breaks, and we have -- everybody down
19 here that we work with -- and that's the thing, I've
20 had the fuel companies called me and said, "We can help
21 out. We want to help you. We need to get you back
22 going again. If we need to go 60, 90 days before you
23 get a check coming in, you do what you need to do."
24        Just the creditors down here are more than
25 willing to help us get going again, because they know

Page 101

1  we're an honest and stable company. And so we will
2  have no trouble getting things going again down here.
3  And one thing -- and like I told Blair, be a little bit
4  conservative. I don't -- I don't want to tell you
5  the -- the log market is going to be fantastic, because
6  I don't know where the housing market's going to be. I
7  don't know that anybody that isn't working right now
8  that's staying home taking care of their kids is going
9  to be able to buy a cabin next year.
10   Q.   Right.
11   A.   But we have diversity between doing jobs --
12 well, like Ely. Ely does that stuff for us on
13 mastications. We are an IDIQ contractor for the four
14 states here. The Forest Service has us on the list.
15 They do not have to advertise jobs that come out only
16 to a short list of people, contractors hitting this
17 area, because they know that we can perform on them.
18 We can do anything from that mastication work to a
19 full-blown logging job like for DF Development, to
20 going in and doing the work in a park for the State of
21 Idaho and selling the materials for hospitals and
22 stuff.
23        So if the -- if nobody is building a new
24 cabin or building onto their house next year, those
25 farms are still putting in extra acreages or running

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 102

```
 1  over poles with their combine and needing maintenance
 2  poles.  There's always a little bit of work.  I mean
 3  we've -- we've been in -- we've been in business since
 4  1991.  IDC Enterprises --
 5      Q.  Uh-huh.
 6      A.  -- was formed in 2007.  Fortunately, even
 7  if it's just small, a two or three-man operation or
 8  whether it's 17 people like we had going up there for
 9  Viking --
10      Q.  Right.
11      A.  -- we got a wide enough array of things.
12  And we were -- you know, we didn't -- we didn't have
13  any debt.  We wouldn't have ever had this problem --
14      Q.  Right.
15      A.  -- had we not stuck our neck out a little
16  too far on that chopping block.  So once we can get
17  that problem solved, and if -- you know, worst case
18  scenario, if I have to go out and cut a load of help
19  poles myself, put them on my truck, and haul them to a
20  farmer, and say I only do $20,000 a month, I can get
21  paid back what debts I owe.
22      Q.  So just a few more questions.  I appreciate
23  the responses.
24          You will, though, need, if you have a job,
25  for instance, going out to DF Development, you will
```

Page 103

```
 1  need to have some operating cash up front; right?
 2  Because you have to pay subcontractors, fuel,
 3  insurance, taxes, things like that.  So I guess the one
 4  concern I had was just, you know, where does this
 5  up-front cash come from?  Because right now you have
 6  about $600 in the checking account.  And is it
 7  feasible --
 8      A.  [Unintelligible.]
 9      Q.  -- moving forward as to the cash you would
10  need initially to do a job?
11      A.  Well, so most of what you said, like I
12  said, we can do -- I have credit.  I don't have to pay
13  a fuel bill for a minimum of 30 days after I have an
14  order into our tank.  The subcontractors aren't paid
15  until we are paid, whether it's like the work that Ely
16  does for us or whether it's truck hire or whether it's
17  our woods boss, they -- if they haul any loads between
18  the 1st and the 15th, our payday is five days after the
19  mill pays us.
20          So -- so once we get -- if we get a report
21  from the sawmill saying that Joe hauled 10 loads in and
22  they all weighed 20 ton, we owe him for hauling
23  200 ton, we have five days after the mill payday to pay
24  Joe.  So there's really not a lot of cash out of hand
25  we have to start a job, we need to start a job.  But I
```

Page 104

```
 1  will -- I will pull it out of my personal account if I
 2  have to.  That's what I've been doing all last year in
 3  Alaska.
 4      Q.  But you -- so you have a personal account
 5  that -- you are able to generate money outside of IDC
 6  Enterprises personally?
 7      A.  Yeah, I could go to work for somebody and
 8  make a wage during the day if I had to eat.  But I -- I
 9  have -- I have the property and IDC Land that I could
10  take out -- and I talked with Blair a little bit about
11  this.  I mean there's some -- and dammit, Andy, I think
12  if I have to go take out some high interest loan
13  because of Viking not paying me, I think that they
14  should have to pay me back for that high interest.  But
15  if I -- if I have to take something that I've worked
16  for my whole life and borrow more money against it to
17  get going to get this back on its feet again, that's
18  just what I'll have to do.
19      Q.  So just two more questions.  And I -- I
20  varied off of this topic.  But you had talked to the
21  trustee about IDC Equipment and then IDC Enterprises.
22          Is any of the 35 items on that equipment
23  list entitled "IDC Enterprises, Inc., Equipment List,"
24  is any of that equipment owned by IDC Equipment rather
25  than Enterprises?
```

Page 105

```
 1      A.  Well, what -- well, start from the
 2  beginning on that.  And so I don't want to get Mary
 3  Beth in trouble or anything else, because what -- what
 4  we did was I said, "Hey, I already got this list of
 5  stuff I made for Northwest Farm Credit, and so this is
 6  everything that I -- that I have.  This is everything I
 7  own."
 8          So we put that list down.  And I -- like I
 9  say, I think everything's on it, but at that time I had
10  even forgot about one D4 and some stuff down there at
11  the ranch.  What that -- and so what that is, so you
12  understand, don't sound too arrogant or something,
13  that's the place I grew up on, the ranch I grew up on.
14          My dad started having some medical issues,
15  and they didn't think the insurance was going to cover
16  these blood -- blood deals he had to take.  So he was
17  going to put that ranch up for sale.  It was up for
18  sale for about six months or something, wouldn't sell.
19  And so I went to Northwest Farm Credit.  And they were
20  able to give me a loan so I could buy that ranch from
21  Mom and Dad.  And that's what that extra equipment
22  was -- was an additional 10 or 12 or some 15,000 or
23  something like that that I paid to them for this other
24  equipment that's just parked out at the ranch.  And
25  that just slipped my mind.  I didn't even have it on
```

---

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 106

1  the list that I made for Northwest Farm Credit agency.
2       But I took this list of stuff down to Mary
3  Beth and said, "Okay.  This is what I got."  So that's
4  where this list came up, and it says IDC Enterprises on
5  it.  And that's --
6       Q.  Right.
7       A.  -- everything that I -- everything that I
8  could think of.  And then afterwards I was talking to
9  Gerald Parkins, and I said, "You know," I said, "Did
10  anything get switched over, you know, that is
11  officially under IDC Equipment?"  I said, "You know,
12  I've got everything pick-piled into this list down
13  there that says IDC Enterprises on it."  And I said, "I
14  know that I paid for a road grader out of that IDC
15  Equipment checking account.  It was the first check I
16  wrote."
17       And he said, "Well, let me check."  And so
18  he got back to me, he said, "Man," he said -- he said,
19  "Nothing is very clear on this."
20       MR. CLARK:  Uh-huh.
21       THE WITNESS:  "But I do see two skidders and a
22  road grader and, you know, that equipment down at the
23  ranch."
24       And I said, "Well, gosh, you know."
25       So I checked into it after that.  And

---

Page 107

1  that's why I want to make sure, just so you guys don't
2  think I'm trying to hide anything, because I don't have
3  any reason to.  That --
4       Q.  (BY MS. SCHWAGER):  Sure.  So --
5       A.  -- little skidder is --
6       Q.  -- that --
7       A.  -- listed as IDC Equipment.  I know -- I
8  did the paperwork, everything on that is IDC
9  Enterprises.  The payment even comes out of the IDC
10  Enterprises account.  So all -- you could -- you could
11  put the road grader under whatever list you want.  I --
12  the -- you know what?  I have -- I have more than
13  enough equipment there to sell at a fair value and pay
14  off loans if we had to, but I don't feel I should be
15  put in that position because somebody isn't paying me
16  what they owe me.
17       Q.  Mr. Lunders, I'm just trying to understand
18  what equipment the debtor actually owns now.  And so
19  you had said that IDC Equipment owns some of the
20  this -- may own some of this equipment that's
21  identified because you recall issuing the first payment
22  for a skidsteer out of the IDC Equipment checking
23  account.
24       But what were -- where did the proceeds
25  come from in that IDC Equipment account?  Because it's

---

Page 108

1  not an operating entity; right?  It's not -- that
2  particular company is not generating money?
3       A.  No, the -- so the -- so the first check I
4  wrote out of that account was for a road grader, a full
5  blade, wing blade that we were going to plow snow with
6  that winter.  I bought it -- I bought it that fall from
7  a kid at -- in Deary.  The --
8       Q.  Right.
9       A.  -- spring [unintelligible].
10       Q.  But it wasn't -- but -- yeah, go ahead.
11       A.  Yeah, so to answer your question with
12  Ely -- I mean I'm not trying to be difficult, but I --
13  I don't know what has the -- if anything, I don't know
14  that anything could be called under ownership of IDC
15  Equipment without causing a squabble.  And it's not
16  worth it to me to cause a squabble because --
17       Q.  Okay.
18       A.  -- it's not going to be the straw that
19  breaks the Camel's Back.
20       Q.  Okay.  So you think that -- I mean based
21  upon payments of money that went back and forth, that
22  it's -- as you sit here today -- and it may change with
23  your bookkeeper, but you think that this is a -- this
24  list of equipment that's in your bankruptcy schedules
25  is considered IDC Enterprises, Inc., and we can rely

---

Page 109

1  upon that equipment in this particular bankruptcy case?
2       THE WITNESS:  Blair, can you help with anything
3  you heard from Parkins on this very thing to help her
4  answer that?
5       MR. CLARK:  Parkins was not willing to verify
6  that it was or wasn't because of the state of the
7  records.  That's why before we actually answer that
8  question, so that you both are satisfied with what the
9  answers are, I want to wait and have Annette go through
10  the records and see what is IDC Equipment and what is
11  not.
12       MS. SCHWAGER:  That's fair.  That's fair.
13       MR. CLARK:  [Unintelligible.]
14       MS. SCHWAGER:  The one thing I would ask, Blair,
15  in that regard, though, is, you know, just because it's
16  titled in one of the other entity's names, if you could
17  trace that through to determine whether or not the
18  proceeds ultimately were from this entity so that it
19  would -- this entity legitimately has a claim or an
20  interest in it, versus just what somebody titled them
21  in.
22       MR. CLARK:  Well, titled and paid for.
23       MS. SCHWAGER:  Right.
24       MR. CLARK:  Yeah.
25       MS. SCHWAGER:  Yeah.  I mean 'cause just because

---

In Re:
IDC Enterprises, Inc.

**Audio Transcription**

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 110

1  it's coming out of the IDC Equipment bank account would
2  not necessarily mean it's an IDC Equipment piece of
3  equipment, because those proceeds may not -- because I
4  don't think IDC Equipment's an operating entity. But I
5  could be wrong.
6      MR. CLARK: I don't know. That --
7      MS. SCHWAGER: Okay.
8      MR. CLARK: That's all I'm saying is --
9      MS. SCHWAGER: All right.
10      MR. CLARK: -- Parkins couldn't tell me. And I
11  asked him specifically, and he said he doesn't do the
12  accounting that we need to do that.
13      MS. SCHWAGER: Okay.
14      MR. CLARK: His firm doesn't do that kind of
15  work.
16      MS. SCHWAGER: Okay. So --
17      MR. CLARK: In talking with Forsmann, the people
18  that actually were supposed to do this, the gal that
19  was his representative at Forsmann is gone.
20      MS. SCHWAGER: Okay.
21      MR. CLARK: No further comment needed.
22      MS. SCHWAGER: Okay.
23      MR. CLARK: But bottom line is they didn't have
24  near as many records as we were led to believe they
25  should have. There was a box.

---

Page 111

1      MS. SCHWAGER: Is it --
2      MR. CLARK: And there's -- there should be more
3  than that.
4      MS. SCHWAGER: Is it possible, Blair, that
5  because of the accounting issues that are not the fault
6  of Mr. Lunders, but are the practical situation we're
7  all under -- and I'm not asking -- and don't respond to
8  this question, but I'm just throwing it out there for
9  the thought process of is it possible that this is not
10  an appropriate Subchapter 5 because of the time frames
11  that are set forth in the Subchapter 5 that -- because
12  of the records having to get reconciled in order to
13  really determine what can be done, that it won't fit
14  within the Subchapter 5? I mean I'm just throwing that
15  out there.
16      MR. CLARK: [Unintelligible.]
17      MS. SCHWAGER: And whether or not it's an 11.
18      MR. CLARK: I've been thinking about that for
19  the last three days.
20      MS. SCHWAGER: Yeah. Okay.
21      MR. CLARK: And I don't have [unintelligible].
22  I haven't answered that question yet to my own
23  satisfaction.
24      MS. SCHWAGER: Okay.
25      MR. CLARK: And I don't want to --

---

Page 112

1      MS. SCHWAGER: I just know that --
2      MR. CLARK: I want to do it the right way --
3      MS. SCHWAGER: Right.
4      MR. CLARK: -- whatever that is. But there's a
5  lot of stuff here that Jason wasn't aware of, I wasn't
6  aware of, or anything else when we first got started on
7  this. Nobody had any ideas --
8      MS. SCHWAGER: Right.
9      MR. CLARK: -- that the records were such a
10  cluster.
11      MS. SCHWAGER: Well, and I think when you get to
12  court on the 13th, you're going to have the Court
13  that's going to be wanting, you know, all of these
14  specific questions answered under Subchapter 5. And I
15  don't know that you can answer them with the state of
16  the financials.
17      MR. CLARK: Like I said, that's what I've been
18  thinking about the last three days.
19      MS. SCHWAGER: Okay.
20      Q. Mr. Lunders, just one final question: Did
21  Northwest not go forward with the loan because of the
22  tax returns?
23      A. Yes.
24      Q. Okay. Was -- and was there any other
25  reason that they provided to you?

---

Page 113

1      A. No. That was it. We didn't have the tax
2  returns to turn into them, so they said they couldn't
3  do anything without tax returns.
4      MS. SCHWAGER: Okay. Okay. I have no further
5  questions. I appreciate. It's been a lengthy call. I
6  appreciate your time.
7      MR. CAHOON: All right. Thanks, Sheila.
8      Any other questions from any creditors?
9
10      FURTHER EXAMINATION
11  BY MR. CAHOON:
12      Q. Along the lines of some of the questions
13  that I asked earlier and that Sheila was asking with
14  respect to equipment and who owns what, could -- would
15  you be able to get me a list of any equipment owned by
16  IDC Equipment or by the debtor or that you're unsure of
17  that's not included on the equipment list or in your
18  schedules? Does that make sense what I'm asking for?
19      A. Yeah, it -- that's -- well, I could go back
20  over them and see if I can think of thinking else
21  that's -- we went over that list time and time again
22  since we were applying for that new loan with all this
23  Farm Credit stuff. And the only thing that -- that
24  possibly [unintelligible] -- that might not be on there
25  is that -- is that -- just that little crap down there

---

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 114

1  at the ranch, like an old disc, an old cultivator, and
2  old D4 -- it's a little D4 cab with a blade on it.
3  So --
4      Q.  Okay.
5      A.  -- if that's -- I don't think that's on the
6  list, and it wasn't even -- I forgot all about it until
7  Parkins mentioned it.  So that -- that would be it.
8      Q.  Okay.  So -- so any equipment that there's
9  any question about as to whether it's the debtor that
10 owns it or IDC Equipment owns it is already included in
11 these schedules, other than the property maybe at the
12 ranch?
13     A.  Right.
14     Q.  Okay.  The -- with respect to the Red River
15 property and the money that IDC Enterprises paid for
16 that property, in your -- in the balance sheet that you
17 filed with the Bankruptcy Court, it shows as an asset
18 money due from IDC Land in the amount of $172,206.09.
19     Does that include -- is part of that the
20 80,000 that IDC Enterprises paid to -- for the IDC
21 Land?  Or where does the $172,000 come from?
22     A.  That [unintelligible].  There was a few
23 different numbers on there that Blair had asked me
24 about that we took to Gerald.  That's -- that's all
25 part of the stuff that this new lady is going to try to

---

Page 115

1  help us try to figure out, because I couldn't -- I
2  couldn't tell you.
3      Q.  So --
4      A.  Since Forsmann -- the Forsmanns were doing
5  that when we first set up the different entities, you
6  know, to rent this from, one entity to rent from
7  another entity.  I wanted to see checks wrote from one
8  to another.  And she said, no, I can just do it all
9  in-house.  So it was all just -- so much of this was
10 she -- whether it's on her QuickBooks deal or what, but
11 I mean so much of this was all just Brandi's doing.
12     And so then when -- when Janey got --
13 picked up stuff from Brandi and Janey took it to
14 Parkins and Parkins said "Well, you know, I don't know
15 what this is.  It appears that IDC owes IDC Land this.
16 And IDC owes IDC Equipment this.  But," he said, "I
17 don't know what it's for, and so I don't know
18 [unintelligible] it's for."
19     So that's all part of what Blair's concern
20 was when he called me and said, you know, "We got to
21 get this figured out.  And I know a lady that's good
22 with these books.  She's helped us before."  And so
23 that's kind of right where we're at.
24     Q.  Okay.  But for the -- from the money that
25 IDC Enterprises has paid for IDC Land assets, do you

---

Page 116

1  believe that IDC Land owes money back to IDC
2  Enterprises?
3      A.  No.  It's the other way around.  IDC -- IDC
4  Enterprises wouldn't have done anything for IDC Land.
5      Q.  Okay.  But I believe you said -- you
6  testified earlier that IDC Enterprises paid $80,000
7  towards the purchase of the Red River property; is that
8  correct?
9      A.  That was money that I took out of that
10 account to give the guy his down payment.  I wrote that
11 check and gave to him.  And the check I had was IDC
12 Enterprises.
13     MR. CLARK: Okay.  But that check came out of
14 IDC Enterprises to start with, I think is what you said
15 earlier.
16     THE WITNESS: Yeah, that's what I mean.  I wrote
17 the check out of IDC Enterprises.  So I took that
18 money.  I handed it to Jerry.  It was just me.
19     Q.  (BY MR. CAHOON):  And I asked you early on
20 in the testimony whether or not you ever received draws
21 or any money from IDC Enterprises.  But I believe your
22 testimony was that you didn't receive money from IDC
23 Enterprises.  So --
24     A.  No.  No, I've never -- I've never gotten a
25 check, you know, like a paycheck every two weeks or

---

Page 117

1  anything like that.  She's got a -- she has a certain
2  amount that she says I'm paid every two weeks, but I
3  think that is what the state, you know, says this is
4  the number we'll base payroll on for workman's comp.
5  But [unintelligible], you know, I've never gotten a
6  check every two weeks to go take and put in my personal
7  bank account or anything like that.
8      Q.  Okay.  But at some point you took $80,000
9  from IDC Enterprises.
10     Have you taken any other money out from IDC
11 Enterprises in that fashion?
12     A.  Well, and that's like I told you earlier,
13 if I -- when I'm going up to camp on a Sunday night or
14 something and I go [unintelligible] at the grocery
15 store, the IDC debit card that I buy all the groceries
16 for that week.  If I go to -- and so dinners, I would
17 buy all the crews dinners up at Carol's Valve
18 [phonetic], and -- and I would pay that out of IDC
19 Enterprises every two weeks or whatever she would get a
20 bill for us.  But --
21     MR. CLARK: That's when you were on company
22 business, though, is that right?
23     THE WITNESS: Sure.  Yeah, all the employees,
24 you know, and my dinner too.  I'd eat there a lot or
25 get dinner to go.

---

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 118

```
 1    Q.  (BY MR. CAHOON):  Okay.  Anything --
 2    A.  But I did that [unintelligible].
 3    Q.  Anything other than paying your food?
 4  Anything along the lines of taking out $80,000 and
 5  paying, you know, to purchase land or purchase anything
 6  else?
 7    A.  Sure.  I paid -- I paid half down on the
 8  Elk City piece, too, you know, with the cabin and the
 9  shop and stuff on it.
10    Q.  And how much did you pay to purchase the
11  Elk City property?
12    A.  I think it was 180, so I -- same deal, I
13  gave half down or real close to half, paid half -- 90
14  and financed 90, I think.
15    Q.  Okay.  So that's pretty close to the
16  172,000 that you have listed on your balance sheet as
17  money that IDC Land owes to IDC Enterprises.
18        Do you think that that's where that figure
19  is coming from or...
20    A.  Yes.  And that could be right.  And so that
21  might be --
22        And, Blair, maybe you could correct me if
23  I'm wrong here.
24        But he said -- Gerald said something about
25  okay, so -- so -- so he said, "So you got this money
```

---

Page 119

```
 1  that IDC Enterprises might have loaned IDC Land and
 2  it's being paid back by a rental every month."
 3        Do you see where that's in there?
 4    Q.  I don't see that right now.
 5    A.  Do you remember [unintelligible]?  There's
 6  something to do with like $1,500 a month rental or
 7  something that shows every month on the -- on the tax
 8  deals.
 9    Q.  Yeah.  Okay.
10    A.  And it's -- and it's going from IDC
11  Enterprises to IDC Land.
12    Q.  Do you -- does IDC Land have equity in the
13  Red River property?
14    A.  So I guess I don't -- so we still owe
15  $60,000 or something on that --
16    Q.  And --
17    A.  -- on that property.  And it's worth 180 or
18  160 or whatever it is.
19    Q.  Okay.  How about on the Elk City
20  property, what's it worth and what do you owe?
21    A.  I think it's 180,000, maybe a little more.
22  We done -- some work on it up there for sure.  And
23  I think we still owe 45 or 55 on it.
24    Q.  Okay.  And I believe you -- you mentioned,
25  you know, one possibility for funding a plan here,
```

---

Page 120

```
 1  making things work and in the bankruptcy was taking a
 2  loan against those properties.
 3        Is that accurate or is that something that
 4  you would consider --
 5    A.  Oh, yeah.
 6    Q.  -- for IDC Land to --
 7    A.  [Unintelligible.]
 8    Q.  Okay.
 9    A.  Also have 16 acres that I don't know
10  [unintelligible].  I also have 16.35 or something like
11  that, 16 acres in Elk City.  And that -- that is one of
12  the pieces I talked to Brandi options about getting one
13  of those high interest, hard money loans on.
14    Q.  And did --
15        MR. CLARK:  That loan hasn't been taken out, has
16  it?
17        THE WITNESS:  No, no.  No, I haven't taken it.
18  It's ridiculous interest rate.
19        MR. CLARK:  Yeah.
20    Q.  (BY MR. CAHOON):  Did -- did IDC
21  Enterprises pay any money towards the purchase of that
22  16 acres in Elk City?
23    A.  No.
24    Q.  What about the -- did IDC Enterprises pay
25  any money towards the purchase of the ranch?
```

---

Page 121

```
 1    A.  Well, yeah, I had to -- so part of that
 2  lowboy money went toward my ranch payment this year,
 3  part of that lowboy payment that I got from Shane's
 4  girlfriend.
 5    Q.  Uh-huh.  Any other payments from IDC
 6  Enterprises towards the ranch?
 7    A.  Well, the last -- so that's an annual
 8  payment.  And so the last payment I made would have
 9  been, you know, in '18 or whatever, September of '18.
10  And I -- I don't remember what account I wrote that out
11  of.  I mean I'm sure we could find out, but I -- I'm
12  telling you, I very well would have wrote it out of IDC
13  Enterprises just as easy as my personal account, but I
14  don't -- I don't remember doing that for sure.
15  [Unintelligible.]
16    Q.  Okay.
17    A.  I'm sure we can look that up.
18    Q.  All right.  Yeah, if you could look that up
19  and account -- it sounds like your bookkeeper is going
20  to be working on a lot of that stuff to straighten out
21  the books of where money was going.  I -- I don't --
22    A.  [Unintelligible.]
23        MR. CAHOON: I don't have any additional
24  questions at this point.
25        Are there any other follow-up questions
```

---

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

---

Page 122

1  that you have, Gary or Sheila?
2      MS. SCHWAGER: I'm good.
3      THE TRUSTEE: This is Gary. I have just a
4  couple, if that's all right.
5      MR. CAHOON: Yeah, that's fine. Thanks, Gary.
6
7          FURTHER EXAMINATION
8  BY THE TRUSTEE:
9      Q.  When was it that you made the loan
10  application to Farm Credit that you've been talking
11  about?
12      A.  It was this fall, in August, I think.
13      Q.  And --
14      A.  [Unintelligible.]
15      Q.  -- at that time did you provide Farm Credit
16  with some documents that relate to IDC Enterprises'
17  finances?
18      A.  I don't know if we had any IDC Enterprises
19  stuff on there or not. Maybe in -- maybe in some of
20  the accounts receivable. I did have the -- when I
21  listed all the bank accounts, I may have listed all of
22  my bank accounts, personal and IDC Equipment and IDC
23  Land and IDC -- I could -- I could dig up those and
24  send them to you. I mean it's just a Northwest Farm
25  Credit loan application I could give to you if you want

---

Page 123

1  it.
2      Q.  Okay. Yeah, if you would. I'd like to see
3  what you provided. That's one of the things I think
4  that -- that's required to be provided is any financial
5  information that's been generated in the last few years
6  for this company.
7      A.  That -- and that Northwest Farm Credit
8  is -- I was putting in for a loan personally before
9  that.
10      Q.  Right. But it --
11      A.  [Unintelligible.]
12      Q.  It sounded like you included in that this
13  list of equipment that's owned by IDC Enterprises.
14      A.  Yeah, I had everything. Everything
15  [unintelligible].
16      Q.  Okay. And then on the -- on your schedules
17  you have "unknown" for the amount of money owed to you
18  by Viking Lumber.
19          When is it that we will learn how much is
20  owed as hard money versus how much you're claiming for
21  the breach of contract? Do you know when you're going
22  to have those numbers for us?
23      THE WITNESS: Blair.
24      MR. CLARK: I don't know.
25      THE TRUSTEE: Okay.

---

Page 124

1      MR. CLARK: Gary, I'm not going to guess on
2  this.
3      THE TRUSTEE: Okay.
4      MR. CLARK: I can tell you one --
5      THE TRUSTEE: Okay.
6      MR. CLARK: Just hold on just half a second,
7  Gary. Mary Beth just told me that she sent you that
8  Farm Service stuff awhile back.
9      MARY BETH: [Unintelligible.]
10      MR. CLARK: It was after the debtor interview.
11      THE TRUSTEE: Okay. I'll go look for it. I
12  don't recall seeing it, but I'll look again.
13      MR. CLARK: Thank you.
14      Q.  (BY THE TRUSTEE): Also, if you -- when it
15  comes to payments made to you, directly to Jason
16  Lunders from IDC Enterprises, could I bother you to
17  look at QuickBooks again. There may be numerous checks
18  written out of IDC Enterprises accounts directly to
19  Jason Lunders. And I'd like to have you send me what
20  were identified from QuickBooks as those -- those
21  monies.
22      THE WITNESS: You got all that, Mary Beth?
23      MR. CLARK: We'll see what QuickBooks shows.
24  I'm not going to say that there is any or not. I don't
25  know.

---

Page 125

1      THE TRUSTEE: Okay. Yeah, that's all I can ask.
2          And that's all I have, Brett.
3      MR. CAHOON: Okay. Thanks, Gary.
4          Any last questions by any creditors?
5          All right. I don't hear any creditors
6  speaking up.
7          Thanks for your time. We're going to go
8  ahead and conclude this meeting.
9          (End of recording.)
10              -oOo-
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

In Re:
IDC Enterprises, Inc.

Audio Transcription

Transcript of Recorded 341(a) Meeting
March 31, 2020

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, JEFF LaMAR, CSR No. 640, Certified Shorthand

 4   Reporter, certify:

 5        That the audio recording of the proceedings were

 6   transcribed by me or under my direction.

 7         That the foregoing is a true and correct

 8   transcription of all testimony given, to the best of my

 9   ability.

10        I further certify that I am not a relative or

11   employee of any attorney or party, nor am I financially

12   interested in the action.

13        IN WITNESS WHEREOF, I set my hand and seal this

14   27th day of April, 2020.

15

16

17

18

19

20        _____

21              JEFF LaMAR, CSR NO. 640

22              Notary Public

23              Post Office Box 2636

24              Boise, Idaho 83701-2636

25   My commission expires December 30, 2023
```